1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  PEDRO RANGEL, | Case No.  1:18-cv-01713-ADA |
| 12             Petitioner, | <u>DEATH PENALTY CASE</u> |
| 13        v. | ORDER (1) DENYING CLAIMS I-XVIII; (2) DENYING PETITION FOR WRIT OF |
| 14  RON BROOMFIELD, Warden of San Quentin State Prison, | HABEAS CORPUS, and (3) ISSUING CERTIFICATE OF APPEALABILITY FOR |
| 15 | CLAIMS XIII-XIV |
| 16             Respondent.[1] | (Doc. No. 38) |
| 17 | CLERK TO VACATE ANY AND ALL SCHEDULED DATES AND |
| 18 | SUBSTITUTE RON BROOMFIELD AS RESPONDENT WARDEN AND ENTER |
| 19 | JUDGMENT |
| 20 | |
| 21 | |

22

## I. INTRODUCTION

23      Petitioner Pedro Rangel is a state prisoner, sentenced to death, proceeding with a

24  petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He is represented in this action

25  for all purposes by D. Jay Ritt, Esq., and Verna J. Wefald, Esq., who were appointed pursuant to

26  18 U.S.C. § 3599.

27

28  ---
[1] Pursuant to the Federal Rules of Civil Procedure, Rule 25(d), Ron Broomfield, Warden of San Quentin State Prison, shall be substituted as respondent in place of his predecessor wardens.

1    Respondent Ron Broomfield is named as Warden of San Quentin State Prison.  He is

2  represented in this action by Deputy Attorneys General Kenneth Sokoler and Sally Espinoza.

3    Before the court for a decision is the petition for writ of habeas corpus filed in this

4  proceeding on February 25, 2020, Claims I-XVIII.  (Doc. No. 38.)

5    Upon careful review of the parties' filings and the relevant case law and for the reasons

6  set out below, the undersigned finds that (1) Claims I-XVIII shall be denied on the merits, (2)

7  the petition shall be denied, and (3) a certificate of appealability shall issue only for Claims

8  XIII-XIV.

9                                    II. STATEMENT OF FACTS

10    This factual summary is taken from the California Supreme Court's summary of the

11  facts in its March 28, 2016 opinion on direct appeal.  The summary of facts is presumed correct

12  except to the extent inconsistent with the court's intrinsic review under 28 U.S.C. § 2254(d)(2).

13  (28 U.S.C. § 2254(e)(1); *see Kirkpatrick v. Chappell*, 950 F.3d 1118, 1131 (9th Cir. 2020), cert.

14  denied, 141 S. Ct. 561 (2020) ("Unlike § 2254(d), § 2254(e)(1)'s application is not limited to

15  claims adjudicated on the merits.  Rather, it appears to apply to all factual determinations made

16  by state courts."); *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004) *overruled on other*

17  *grounds by Cullen v. Pinholster*, 563 U.S. 170, 185, (2011), *as recognized by Ybarra v. Gittere*,

18  69 F.4th 1077, 1089 (9th Cir. 2023) (acknowledging Antiterrorism and Effective Death Penalty

19  Act ("AEDPA") deference to state court factual findings); *Vasquez v. Kirkland*, 572 F.3d 1029,

20  1031 n.1 (9th Cir. 2009) ("We rely on the state appellate court's decision for our summary of

21  the facts of the crime.")  Petitioner does not present clear and convincing evidence to the

22  contrary; thus, the court adopts the factual recitations set forth by the state supreme court.

23  *Vasquez,* 572 F.3d at 1031 n.1.

24        A. Guilt Phase

25        On the night of October 7, 1995, defendant, his son Pedro Rangel
          III (Little Pete),[1] Rafael Avila, and Richard Diaz drove to the
26        Madera home of Chuck Durbin in search of Juan Uribe.
          Defendant and Little Pete entered the home and shot and killed
27        Durbin and Uribe and wounded Durbin's wife Cynthia (Cindy)
          Durbin.

28

-----------------------------FOOTNOTE--------------------------------

n.1 At trial, the parties and witnesses referred to defendant as "Big Pete" and to his son as "Little Pete."

---------------------------END FOOTNOTE-----------------------------

Little Pete's case was severed from defendant's before trial. Avila fled after the crime but Diaz testified against defendant at trial.[2] Defendant was also linked to the crime by his statements and by ballistics evidence.

-----------------------------FOOTNOTE--------------------------------

n.2 Diaz testified before the jury that he pled guilty to violating Penal Code section 32 or accessory after the fact. He had not yet been sentenced but understood it was possible he would serve either prison time or time on probation and was required to tell the truth.

---------------------------END FOOTNOTE-----------------------------

1. Prosecution evidence

a. Events before the murders

On September 23, 1995, about two weeks before Uribe's murder, he and Martha Melgoza, the mother of his daughter, attended a baptism party at a Madera reception hall. They saw Little Pete arguing with Carlos Romero and David Varela. Uribe was good friends with both Little Pete and Varela. Jesse Candia, Varela's uncle, suggested Little Pete and Varela "fight and get it over with," but Varela refused, explaining Little Pete had a gun. Candia and Romero told Little Pete to leave the party, and Romero punched Little Pete in the face. Little Pete looked at Uribe and asked him, "[W]hat's up?" and "Juan, why don't you back me up?" Juan shook his head and said, "No" and "It was none of my business." Little Pete left in his BMW.

Little Pete told Richard Diaz he was upset with Uribe for not backing him up and wanted to get even. Little Pete, Diaz, and Florentino (Tino) Alvarez slowly drove by the baptism party in Little Pete's BMW but did not stop. Diaz described how "everybody started running" and "they shut the front doors."

Melgoza and Uribe left the party later that evening. As they drove, they were stopped by Little Pete and Tino Alvarez. When Uribe got out of the car to see what the men wanted, Alvarez asked him why he had hit Little Pete. Uribe denied hitting Little Pete, and said Little Pete should know who hit him. Alvarez punched Uribe.

Later that night, Varela was driving a friend home from the baptism party when he saw Uribe, Romero, and several others standing on the street. Little Pete drove by in his BMW with Diaz

3

in the front seat. Several shots were fired out of the passenger side of the BMW. As Varela drove away, more shots were fired. He noticed Little Pete's BMW behind him. A bullet grazed Little Pete's head.

On September 24, 1995, Jesse Rangel, defendant's nephew, who was living in Fresno, learned that his cousin Little Pete had been shot. Jesse[3] visited Little Pete in Madera. Tino Alvarez told Jesse that Juan Uribe had shot Little Pete. In retaliation, Jesse and Alvarez fired several bullets into Uribe's car. Jesse did not see Uribe or anyone else in the area, and there had been no discussion of shooting Uribe if they saw him. At trial, Jesse denied ever shooting at Uribe.

------------------------------FOOTNOTE---------------------------------

n.3  To avoid confusion, we refer to some Rangel family members by their first names.

--------------------------END FOOTNOTE-----------------------------

b. Events on the night of the murders

On October 7, 1995, Richard Diaz attended a barbecue at defendant's house. Little Pete and Rafael Avila, who were married to defendant's stepdaughter Endora Avila, also were there. Defendant was angry about his son "getting shot in the head" and spoke about "getting back" at Juan Uribe. Defendant said "he wasn't going to let anybody get away with shooting his son in the head," and wanted to go look for Uribe.

Defendant asked to borrow Avila's car but Avila told defendant he would drive because defendant "was too drunk." Defendant, Diaz, Little Pete, and Avila got into Avila's car. They drove to Uribe's house but did not see his car there. As they drove to a different location, they noticed Uribe's car parked across the street from victim Durbin's home on East Central Avenue in Madera. Durbin lived with his wife Cindy and three children, who were seven, six, and three years old. The Durbins also had three visitors that night, Juan Uribe, Alvin Areizaga, and Richard Fitzsimmons. Diaz saw people in the house and noticed that two children were watching television in the front room.

Defendant, Little Pete, and Diaz got out of the car, and Avila drove away slowly. About 10:00 p.m., Diaz stood across the street while defendant, armed with a .380–caliber weapon, and Little Pete, armed with a .22–caliber rifle, entered the house through an unlocked screen door.

Little Pete asked where Juan Uribe was. When Uribe appeared, Little Pete asked him: "What's up, Juan Uribe? What's up now?" He then shot and killed Uribe. Durbin ran through the living room but defendant grabbed him and shot him. From across the street, Diaz fired two shots through the living room window to encourage defendant and Little Pete to leave. Defendant and Little

Pete ran out of the house, and Diaz stopped Avila, who was driving by. The men got into the car and drove off. Little Pete said that he "got Juan Uribe" and thought he had killed him. Defendant said that he had shot Durbin because he thought he was "running to get a gun." Defendant accidentally fired two shots in the car while trying to unload his weapon.

Cindy Durbin, Chuck Durbin's wife, testified she heard a big bang and walked into the living room to check on her children. She saw two armed Hispanic men with dark hair and wearing baseball caps standing in the house; she was "80 to 90 percent sure" one of the men was defendant. The men began shooting and one or both "scream[ed]" they were "going to get" Juan and said "Juan was a traitor" and "now he was dead" or "going to die." Cindy ran into the kitchen where Chuck told her to hide. Chuck ran into the living room. When the shooting stopped, Uribe's bullet-ridden body was on top of Cindy. Cindy had been shot in the abdomen, and bullets had grazed her legs. She found Chuck with bullet holes in his head and neck on the living room floor. He raised his hands to his face and tried to speak but she could not understand him. She took their children into a bedroom and asked Areizaga to call 911.

c. Events after the murders

On the night of October 7, 1995, Endora Avila, defendant's stepdaughter and Rafael Avila's wife, was returning from a church revival when she saw Rafael's car "flying" across Yosemite Street in Madera. When Endora arrived home, Rafael was not there. Rafael came home later that night and "banged on the door like a cop." He was "[n]ervous" and pulled on his hair. His pants were wet almost to his knees. Rafael removed his clothes and threw them in the trash. Later that night Endora's stepbrother, Little Pete, "bang[ed] on the door" and he and Rafael argued. Endora did not see Rafael the next day, and had only seen him once since that night for about a 15–minute period.

Also on the night of October 7, 1995, during the 10:00 o'clock news, Jesse Rangel, who was in Fresno, received a telephone call from Little Pete. Little Pete told Jesse he "got Juan." Later that night, Jesse was awakened by a second call from Little Pete, who sounded drunk and was laughing. Little Pete said he had killed "Juan," and that defendant, "Richard, [and] Rafael" also were involved. Defendant then came on the line laughing and said he "put those motherfuckers on ice."

One night in October 1995, defendant gave Juan Ramirez, who was married to defendant's stepdaughter Deanna, a basket covered with bags and clothing and asked him to "do him the favor of throwing that away." Defendant also said they "had resolved their problem." When Ramirez disposed of the basket near a canal, he noticed it contained two weapons. He later showed police where the weapons were located. The weapons were a .380–caliber semiautomatic handgun, and a .22–caliber semiautomatic rifle. Ballistics testing revealed that the .380–caliber bullets found at

5

the crime scene and in Avila's car had been fired from the same gun and "probably" had been fired from the .380–caliber handgun. All sixteen .22–caliber casings found at the crime scene had been fired from the rifle. The rifle, or a similar weapon, had fired the .22–caliber bullets recovered from Uribe's and Durbin's bodies.

The day after the murders, Jesse Rangel, defendant, and Little Pete paid a surprise visit to defendant's brother, Frank Rangel, Sr. (Frank Sr.), and his son, Frank Rangel, Jr. (Frank Jr.), in Fresno. Frank Jr. had not seen defendant and Little Pete for about seven years.[4] During the visit, defendant told Frank Sr. that defendant and Little Pete "had went and done a shooting," and told Frank Jr. "[t]hey went to the house and shot the house up." Also during this visit, Little Pete described the shootings to Jesse, saying defendant had a .380–caliber handgun, Little Pete had a .22–caliber rifle, and Diaz had a .38–caliber handgun. "Rafael had dropped him off. They … walked to the house … [and] [h]e opened the door…. He went off in the house looking for Juan." Diaz stayed outside across the street. Little Pete "shot Juan." Chuck Durbin came out "from the side" and defendant "shot him in the head." Defendant later gave the guns to his stepdaughter's husband Juan to dispose of them.

------------------------------FOOTNOTE---------------------------------

n.4   Frank Jr. was granted use immunity for any action with respect to the case after October 7, 1995.

---------------------------END FOOTNOTE-----------------------------

During his visit to Fresno, defendant gave Frank Jr. a .38–caliber revolver and asked Frank Jr. to "hold this for me." Frank Jr. hid it outside, and later showed law enforcement officers where the gun was hidden. The gun "matched" the .38–caliber bullets found at the crime scene.

A few days after the murders, Erica Rangel, Jesse Rangel's wife, was in a motel room with defendant's wife Mary, defendant, Little Pete, and Jesse Rangel. Mary told defendant, "You're a murderer. And now my son is one, too." Defendant did not respond.

The prosecution introduced evidence of defendant's efforts to create an alibi. The prosecution introduced the testimony of Sanjeevider (Romi) Singh, who, at the time of the murders, was the boyfriend of defendant's stepdaughter, Carmina Garza, and owned a convenience store. Garza helped Singh manage the store. On October 8, 1995, defendant and Little Pete worked in Singh's store for about 45 minutes until about 10:20 p.m., where they were videotaped on the store security system. Garza mislabeled the tape October 7, 1995. While they were in Fresno visiting Frank Sr. and Frank Jr., Little Pete told Jesse Rangel he and defendant had made a video showing them working at the store, and that Singh was "supposed to switch the dates" on the tape so it looked like they were at the store mopping at the time of

the murders. Little Pete made a similar but less detailed statement to Diaz.

Defendant voluntarily spoke to police and his statement was played for the jury. He said that on October 7, 1995, the night of the murders, he and Little Pete left the barbecue to go to Romi Singh's convenience store. They arrived before 10:00 p.m., worked for 35 to 40 minutes in the store, and left sometime after 10:00 p.m. He agreed with the interviewing officer he would be "shock[ed]" to learn the videotape showing this activity was actually taped on October 8, 1995, and denied being in the store on that date.

The prosecution also introduced evidence of defendant's flight. The parties stipulated defendant worked at FMC Corporation from August 11, 1980, to October 16, 1995, when he voluntarily terminated his employment for personal reasons, and that defendant did not work from October 10 to October 15, 1995. Jerry Smith, who worked with defendant, testified that defendant had worked on Monday, October 9, 1995, the first Monday after the murders, but did not work after that date. On about October 16, 1995, defendant called Smith and asked for a one-year leave of absence. Smith told defendant he would refer the matter to the plant supervisor because he could not authorize the time off.

2. Defense evidence

Defendant introduced pretrial statements by Cindy Durbin, Richard Diaz, and others that differed from their trial testimony.

Richard Fitzsimmons testified he was in the Durbin kitchen on the night of the murders. He heard gunshots and saw two Hispanic males no more than 30 years old. He had used methamphetamine at the Durbin residence about 10 to 15 minutes before the attack. On cross-examination, Fitzsimmons said he only observed the men for a "[m]illisecond," the living room was dark except for the television, and agreed with the prosecutor it was possible he "just assumed they were younger." He claimed to have been shot during the attack, resulting in a bruise below his knee, but agreed with the prosecutor that a photograph showed that the injury was scarcely visible.

Madera Police Corporal Brian Ciapessoni testified that Cindy Durbin had picked Jesse Rangel's photograph out of a lineup as the shorter of the two assailants. On cross-examination, the corporal said Jesse Rangel closely resembled Jesse's cousin, Little Pete, and Cindy was never shown a photograph of defendant. Corporal Ciapessoni also testified that Diaz had a tentative agreement with the district attorney's office at the time he made his January 5, 1996, statement to police that if he fully cooperated and told the truth he would not serve time in custody.

Tino Alvarez denied shooting at Juan Uribe's car. Alvarez told police in late November 1995 that, earlier that month, Diaz had identified the shooters as Jesse Rangel and Juan Ramirez.

Jose Enriquez, defendant's father-in-law, testified by conditional examination because he was ill and his life expectancy was short. (Pen.Code §§ 1335, 1345.) Enriquez stated that after Little Pete was shot, Enriquez and defendant were conversing outside defendant's house. Jesse Rangel appeared and said, "Don't worry [uncle]. I'm going to take care of everything." He then pulled out a gun.

Christina Bowles, who considered defendant her father, testified that on the afternoon of October 6, 1995, the day before the murders, she saw Richard Diaz and Jesse Rangel together in a Jeep. Bowles was looking for Diaz so that she could "buy a dime of crank" from him as she frequently did. Diaz and Jesse picked her up and, while in the Jeep, she noticed a gun. Diaz explained the gun was to "[g]o get even," and either Diaz or Jesse added with "Juan Uribe." Bowles did not tell law enforcement about this encounter. At one point, she tried to tell investigating Madera Police Officer Benabente, "The ones that are your snitches are the ones that ... did it," and "they got the wrong people locked up," but he brushed her off. On cross-examination, Bowles was impeached by her recent theft of liquor.

B. Penalty Phase

1. Prosecution evidence

The prosecution presented victim impact testimony and relied on the circumstances of the crimes.

Martha Melgoza, the girlfriend of victim Juan Uribe and the mother of his young daughter, testified that she had been at Chuck Durbin's house on October 7, 1995. She left before the murders, and later heard about a shooting on East Central Avenue. She rushed back to Durbin's house, but was told by police that Uribe was dead. Her daughter missed Uribe, and believed she saw him "every place we go."

Maria Sanchez Guzman (Sanchez), Juan Uribe's mother, testified that Uribe was her first child. He and his girlfriend Melgoza lived with Sanchez. Uribe had a younger brother and was close to his three sisters. He took responsibility for the family by making sure they were fed and the bills were paid. Sanchez described learning something had happened to Uribe, going to East Central Avenue, and learning from police of his murder. For the first few weeks after his death, Sanchez wanted "to die myself." When Uribe's little sister saw his body at the funeral, she ran out crying and nearly ran into traffic. Shortly after Uribe's murder, the family moved to Tennessee.

Cindy Durbin, Chuck Durbin's wife, recounted the events on the night of the murders. She described telling Chuck that she loved him and did not want him to die. Chuck raised his hands to his head, and tried to talk, but only made noises. Only after responding paramedics told her Chuck was dead did she tell them she also had been shot because Chuck "was hurt worse than I

8

was." Telling their children their father was dead "was the hardest thing" she had ever done. The family received counseling; their daughter Natasha received more than the other children because she witnessed her father's murder. Natasha died from influenza about a year before Cindy's testimony. It was difficult to deal with her death without Chuck. Their son was slightly autistic, had a speech impediment, and for more than a year after Chuck's murder, would hide whenever the doorbell rang at night. He "still says he is looking for Chuck."

Ginger Colwell, Chuck's mother, testified she was close to Chuck and saw him every day. She described Cindy calling on the night of the murders and asking Colwell to pick up the children, seeing police cars when she arrived, and being told Chuck was all right. She took the children to her house. Natasha told Colwell, "[G]randmother, they were calling Juan a traitor." Colwell asked if Chuck said anything. Natasha said he told her to run and hide. Natasha put a pillow over her two siblings, and "pulled the covers up so they wouldn't get hurt." At 4:00 a.m. the next day, Colwell learned from her son Randy of Chuck's death.

Randy Durbin, Chuck Durbin's younger brother by two years and only sibling, testified that their mother was a single parent, and Chuck had therefore been a predominant male figure in Randy's life. Randy described hearing from his mother her concern that Chuck might have been shot, and going to Chuck's house and seeing him alone on the living room floor, but being barred by police from entering. Since Chuck's death, Randy had avoided being close to others because of a fear of losing them.

2. Defense evidence

Michael Percy testified he had worked side by side with defendant from 1980 when defendant was hired to work at FMC Corporation (FMC) until 1995. Percy was new in Madera, and defendant was the first person to befriend him. Defendant moved into a leadership role quickly at FMC because of his mechanical aptitude. He helped train other employees and was "[u]pbeat all the time." Percy never observed defendant to have a problem with any employee, and he was professional with customers. Percy described defendant as "one of the most easygoing persons I know." Although Percy could be difficult to work with, defendant had never shown anger.

Jerry Smith testified that he had worked with defendant at FMC for 15 years and that he had supervised him for a number of years. Defendant was a "[r]eal good man" and one of Smith's best friends. Defendant was a leader who was consistently patient and worked well with both mechanics and engineers. He fixed other employees' lawnmowers and chain saws without compensation.

Ronald Edwards testified that he worked with defendant at FMC from 1985 to 1995. For a time they were also neighbors. Edwards described one incident when Edwards was about to fight with a different neighbor and defendant calmed everyone down and told

9

Edwards, "[T]hat's not the right way to handle it."

The week after Little Pete was shot, defendant told Edwards what had happened and said he had talked to Little Pete about "how he is going to have to let this go. And just let bygones be bygones. [Defendant] was afraid something was going to happen to [Little Pete] even worse than what had already happened. He didn't want things to escalate any further."

Joe Rangel testified that he was defendant's youngest brother. Joe was 46 years old and defendant was about 51 years old. When Joe and defendant were children, the family worked in seasonal agriculture and struggled economically. They followed work from state to state, and had lived in Texas, Washington, Utah, and Arizona. When they moved to Madera, their father contracted tuberculosis, and was placed in a sanitarium. Defendant had finished only the eighth grade but dropped out of school without complaint to support the family. This sacrifice allowed Joe and a third brother to graduate from high school. About the time their father was able to work again, defendant joined the Navy. His service influenced Joe to join the Army National Guard after high school. In addition to FMC, defendant had worked for Madera Glass, Bob's Cyclery, and for a crop dusting firm. Once defendant married, he and Joe remained close but had little contact. Their respective families were not close.

Deanna Ramirez, defendant's stepdaughter, testified that defendant was loving and caring, and never referred to her as his stepdaughter but always as his daughter. He took her and her siblings to Magic Mountain and Santa Cruz, camping, the zoo, and to many restaurants and movies. He helped Deanna with her homework and was always involved in school activities. When she was about 26 years old, her biological father, whom she had never known, died. Defendant took her and her sister and mother to his funeral in Mexico. When Deanna's biological family excluded her and her sister at the funeral, defendant told them he loved them and he would always be their dad.

Deanna became pregnant at about 16 years of age, and the child's father left her. Deanna's mother threw her out of the house, but defendant urged her to come home and helped care for Deanna's child so that Deanna could finish high school. Deanna's daughter was now 12 years old and was close to defendant.

A family relative named Yolanda and her friend Roy, both of whom had Down's syndrome, also lived for many years with the family, and defendant treated them like everyone else. When Deanna was 16 years old, her four young cousins came to live with them because their mother had died. Defendant treated them as his children. On cross-examination, Deanna agreed with the prosecutor that defendant received payment apparently from the state for supporting these individuals.

Josephine Reyes testified that she had lived with defendant for about 16 years from the time she was about one year old.

10

1
2
3
4
5
6
7
8
9

Defendant treated her as his daughter. Josephine's biological father disowned her because her complexion was lighter than that of her sister. Defendant told Josephine he would always accept her and that he was there for her.

Angela Marie Chapa testified that although she and Little Pete were not married, she considered defendant her father-in-law. In 1993, when Angela became pregnant, she moved in with defendant and his wife. Defendant was emotionally and financially supportive, and treated Angela like a daughter. He frequently spent time with her daughter Alexis, and he and his wife often socialized with Angela and Little Pete. When Little Pete was shot, defendant cried both that night and the next day. On cross-examination, Angela said Little Pete was only in the hospital for a couple of hours, and did not require surgery but received stitches.

10  *People v. Rangel*, 62 Cal. 4th 1192, 1199–1207 (2016).

11                              III. PROCEDURAL HISTORY

12      On October 1, 1998, a jury in Madera County Superior Court Case No. M13413A found

13  petitioner guilty in counts one and two of first-degree murder (pursuant to Penal Code § 187(a))

14  for the October 7, 1995 killing of Juan Uribe and Chuck Durbin.[2]   (Doc. No. 22-3 at

15  AGO02324-29 [11 CT 2385-2390].)  The jury found true the special circumstance of multiple

16  murders (pursuant to Penal Code § 190.2(a)(3)).  (*Id.*)  The jury further found that petitioner had

17  personally used a firearm in the commission of the offense in count two (pursuant to Penal Code

18  § 12022.5(a)).  (*Id.*)

19      On October 13, 1998, the jury rendered a death verdict.  (Doc. No. 22-3 at AGO02373

20  [11 CT 2434]; Doc. No. 22-5 at AGO02824 [13 CT 2803].)

21      On February 8, 1999, the trial court imposed a judgment of death as to both murder

22  counts. (Doc. No. 22-5 at AGO02886-90 [13 CT 2865-2869].)  The court imposed but stayed

23  the sentence for the arming allegation.  (*Id.*).

24      On June 21, 2010, petitioner filed a petition for a writ of habeas corpus in California

25  Supreme Court case number S183606.  (Doc. No. 29 at AGO14214-456; Doc. No. 29-1 at

26  AGO14458-700.)

27

28  [2] Reference to state law is to California law.

11

1    On March 28, 2016, the California Supreme Court issued an opinion affirming the

2   judgment on direct appeal.  *Rangel*, 62 Cal. 4th 1192.

3    On November 28, 2018, the California Supreme Court denied on the merits and on

4   procedural grounds the habeas corpus petition in Case No. S183606 .  (Doc. No. 31-7  at

5   AGO16725.)

6    On December 14, 2018, petitioner began this federal habeas proceeding by filing an

7   application for leave to proceed *in forma pauperis* and request for appointment of counsel to

8   represent him.  (Doc. No. 1.)

9    On January 26, 2019, the court appointed counsel to represent petitioner for all purposes

10   in this proceeding.  (Doc. No. 10.)

11    On February 25, 2020, petitioner filed in this proceeding his 128-page §2254 habeas

12   corpus petition stating eighteen claims including argument and points and authorities, supported

13   by six exhibits.  (Doc. Nos. 38 through 38-6.)

14    On October 27, 2020, the respondent warden filed his answer to the petition, including

15   all substantive and procedural defenses, argument and points and authorities, totaling 76 pages.

16   (Doc. No. 43.)

17    On April 27, 2021, petitioner filed his reply to the answer, totaling 30 pages.[3]  (Doc.,

18   No. 45.)

19    IV. JURISDICTION

20    Relief by way of a petition for writ of habeas corpus extends to a person in custody

21   pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

22   or treaties of the United States.  28 U.S.C. §§ 2241(c)(3), 2254(a); *Williams v. Taylor*, 529 U.S.

23   362, 375 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the

24   U.S. Constitution.  The challenged conviction arises out of Madera County Superior Court,

25

26   ___

[3] Unless otherwise indicated, throughout this order, "SHCP" refers to the  State Habeas Corpus Petition; "CT"
refers to the Clerk's Transcript on appeal, "RT" refers to the Reporter's Transcript on appeal, and  "SCT" refers to
27   the Supplemental Clerk's Transcript on appeal.  Other miscellaneous transcripts are referenced by date.  Reference
to page numbering is to Electronic Court Filing System ("ECF") page numbering, unless otherwise specified.

28

1   which is located within the jurisdiction of this court.  28 U.S.C. §§ 2241(d), 2254(a).

2                              V. STANDARDS OF REVIEW

3        This action was initiated after April 24, 1996.  Therefore, the amendments to 28 U.S.C.

4   § 2254 enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996, 110 Stat.

5   1214 (hereinafter the "AEDPA"), apply.  *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Van Tran*

6   *v. Lindsey*, 212 F.3d 1143, 1148 (9th Cir. 2000), *overruled on other grounds by Lockyer v.*

7   *Andrade*, 538 U.S. 63, 71 (2003).

8        Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is

9   barred unless a petitioner can show that the state court's adjudication of his claim:

10

11           (1) [R]esulted in a decision that was contrary to, or involved an
             unreasonable application of, clearly established Federal law, as
12           determined by the Supreme Court of the United States; or

13           (2) [R]esulted in a decision that was based on an unreasonable
             determination of the facts in light of the evidence presented in the
14           State court proceeding.

15   28 U.S.C. § 2254(d); *see also Patsalis v. Shinn*, 47 F.4th 1092, 1097 (9th Cir. 2022) (citing

16   *Johnson v. Williams*, 568 U.S. 289, 292 (2013)) (quoting 28 U.S.C. § 2254(d)); *Harrington v.*

17   *Richter*, 562 U.S. 86, 98 (2011); *Lockyer*, 538 U.S. at 70-71; *Williams*, 529 U.S. at 413.

18        "[A] state has 'adjudicated' a petitioner's constitutional claim 'on the merits' for

19   purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the

20   basis of substance of the constitutional claim advanced, rather than denying the claim on the

21   basis of a procedural or other rule precluding state court review of the merits."  *Brown v.*

22   *Walker*, Case No. C 09-04663 JSW, 2014 WL 4757804 at *5 (N.D. Cal. Sept. 24, 2014) (citing

23   *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004)); *Kirkpatrick*, 950 F.3d at 1131 (citing

24   *Lambert*, 393 F.3d at 969).

25        "[A]n adjudication on the merits is 'a decision finally resolving the parties' claims . . .

26   that is based on the substance of the claim advanced, rather than on a procedural, or other,

27   ground.' " *Kirkpatrick*, 950 F.3d at 1131 (citing *Lambert*, 393 F.3d at 969).  When a petitioner

28   presents a federal claim "to a state court and the state court has denied relief," we presume that

                                        13

1   "the state court adjudicated the claim on the merits in the absence of any indication or state-law

2   procedural principles to the contrary." *Harrington*, 562 U.S. at 99.  This presumption applies

3   even when the state court resolves the federal claim in a different manner or context than

4   advanced by the petitioner so long as the state court "heard and *evaluated* the evidence and the

5   parties' substantive arguments."  *Johnson*, 568 U.S. at 302; *see also Sturgeon v. Chandler*, 552

6   F.3d 604, 611–12 (7th Cir. 2009) (holding that the constitutional claim was necessarily decided

7   on the merits even though state court only referred to statutory claim).

8         As a threshold matter, this court must "first decide what constitutes clearly established

9   Federal law, as determined by the Supreme Court of the United States."  *Lockyer*, 538 U.S. at

10  71 (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal law,"

11  this court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions

12  as of the time of the relevant state-court decision."  *Williams*, 529 U.S. at 412.  "In other words,

13  'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or

14  principles set forth by the Supreme Court at the time the state court renders its decision."  *Id.*  In

15  addition, the Supreme Court decision must "squarely address [] the issue in th[e] case;

16  otherwise, there is no clearly established Federal law for purposes of review under AEDPA."

17  *Moses v. Payne*, 555 F.3d 742, 754 (9th Cir. 2009) (quoting *Wright v. Van Patten*, 552 U.S.

18  120, 125 (2008)); *see also Panetti v. Quarterman*, 551 U.S. 930, 949 (2007); *Carey v.*

19  *Musladin*, 549 U.S. 70, 74 (2006).

20        If no clearly established Federal law exists, the inquiry is at an end and the court must

21  defer to the state court's decision.  *Carey*, 549 U.S. 70; *Wright,* 552 U.S. at 126; *Moses*, 555

22  F.3d at 760.  In addition, the Supreme Court has clarified that habeas relief is unavailable in

23  instances where a state court arguably refuses to extend a governing legal principle to a context

24  in which the principle should have controlled.  *White v. Woodall*, 572 U.S. 415, 425-26 (2014).

25  The Supreme Court stated: "[I]f a habeas court must extend a rationale before it can apply to the

26  facts at hand, then by definition the rationale was not clearly established at the time of the state-

27  court decision."  *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004)).

28        If the court determines there is governing clearly established Federal law, the court must

14

1   then consider whether the state court's decision was "contrary to, or involved an unreasonable

2   application of, [the] clearly established Federal law." *Lockyer*, 538 U.S. at 72 (quoting 28

3   U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ

4   if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

5   question of law or if the state court decides a case differently than [the] Court has on a set of

6   materially indistinguishable facts." *Williams*, 529 U.S. at 412-13; *see also Lockyer*, 538 U.S. at

7   72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite

8   in character or nature,' or 'mutually opposed.' " *Williams*, 529 U.S. at 405 (quoting Webster's

9   Third New International Dictionary 495 (1976)). "A state-court decision will certainly be

10  contrary to [Supreme Court] clearly established precedent if the state court applies a rule that

11  contradicts the governing law set forth in [Supreme Court] cases." *Id.*

12        "Under the 'reasonable application clause,' a federal habeas court may grant the writ if

13  the state court identifies the correct governing legal principle from [the] Court's decisions but

14  unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at

15  413. "[A] federal court may not issue the writ simply because the court concludes in its

16  independent judgment that the relevant state court decision applied clearly established Federal

17  law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411;

18  *see also Lockyer*, 538 U.S. at 75-76. "A state court's determination that a claim lacks merit

19  precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness

20  of the state court's decision." *Richter*, 562 U.S. at 101 (citing *Yarborough*, 541 U.S. at 664). In

21  Richter, the Supreme Court stated that:

22
23
24
> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.

25  *Id.* at 101-05. In other words, so long as fair-minded jurists could disagree on the correctness of

26  the state court's decision, the decision cannot be considered unreasonable. *Id.* at 98-99. In

27  applying this standard, "a habeas court must determine what arguments or theories supported . .

28  . or could have supported the state court's decision; and then it must ask whether it is possible

1    fair-minded jurists could disagree that those arguments or theories are inconsistent with the

2    holding in a prior decision of [the Supreme Court]." *Id.* at 101-03.  This objective standard of

3    reasonableness applies to review under both subsections of 28 U.S.C. § 2254(d).  *Hibbler v.*

4    *Benedetti*, 693 F.3d 1140, 1146-47 (9th Cir. 2012).  If the court determines that the state court

5    decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless

6    unavailable unless the error had a substantial and injurious effect on the verdict.  *Brecht v.*

7    *Abrahamson*, 507 U.S. 619, 637 (1993).

8        Where the state court has determined on direct appeal that an error was harmless beyond

9    a reasonable doubt - the standard required for review of non-structural constitutional errors

10   under *Chapman v. California*, 386 U.S. 18 (1967) - a petitioner must demonstrate that the court

11   applied *Chapman* in an objectively unreasonable manner.  A court may not grant habeas relief

12   unless petitioner satisfies both the AEDPA/*Chapman* test as well as the standard set out in

13   *Brecht*.  *Brown v. Davenport*, 142 S. Ct. 1510, 1517, 1520, 1524 (2022).

14        Petitioner has the burden of establishing that the decision of the state court is contrary to

15   or involved an unreasonable application of United States Supreme Court precedent.  *Baylor v.*

16   *Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on

17   the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether

18   a state court decision is objectively unreasonable.  *LaJoie v. Thompson*, 217 F.3d 663, 669 n.6

19   (9th Cir. 2000); *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999).

20        Furthermore, "review under § 2254(d)(1) is limited to the record that was before the

21   state court that adjudicated the claim on the merits," *Pinholster*, 563 U.S. at 181, and "evidence

22   introduced in federal court has no bearing on 2254(d)(1) review." *Id.* at 185.  "Factual

23   determinations by state courts are presumed correct absent clear and convincing evidence to the

24   contrary." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(e)(1)).

25   However, a state court factual finding is not entitled to deference if the relevant state court

26   record is unavailable for the federal court to review.  *Townsend v. Sain*, 372 U.S. 293, 319

27   (1963), *overruled by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), *superseded by statute as*

28   *stated in Shinn v. Ramirez*, 142 S. Ct. 1718, 1734 (2022).

1  AEDPA deference to the factual determinations of the state court pursuant to §

2  2254(e)(1) is available only if the state court acted reasonably within the meaning of §

3  2254(d)(2).  *Hurles v. Ryan*, 752 F.3d 768, 790 (9th Cir. 2014).  If a state court's fact-finding

4  process as to matters in the state record survives intrinsic review under § 2254(d)(2), then the

5  state court's fact-finding may be overturned based on new evidence presented for the first time

6  in federal court only if such new evidence amounts to clear and convincing proof, under §

7  2254(e)(1), that a state court finding is in error.  *Taylor*, 366 F.3d at 999-1000; *see also Leite v.*

8  *Anglea*, No. 17-CV-06707-YGR (PR), 2019 WL 1767337 at *5 (N.D. Cal. Apr. 22, 2019)

9  (citing *Taylor*, 366 F.3d at 1000) ("Significantly, the presumption of correctness and the clear-

10  and-convincing standard of proof only come into play once the state court's fact-findings

11  survive any intrinsic challenge; they do not apply to a challenge that is governed by the

12  deference implicit in the 'unreasonable determination' standard of § 2254(d)(2)."); *Mendez v.*

13  *Knowles*, 556 F.3d 757, 771 (9th Cir. 2009) (a state court factual determination entitled to

14  AEDPA deference unless it is unreasonable within the meaning of § 2254(d)(2)).

15  If a petitioner satisfies either subsection (1) or (2) of § 2254 for a claim, then the federal

16  court considers that claim *de novo*.  *Panetti*, 551 U.S. at 953 (when § 2254(d) is satisfied, "[a]

17  federal court must then resolve the claim without the deference AEDPA otherwise requires.");

18  *accord Frantz v. Hazey*, 533 F.3d 724, 737 (9th Cir. 2008).

19  In this case, some of petitioner's claims and allegations were raised and rejected by the

20  California Supreme Court on direct appeal while others were raised in his state habeas petition

21  to that court and summarily denied.  In the case of summary denial, where the state court

22  decision is unaccompanied by an explanation, "[t]he habeas petitioner's burden still must be

23  met by showing there was no reasonable basis for the state court to deny relief."  *Richter*, 562

24  U.S. at 98.  The Supreme Court stated that "a habeas court must determine what arguments or

25  theories supported or . . . *could have supported*, the state court's decision; and then it must ask

26  whether it is possible fair-minded jurists could disagree that those arguments or theories are

27  inconsistent with the holding in a prior decision of this Court."  *Id.* at 101-03 (emphasis added).

28  Petitioner bears "the burden to demonstrate that there was no reasonable basis for the state court

1    to deny relief." *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Richter*, 562 U.S.

2    at 98). "Crucially, this is not a *de novo* review of the constitutional question," *id.*, as "even a

3    strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.*

4    (*quoting Richter,* 562 U.S. at 102); *see also Murray v. Schriro*, 745 F.3d 984, 996-97 (9th Cir.

5    2014).

6          When reviewing the California Supreme Court's summary denial of a petition, this court

7    must consider that the California Supreme Court's summary denial of a habeas petition on the

8    merits reflects that court's determination that:

9
        [T]he claims made in th[e] petition do not state a prima facie case
10           entitling the petitioner to relief. It appears that the court generally
        assumes the allegations in the petition to be true, but does not
11           accept wholly conclusory allegations, and will also review the
        record of the trial ... to assess the merits of the petitioner's claims.

12   *Pinholster,* 563 U.S. 181 n.12 (quoting *In re Clark*, 5 Cal. 4th 750, 770 (1993)), *superseded by*

13   *statute as stated in In re Friend*, 11 Cal. 5th 720 (2021), *as modified* (Sept. 1, 2021); *see also*

14   *Williams*, 568 U.S. at 300-01 (holding that even where the state court does not separately

15   discuss a federal claim there is a presumption that that state court adjudicated the federal claim

16   on the merits); *Richter*, 562 U.S. at 99-100 (holding that "[§] 2254(d) does not require a state

17   court to give reasons before its decision can be deemed to have been adjudicated on the

18   merits."; *Montiel v. Chappell*, 43 F.4th 942, 957 (9th Cir. 2022) (citing *Pinholster*, 563 U.S. at

19   187) ("[s]ection 2254(d) applies even where there has been a summary denial[.]"); *Ochoa v.*

20   *Davis,* 50 F.4th 865, 888 (9th Cir. 2022) ("[A]ccordingly, we take this opportunity to make

21   explicit what has to this point been implicit: the California Supreme Court's summary denial of

22   Ochoa's claims - both certified and uncertified - is a decision on the merits and thus entitled to

23   AEDPA deference.").

24         Accordingly, if this court finds petitioner has unarguably presented a prima facie case

25   for relief on a claim, the state court's summary rejection of that claim would be unreasonable.

26   *Taylor*, 366 F.3d at 1000.

27         For any habeas claim that has not been adjudicated on the merits by the state court, the

28   federal court reviews the claim *de novo* without the deference usually accorded state courts

1  under 28 U.S.C. § 2254(d)(1).  *Fox v. Johnson*, 832 F.3d 978, 985 (9th Cir. 2016) (citing 28

2  U.S.C. § 2254(d)); *Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005); *Pirtle v. Morgan*,

3  313 F.3d 1160, 1167 (9th Cir. 2002).  For example, claims denied solely on procedural grounds

4  are reviewed *de novo*.  *Vang v. Nevada*, 329 F.3d 1069, 1072 (9th Cir. 2003).  In such instances,

5  however, the provisions of 28 U.S.C. § 2254(e) still apply.  *Pinholster,* 563 U.S. 185 ("Section

6  2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief.");

7  *Pirtle*, 313 F.3d at 1167–68 (stating that state court findings of fact are presumed correct under

8  § 2254(e)(1) even if legal review is *de novo*).

9       According to the Ninth Circuit:

> In a habeas corpus proceeding, we do not review a question of
> federal law decided by a state court "if the decision of that court
> rests on a state law ground that is independent of the federal
> question and adequate to support the judgment." *Coleman v.
> Thompson,* 501 U.S. 722, 729, 111 S. Ct. 2546, 115 L.Ed.2d 640
> (1991). This doctrine "applies to bar federal habeas review when
> the state court has declined to address the petitioner's federal
> claims because he failed to meet state procedural requirements."
> *McKenna v. McDaniel,* 65 F.3d 1483, 1488 (9th Cir.1995). If a
> petitioner has procedurally defaulted, we do not review the claim
> unless the petitioner "can establish cause and prejudice or that a
> miscarriage of justice would result in the absence of our review."
> *Moran v. McDaniel,* 80 F.3d 1261, 1270 (9th Cir.1996).

17  *Vang*, 329 F.3d at 1072.

> Procedural default is an affirmative defense. *Bennett v. Mueller,*
> 322 F.3d 573, 585 (9th Cir.2003). Generally, the state must assert
> the procedural default as a defense to the petition before the
> district court; otherwise the defense is waived. *Franklin v.
> Johnson,* 290 F.3d 1223, 1229 (9th Cir.2002). However, the
> district court retains discretion to consider the issue *sua sponte* if
> the circumstances warrant. *Boyd v. Thompson,* 147 F.3d 1124,
> 1128 (9th Cir.1998).
>
> In *Boyd,* we recognized that the district court may, *sua sponte,*
> raise the issue of procedural default when the default is obvious
> from the face of the petition and when recognizing the default
> would "further the interests of comity, federalism, and judicial
> efficiency." *Id.*

26  *Id.* at 1073.

27       A state procedural rule is "adequate" if it is "clear, consistently applied, and well-

28  established at the time of the petitioner's purported default."  *Id.* (citing *Calderon v. United*

1    *States Dist. Court,* 96 F.3d 1126, 1129 (9th Cir.1996)).

2        A state procedural bar is "independent" if the state court explicitly invokes the

3 procedural rule as a separate basis for its decision.  *McKenna v. McDaniel,* 65 F.3d 1483, 1488

4 (9th Cir. 1995).  For a state law ground to be "independent," it must not be interwoven with

5 Federal law.  *La Cross v. Kernan,* 244 F.3d 702, 704 (9th Cir. 2001).  A state court's decision is

6 not "independent" if the application of a state's default rule depends on a consideration of

7 Federal law.  *Park v. California,* 202 F.3d 1146, 1152 (9th Cir. 2000).  If the state court's

8 decision fails "to specify which claims were barred for which reasons," we have held that the

9 ambiguity serves to defeat the independence of the state procedural bar.  *Valerio v. Crawford,*

10 306 F.3d 742, 775 (9th Cir. 2002).

11                                           VI. PROCEDURAL BARS

12        Certain of petitioner's claims or aspects thereof were denied by the California Supreme

13 Court on the merits and as procedurally barred.  (Doc. No. 31-7 at  AGO16725.)  As to those

14 claims denied both on the merits and as procedurally barred, respondent has not invoked the

15 noted independent state ground doctrine, pursuant to which a federal court will not review a

16 question of Federal law decided by a state court "if the decision of that court rests on a state law

17 ground that is independent of the federal question and adequate to support the judgment."

18 *Vang*, 329 F.3d at 1069 (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).

19        In any event, since "cause and prejudice" can excuse a procedurally defaulted claim,

20 *Smith v. Baldwin*, 510 F.3d 1127, 1139 (9th Cir. 2007) (citing *Coleman*, 501 U.S. at 750), and

21 "prejudice" essentially requires a merits analysis, the court proceeds to the merits of claims

22 found to be procedurally defaulted, and reviews them *de novo* if denied solely on procedural

23 grounds, without determining whether the state procedural default is adequate and independent

24 to bar relief in federal court.  *Id.* (citing *Coleman*, 501 U.S. at 732-35); *see also Franklin v.*

25 *Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) (courts empowered to reach the merits if on their

26 face claims are clearly not meritorious despite asserted procedural bar); *Bell v. Cone*, 543 U.S.

27 447, 451 n.3 (2005) (an application for habeas corpus may be denied on the merits even if

28 unexhausted in state court); *Loggins v. Thomas*, 654 F.3d 1204, 1215 (11th Cir. 2011) (relief

1  may be denied on the merits where petition is clearly not meritorious despite asserted

2  procedural bar).

3    Additionally, the court will not consider petitioner's proffer in this proceeding of new

4  (non-record) evidence that was not before the state supreme court for claims that do not pass

5  through the § 2254(d) gateway. *Pinholster*, 563 U.S. at 181; (*see also* Doc. No. 38 at 18 citing

6  Ex.'s 1-6 thereto).

7    Even then, evidentiary development in federal court for claims that do pass through the

8  § 2254(d) gateway requires petitioner "clear the bar in §2254(e)(2) for expanding the state court

9  record, or show that the bar was somehow inapplicable." *Shoop v. Twyford*, 142 S. Ct. 2037,

10  2044 (2022) (citing *Pinholster*, 563 U. S. at 186) ("**[A]**lthough state prisoners may occasionally

11  submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly

12  discourage them from doing so."); *see also Williams*, 529 U. S. at 437 ("Federal courts sitting in

13  habeas are not an alternative forum for trying facts and issues which a prisoner made

14  insufficient effort to pursue in state proceedings."); *Shinn*, 142 S. Ct. at 1730 ("[O]nly rarely

15  may a federal habeas court hear a claim or consider evidence that a prisoner did not previously

16  present to the state courts in compliance with state procedural rules.").  Petitioner's argument

17  that this new evidence does not "change the nature of [his federal] Claims" for purposes of

18  exhaustion, is not authority otherwise.  (Doc. No. 38 at 18 and cases cited therein.)

19    To the extent claims already adjudicated were later denied on procedural grounds, the

20  court finds these claims remain ripe for federal adjudication.  *Cone*, 556 U.S. 449, 466-67

21  (2009); *see also Forrest v. Vasquez*, 75 F.3d 562, 564 (9th Cir. 1996) (applying look through

22  doctrine to *Waltreus* bars); *Kim v. Villalobos*, 799 F.2d 1317, 1319 n.1 (9th Cir. 1986) (applying

23  look through doctrine to *Miller* bars).

24  VII. PRELIMINARY MATTERS

25    The court takes judicial notice of the certified record on appeal to the California

26  Supreme Court, all documents on file in the California Supreme Court in the case of *People v.*

27  *Rangel*, California Supreme Court Case No. S076785, and all declarations, witness statements,

28  and records filed on petitioner's behalf in his habeas corpus proceeding before the California

1   Supreme Court (*In re Rangel*, California Supreme Court Number(s) S183606), as lodged with

2   this court.[4]

3   VIII. REVIEW OF CLAIMS

4   A.    Jury Selection Claims

5        *1.    Claim I.*

6        Petitioner alleges that the trial court erred by refusing to strike two prospective (and

7   ultimately empaneled) jurors who had a relationship with relatives of victim Chuck Durbin,

8   denying him a fair trial before an impartial jury, violating his rights under the Sixth and

9   Fourteenth Amendments.  (Doc. No. 38 at 54-56.)

10                a.    State Court Direct and Collateral Review

11       Claim I allegations were raised on direct appeal (Doc. No. 28-11 at AGO13510-17), and

12  denied on the merits, as follows:

13                Retention of Jurors No. 9 and No. 12

14                After jury selection and before opening statements, Jurors No. 9
15                and No. 12 came forward regarding their relationships with
                  potential trial witnesses. Defendant contends that the trial court
16                erred in failing to discharge these jurors. We disagree.

17                a. Juror No. 9

18                After the jury was sworn and before opening statements, Juror
                  No. 9 contacted the trial court and said she was acquainted with
19                Randy Durbin, who, counsel explained, was the brother of victim
                  Chuck Durbin. In a hearing outside the presence of the jury, Juror
20                No. 9 said that about four years earlier, Randy Durbin had, on
                  occasion, apparently been her substitute water aerobics instructor
21                at the Madera Athletic Club. The juror's husband was currently
                  taking a class taught by Randy Durbin at Madera College, and
22                Juror No. 9 had "attended a few of the classes." The court asked
                  whether "[a]nything about that would have any effect on your
23                ability to be fair and impartial to both sides in this case?" She
                  replied, "No, I don't think so. I just wanted everybody to be aware
24                of that."

25                Defense counsel noted that Randy Durbin might be a witness at
                  the penalty phase, and asked Juror No. 9 if she was aware Randy
26                and victim Chuck Durbin were brothers. She replied, "Right."
                  Counsel asked, "When it comes down to the penalty phase, the
27                fact that you have had a past and what appears to be [an] ongoing

28  ─────────────
    [4] Petitioner, in his federal petition, incorporates the state record.  (Doc. No. 38 at 18, citing *People v. Rangel*, S076785; *In re Rangel*, S183606.)

relationship with Randy Durbin, do you feel that that would affect you in any way in the penalty phase?" Juror No. 9 replied: "No, I don't think so. We are not personal friends or anything. And I am not going to go to class anymore because of that. So nothing comes of it." Neither counsel had any further questions.

Defendant then moved to reopen jury selection, use a peremptory challenge on Juror No. 9, and have her replaced by an alternate. Defense counsel said that on voir dire it had been "a very close question whether we were going to use a peremptory challenge" because of Juror No. 9's "background and many of her family members being in the correctional area." Defense counsel said: "I am not saying [Juror No. 9] intentionally kept from us this information" because "if that were the case, she wouldn't have told us now. However, it seems rather incredible to me given her relationship with Randy, that it didn't come out during voir dire. And there was every opportunity for it to come out."

The court ruled that Juror No. 9 could not be removed unless she was "disqualif[ied]," and there was no basis for doing so. The court stated: "She is not personal friends with this Randy Durbin. Apparently he went to the same gym she did four years ago. And apparently this Randy Durbin teaches her husband. And she had gone to class a couple of times with him. There's no relationship there whatsoever.... And she has indicated it would have no effect." Defendant then "challenged" Juror No. 9 for cause, in essence moving to discharge her for cause, asserting there was no reason for Juror No. 9 not to have brought up the issue on voir dire. The court denied the challenge, stating: "Well, she certainly didn't intentionally mislead counsel, [or] the court in voir dire. This person was not somebody that she is so well acquainted with she would necessarily recall that she knew who he was. And there's no evidence of any personal relationship.... So I see no bias or prejudice. She seems to be forthright in bringing that to our attention." The court stated that its ruling was "without prejudice to renewing your motion upon looking further into her background or upon" legal research.[5] Defendant did not renew the motion. Randy Durbin testified at the penalty phase.

------------------------------FOOTNOTE--------------------------------

n.5 The trial court actually said that its ruling was "not without prejudice to renewing [the] motion," but in context it is apparent the court meant "without prejudice to renewing [the] motion."

---------------------------END FOOTNOTE-----------------------------

Penal Code section 1089 " 'authorizes the trial court to discharge a juror at any time before or after the final submission of the case to the jury if, upon good cause, the juror is "found to be unable to perform his or her duty." ' " (Nunez and Satele, supra, 57 Cal.4th at p. 55, 158 Cal.Rptr.3d 585, 302 P.3d 981.) " '[W]hen a trial court's denial of a motion to discharge a juror is supported by

23

substantial   evidence,   it   will   be   upheld.' " (People   v. Maciel (2013) 57 Cal.4th 482, 543, 160 Cal.Rptr.3d 305, 304 P.3d 983 (Maciel ).)

Substantial evidence supports the trial court's ruling here. The court, which was in a position to observe Juror No. 9's demeanor, found no evidence of disqualifying bias. Nor does anything in Juror No. 9's conduct—contacting the court right after voir dire and before opening statements to mention she knew Randy Durbin—or her subsequent voir dire statements reveal actual bias. (See Maciel, supra, 57 Cal.4th at pp. 543–544, 160 Cal.Rptr.3d 305, 304 P.3d 983 [upholding denial of motion to discharge juror who worked at the same jail as two anticipated penalty phase witnesses, where the trial court found the juror appeared to be honest based on his answers and demeanor and there was no evidence he had prejudged any issue]; People v. McPeters (1992) 2 Cal.4th 1148, 1174–1175, 9 Cal.Rptr.2d 834, 832 P.2d 146 [upholding denial of motion to remove juror where trial court found juror's nondisclosure inadvertent and no bias on his part].)

Juror No. 12

Juror No. 12 said she had known a Ginger Colwell, who, counsel explained, was the mother of victim Chuck Durbin. Juror No. 12 said her sister-in-law's brother had married "this Ginger Colwell," and that Juror No. 12 had not spoken to her in at least 15 years. The trial court asked, "So the fact that she may testify in this case would not have any effect on your ability to fairly decide the case?" Juror No. 12 replied, "No." The court invited inquiry and both parties replied, "No questions."

Defendant did not move for discharge of Juror No. 12. The claim is therefore forfeited on appeal. (See People v. Coffman and Marlow (2004) 34 Cal.4th 1, 47–48, 17 Cal.Rptr.3d 710, 96 P.3d 30 [failure to challenge for cause purportedly biased jurors "forfeit[s] any appellate claim of error in the seating of those jurors"].) In any event, defendant merely mentions Juror No. 12's statements concerning her prior relationship to Ginger Colwell, without making any attempt to explain how her statements demonstrate disqualifying bias. No such bias is apparent from the record.

*Rangel*, 62 Cal. 4th at 1210–12.

b.   Legal Standard

(i)   *Trial Court Error*

Trial court error violates due process where it renders the resulting criminal trial fundamentally unfair. *Chambers v. Mississippi*, 410 U.S. 284, 294, 303 (1973).

"Federal habeas petitioners are not entitled to habeas relief based on trial error unless

24

1  they can establish that it resulted in actual prejudice." *Davis v. Ayala*, 576 U.S. 257, 267 (2015)

2  (quoting *Brecht*, 507 U.S. at 637).   "Under this test, relief is proper only if the federal court has

3  grave doubt about whether a trial error of federal law had substantial and injurious effect or

4  influence in determining the jury's verdict." *Id.* at 267–68 (quoting *O'Neal v. McAninch*, 513

5  U.S. 432, 436 (1995)); *see also Beardslee v. Brown,* 393 F.3d 1032, 1041-44 (9th Cir. 2004)

6  (applying *Brecht's* harmless error test to an Eighth Amendment error based on the improper

7  consideration of invalid aggravating factors); *Sansing v. Ryan*, 41 F. 4th 1039, 1050 (9th Cir.

8  2022) (a federal habeas petitioner must show actual prejudice, i.e. a "substantial and injurious

9  effect or influence" on the outcome, and satisfy AEDPA); *Davenport*, 142 S. Ct. at 1520 (a state

10  prisoner should not receive federal habeas relief based on trial error unless he can show the

11  error had a "substantial and injurious effect or influence" on the verdict under *Brecht*, and

12  satisfy AEDPA).

13                    *(ii)      Trial by a Fair and Impartial Jury*

14         The Sixth Amendment secures to criminal defendants the right to trial by a fair

15  and  impartial jury. *Skilling v. United States*, 561 U.S. 358, 377-78 (2010); *Irvin v. Dowd*, 366

16  U.S. 717, 722 (1961).  The Due Process Clause of the Fourteenth Amendment independently

17  requires the impartiality of any jury empaneled to try a cause.  *Morgan v. Illinois*, 504 U.S. 719,

18  726 (1992); *see also McDonough Power Equipment v. Greenwood*, 464 U.S. 548, 554 (1984),

19  (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)).

20         The standard of "actual prejudice" examines the jury voir dire to determine if,

21  notwithstanding jurors' assurances of impartiality, the record compels an inference that jurors

22  were not impartial. *Murphy v. Florida*, 421 U.S. 794, 799-803 (1975).

23         A court must determine from the record of voir dire if the jurors demonstrated actual

24  partiality or hostility which could not be set aside.  *See Fetterly v. Paskett,* 163 F.3d 1144, 1147

25  (9th Cir. 1998) (examining jurors' responses during voir dire and finding no substantial

26  evidence of actual prejudice).

27                    c.      Analysis

28                    *(i)      Juror No. 9*

1    Petitioner argues that trial court erred by refusing post-empanelment peremptory

2    challenge, and by failing to discharge Juror No. 9 on grounds her jury questionnaire, voir dire

3    responses, and disclosure of a relationship with penalty phase prosecution witness Randy

4    Durbin, victim Chuck Durbin's brother, showed bias.  (Doc. No. 38 at 54-56 citing Civ. Proc.

5    Code §§ 233, 234; Pen. Code, § 1089; *People v. Cottle*, 39 Cal.4th 246, 254-255 (2006); *see*

6    *also* Doc. No. 22-3 at 100.)

7    The record reflects Randy Durbin's testimony during the penalty phase that his older

8    brother Chuck was like a father figure to him; and that Randy had a hard time getting close to

9    people since his brother's death.  (Doc. No. 27-9 at AGO12430, AGO12440) (10 RT 2393,

10   2403).)

11   However, the state supreme court reasonably denied the Claim for the reasons stated by

12   that court and those discussed below.

13                                   (1)    Peremptory Challenge

14   Petitioner argues Juror No. 9 was subject to peremptory challenge after empanelment.

15   The record reflects that, after Juror No. 9 was empaneled and upon her disclosure of a

16   relationship with trial witness Randy Durbin (discussed below), trial counsel attempted

17   peremptory challenge and  replacement with an alternate.  (Doc. No. 38 at 55 citing Doc. No.

18   27-3 at AGO10817-19 (4 RT 852-854).)   Respondent objected that the time for peremptory

19   challenge had passed, and the trial court refused any peremptory challenge.  (*Id.*)

20   The state supreme court reasonably could find no error in this regard.  The controlling

21   state law precluded peremptory challenge of already sworn jurors.  *Cottle*, 39 Cal. 4th at 254-58

22   (citing Code Civ. Proc. §§ 226, 231, 233) (trial court has no discretion to reopen jury selection

23   after the jury is sworn.)  Petitioner has not provided state law authority and entitlement to

24   reopen jury selection after the jury has been sworn.  (*See* Doc. No. 38 at 56.)

25                                   (2)    For Cause Challenge

26   Petitioner argues that Juror No. 9 should have been removed "for cause" because she

27   could not be impartial.  He argues the above discussed pre-empanelment evidence of bias,

28   combined with her post-empanelment revelation of a relationship with Randy Durbin,

1   demonstrated disqualifying bias.  He argues that had Juror No. 9 been honest in responding to

2   voir dire, her disqualification for cause would have been established.  (Doc. No. 45 at 11 citing

3   *McDonough Power Equipment, Inc.*)  He observes the "multiple personal interactions" Juror

4   No. 9 and her husband had with Randy Durbin (*id.*); that Randy had been her occasional

5   substitute water aerobics instructor four years earlier and that her husband was then taking class

6   from Randy and she had attended a few of the classes (Doc. No. 38 at 54 citing Doc. No. 27-3 at

7   AGO10811-15 (4 RT 846-850).)  He points out that Randy's name was mentioned orally during

8   voir dire such that Juror No. 9 should have been aware of his involvement in the trial, even

9   though Randy was not on the witness list presented to prospective jurors.  (Doc. No. 38 at 54

10  citing Doc. No. 27-3 at AGO10814-15 (4 RT 849-850).)

11      As noted, the trial court refused petitioner's peremptory and for cause challenges to

12  Juror No. 9 and his request for replacement with an alternate.  (*See* Doc. No. 38 at 55 citing

13  Doc. No. 27-3 at AGO10817-19 (4 RT 852-854).)  That court found Juror No. 9 had no reason

14  to disclose her relationship with Randy Durbin during voir dire (Doc. No. 38 at 55 citing Doc.

15  No. 27-3 at AGO10818-19) (4 RT 853-854)), and that there was no personal relationship

16  between them and no indication of bias or prejudice that would support disqualification (*id.*

17  citing Doc. No. 27-3 at AGO10818-20 (4 RT 853-855)).  Based thereon, the trial court ruled

18  there was not sufficient evidence to disqualify Juror No. 9, but did so without prejudice to

19  counsel's renewing the motion at a later time.  (*Id.*)

20      Here, the state supreme court reasonably could find the trial court, being in the best

21  position to judge Juror No. 9's demeanor, did not err in finding counsel's belated peremptory,

22  and "for cause" challenges lacking in merit, and thereupon finding Juror No. 9 not disqualified

23  on the basis of bias.  Petitioner failed to show both that Juror No. 9 responded dishonestly

24  during voir dire and that a correct response would have been a basis for a "for cause" challenge.

25  *See e.g., Rangel*, 62 Cal. 4th at 1211; (*see also* Doc. No. 43 at 28 citing *McDonough Power*

26  *Equipment, Inc.*, 464 U.S. at 554-56) (to obtain a new trial where a juror provides a mistaken

27  though honest answer during voir dire, a party must show the juror failed to answer honestly a

28  material question, and a correct response would have provided a valid basis for a challenge "for

cause.").)

Thus, the state supreme court reasonably could find the fairness of petitioner's trial was not affected by any partiality of Juror No. 9.  *See McDonough Power Equip, Inc.*, 464 U.S. at 585.  Especially so, as Juror No, 9 stated on the record that her relationship with Randy Durbin would not affect her judgment at the penalty phase.  (Doc. No. 38 at 54 citing Doc. No. 27-3 at AGO10815-16 (4 RT 850-851).)

Moreover, this case is factually distinct from those cases relied upon by petitioner wherein the undisclosed evidence indicated juror bias.  (Doc. No. 38 at 56 citing *Williams*, 529 U.S. at 442 (juror's failure to disclose that she had once been married to the prosecution's lead witness, a deputy sheriff, and that the prosecutor had once been her attorney)); *Phillips*, 455 U.S. at 217, 219-221 (juror's failure to disclose that she had an employment application pending with the prosecutor's office); *Conway v. Polk*, 453 F.3d 567, 584-585, 591 (4th Cir. 2006) (juror's failure to disclose that she was a double first cousin of important prosecution witness).

Petitioner argues that Juror No. 9's jury questionnaire and voir dire responses provided a basis for challenging her impartiality before empanelment.   (Doc. No. 38 at 56 citing *McDonough Power Equip, Inc,* 464 U.S. at 556.)  He points to Juror No. 9's juror questionnaire responses where she stated that death was the only appropriate punishment for murder and that the death penalty was not used enough.  (Doc. No. 38 at 54 citing Doc. No. 23-1 at AGO03100-01 (14 RT 3063-64).)

However, petitioner concedes that Juror No. 9 was rehabilitated somewhat during voir dire, where she said she would not automatically vote for the death penalty; and that she could make that decision after weighing the factors presented to her.  (Doc. No. 38 at 54 citing Doc. No. 27-2 at AGO10553 (3 RT 598).)  Moreover, the state supreme court reasonably could find counsel failed to challenge Juror No. 9 on such grounds during voir dire, even though peremptory challenge remained available to counsel.   (*See* Doc. No. 27-3 at AGO10817 (4 RT 852).)

Petitioner argues Juror No. 9's voir dire responses showed bias in favor of law enforcement and against him.  He observes Juror No. 9's disclosure during voir dire that she had

1   friends in law enforcement (Doc. No. 38 at 54 citing Doc. No. 23-1 at AGO03088 (14 CT

2   3051)), and family members who worked in corrections; and that she was concerned they could

3   be harmed should it become known she was on the petitioner's jury (Doc. No. 38 at 54 citing

4   Doc. No. 27-2 at AGO10554 (3 RT 599)).

5   However, petitioner concedes trial counsel did not challenge Juror No. 9 on such

6   grounds. (Doc. No. 38 at 55 citing Doc. No. 27-3 at AGO10817 (4 RT 852).)  Moreover, Juror

7   No. 9 seemingly abandoned these concerns when informed by the trial court that her personal

8   information would be maintained by the court in confidence (*see* Doc. No. 27-2 at AGO10554-

9   55); thereupon Juror No. 9 agreed that she could be a fair and impartial juror (*id.*).

10   Finally, the state supreme court reasonably could reject petitioner's argument that the

11   state court's recitation of facts is not presumptively correct (under 28 U.S.C. § 2254(e)(1)) on

12   grounds that court made unspecified material misstatements.  (Doc. No. 45 at 11-12 citing

13   *Burton v. Davis*, 816 F.3d 1132, 1155-59 (9th Cir. 2016); *Maxwell v. Roe*, 628 F.3d 486, 504-05

14   (9th Cir. 2010); *Taylor*, 366 F.3d at 1000 (citing *Miller-El*, 537 U.S. at 346).)  The Claim fails

15   to pass through the § 2254(d) gateway for the reasons stated, and thus § 2254(e)(1)) continues

16   in effect.

17   *(ii)     Juror No. 12*

18   (1)     For Cause Challenge

19   Petitioner argues that the trial court erred by failing to discharge empaneled Juror No. 12

20   for bias upon her disclosure that her sister-in-law's brother had been married to penalty phase

21   witness Ginger Colwell, Chuck Durbin's mother.  (Doc. No. 38 at 54-56 citing Doc. No. 27-3 at

22   AGO10813-15 (4 RT 849-50); Civ. Proc. Code §§ 233, 234; Pen. Code, § 1089; *Cottle*, 39

23   Cal.4th at 254-255; *see also* Doc. No. 22-3 at 100.)

24   Ginger Colwell provided victim impact testimony at the penalty phase, that she was

25   "very close" to her son Chuck; saw him every day; and depended on him for everything.  (Doc.

26   No. 38 at 55 citing Doc. No. 27-9 at AGO12472-73 (10 RT 2434-35).)

27   However, the state supreme court reasonably could find that the trial court reasonably

28   refused to disqualify Juror No. 12.  The record reflects that Juror No. 12 had not spoken to

1  Colwell for at least fifteen years.  (Doc. No. 38 at 55 citing Doc. No. 27-3 at AGO10814 (4 RT

2  849).)  Juror No. 12 expressly denied this relationship would impact her ability to fairly decide

3  the case.  (Doc No. 27-3 at AGO10814 (4 RT 849).)  As the state supreme court observed:

> The trial court asked, "So the fact that she may testify in this case
> would not have any effect on your ability to fairly decide the
> case?" Juror No. 12 replied, "No." The court invited inquiry and
> both parties replied, "No questions."

7  *Rangel*, 62 Cal. 4th at 1212.  Nor did trial counsel challenge Juror No. 12 on this ground

8  when given the opportunity by the trial court.  (Doc No. 27-3 at AGO10814 (4 RT 849);

9  *see also* Doc. No. 38 at 55.)  The state supreme court observed that:

> Defendant did not move for discharge of Juror No. 12. The claim is therefore
> forfeited on appeal. (See People v. Coffman and Marlow (2004) 34 Cal.4th 1, 47–
> 48, 17 Cal.Rptr.3d 710, 96 P.3d 30 [failure to challenge for cause purportedly
> biased jurors "forfeit[s] any appellate claim of error in the seating of those
> jurors"].) In any event, defendant merely mentions Juror No. 12's statements
> concerning her prior relationship to Ginger Colwell, without making any attempt
> to explain how her statements demonstrate disqualifying bias. No such bias is
> apparent from the record.

15  *Rangel*, 62 Cal. 4th at 1212.

16      Here again,  the state supreme court reasonably could find the trial court was best

17  situated to judge Juror No. 12's demeanor and did not err in finding counsel's "for cause"

18  challenge lacking in merit.  Particularly, that court reasonably could find  petitioner failed to

19  show  that Juror No. 12 responded dishonestly during voir dire; that a correct response would

20  have a basis for a "for cause" challenge; and that the fairness of petitioner's trial was not

21  affected by partiality of Juror No. 12.  *See e.g., Rangel*, 62 Cal. 4th at 1212; *McDonough Power*

22  *Equipment, Inc.*, 464 U.S. 548, 554-56, 585.  As discussed above, the cases relied upon by

23  petitioner wherein there was undisclosed evidence indicating juror bias are distinguishable on

24  their facts.  (Doc. No. 38 at 56 citing *Williams*, 529 U.S. at 442; *Phillips*, 455 U.S. at 217, 219-

25  221; *Conway*, 453 F.3d at 584-585, 591.)

26          d.    Conclusions

27      A fair-minded jurist could find the state supreme court's denial of the Claim was not

28  contrary to, or an unreasonable application of, clearly established Federal law, as determined by

1    the Supreme Court, or based on an unreasonable determination of the facts in light of the

2    evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

3         Claim I shall be denied.

4    B.   Claims Alleging Ineffective Assistance of Counsel – Guilt Phase

5         *1.    Claim XI*

6         Petitioner alleges that counsel was ineffective by failing to present testimony from an

7    expert on alcohol impairment, violating his rights under the Sixth and Fourteenth Amendments.

8    (Doc. No. 38 at 85-89.)

9              a.    State Court Direct and Collateral Review

10        Claim XI allegations were raised in the state habeas petition (Doc. No. 29-1 at

11   AGO14476-81), and summarily denied on the merits (Doc. No. 31-7 at  AGO16725).

12             b.    Legal Standard

13                  *(i)    Ineffective Assistance of Counsel*

14        "The Sixth Amendment right to counsel in a criminal trial includes 'the right to the

15   effective assistance of counsel.' "  *Summerlin v. Schriro*, 427 F.3d 623, 629 (9th Cir. 2005) (*en

16   banc*) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).  The Sixth Amendment

17   right to effective assistance of counsel, applicable to the states through the Due Process Clause

18   of the Fourteenth Amendment, applies through the sentencing phase of a trial.  *Murray*, 745

19   F.3d at 1010–11 (citing U.S. Const. amend. VI; U.S. Const. amend. XIV, § 1; *Gideon v.

20   Wainwright*, 372 U.S. 335, 343-45 (1963); *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir.

21   2002)).

22        The Sixth Amendment standard for analyzing an ineffective assistance of counsel claim

23   is well established.  In order to prevail on a claim of ineffective assistance of counsel, a

24   petitioner must show that his trial counsel's performance "fell below an objective standard of

25   reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional

26   errors, the result of the proceeding would have been different."  *Strickland v. Washington*, 466

27   U.S. 668, 687-88, 694 (1984); *see also Carter v. Davis*, 946 F.3d 489, 502–03 (9th Cir. 2019)

28   (under *Strickland*, a petitioner must show counsel's deficient performance under prevailing

31

1  professional norms and resulting prejudice).

2              (1)     Deficient Performance

3         Under the first prong of the *Strickland* test, a petitioner must show that counsel's

4  conduct failed to meet an objective standard of reasonableness.  *Strickland*, 466 U.S. at 687;

5  *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).  There is "a 'strong presumption' that counsel's

6  representation was within the 'wide range' of reasonable professional assistance."  *Richter*, 562

7  U.S. at 104  (quoting *Strickland*, 466 U.S. at 689); *see also Sanders v. Ratelle*, 21 F.3d 1446,

8  1456 (9th Cir. 1994).  A petitioner must rebut this presumption by demonstrating that his

9  counsel's performance was unreasonable under prevailing professional norms and was not the

10  product of sound trial strategy.  *Strickland*, 466 U.S. at 688-89; *see also United States v.*

11  *Quintero-Barraza*, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's

12  performance is highly deferential, and thus the court must evaluate counsel's conduct from his

13  perspective at the time it occurred, without the benefit of hindsight.  *Strickland*, 466 U.S. at 689;

14  *see also Pinholster*, 563 U.S. at 196 (the court is to "affirmatively entertain the range of

15  possible reasons counsel may have had for proceeding as they did.").

16         The Supreme Court has "declined to articulate specific guidelines for appropriate

17  attorney conduct and instead ha[s] emphasized that '[t]he proper measure of attorney

18  performance remains simply reasonableness under prevailing professional norms.' "  *Wiggins*,

19  539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688).  However, "general principles have

20  emerged regarding the duties of criminal defense attorneys that inform [a court's] view as to the

21  'objective standard of reasonableness' by which [a court must] assess attorney performance,

22  particularly with respect to the duty to investigate."  *Summerlin*, 427 F.3d at 629.  For instance,

23  "strategic choices made after thorough investigation of law and facts relevant to plausible

24  options are virtually unchallengeable."  *Strickland*, 466 U.S. at 690.  However, the Supreme

25  Court has explained,

26              [S]trategic choices made after less than complete investigation are
               reasonable precisely to the extent that reasonable professional
27              judgments support the limitations on investigation.  In other
               words, counsel has a duty to make reasonable investigations or to
28              make a reasonable decision that makes particular investigations

1
2

> unnecessary. In any ineffectiveness case, a particular decision not
> to investigate must be directly assessed for reasonableness in all
> the circumstances.

3    *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 690-91); *see also Sanders*, 21 F.3d at

4    1457.

5          Similarly, a decision not to present a particular defense or not to offer particular

6    mitigating evidence is unreasonable unless counsel has explored the issue sufficiently to

7    discover the facts that might be relevant to making an informed decision. *Wiggins*, 539 U.S. at

8    522-23; *see also Thomas v. Chappell*, 678 F.3d 1086, 1104 (9th Cir. 2012) (defense counsel's

9    decision not to call a witness can only be considered tactical if counsel had "sufficient

10   information with which to make an informed decision"); *Correll v. Ryan*, 539 F.3d 938, 949

11   (9th Cir. 2008) ("An uninformed strategy is not a reasoned strategy. It is, in fact, no strategy at

12   all."); *Reynoso v. Giurbino*, 462 F.3d 1099, 1112–15 (9th Cir. 2006) (counsel's failure to cross-

13   examine a witnesses cannot be considered strategic where counsel did not investigate possible

14   areas of impeachment); *Stankewitz v. Woodford*, 365 F.3d 706, 719 (9th Cir. 2004) ("*Stankewitz*

15   *I*") ("[T]here is no record evidence that [counsel] ever hired an investigator or interviewed

16   Stankewitz's teachers, foster parents, psychiatrists, psychologists or anyone else who may have

17   examined or spent significant time with him during his childhood and youth."); *Jennings v.*

18   *Woodford*, 290 F.3d 1006, 1016 (9th Cir. 2002) (counsel's choice of presenting an alibi defense

19   and rejecting a mental health defense was not a reasonable strategy where counsel failed to

20   investigate the possible mental defenses).

21         "[P]retrial investigation and preparation are the keys to effective representation of

22   counsel." *United States v. Tucker*, 716 F.2d 576, 581 (9th Cir. 1983); *see also Ross v. Davis*, 29

23   F.4th 1028, 1053 (9th Cir. 2022) ("[C]ounsel has a duty to make reasonable investigations or to

24   make a reasonable decision that makes particular investigations unnecessary.") (quoting

25   *Strickland*, 466 U.S. at 691); *Daniels v. Woodford*, 428 F.3d 1181, 1203 (9th Cir. 2005) ("We

26   have found counsel 'ineffective where he neither conducted a reasonable investigation nor made

27   a showing of strategic reasons for failing to do so.' ") (quoting *Hendricks v. Vasquez*, 974 F.2d

28   1099, 1109 (9th Cir. 1992)). This duty on the part of defense counsel to investigate begins prior

1    to trial.  It is well-recognized that competent strategy decisions cannot be made regarding

2    presentation of guilt phase or penalty phase evidence without a foundation of knowledge based

3    upon a thorough defense investigation that was completed long before jury selection begins.

4    *Williams*, 529 U.S. at 395 (holding that the petitioner received ineffective assistance in

5    connection with the penalty phase of his trial and noting the record established "that counsel did

6    not begin to prepare for that phase of the proceeding until a week before the trial"); *Earp v.*

7    *Ornoski*, 431 F.3d 1158, 1175 (9th Cir. 2005) ("The Supreme Court has conveyed a clear, and

8    repeated, message about counsel's sacrosanct duty to conduct a full and complete mitigation

9    investigation before making tactical decisions . . . [.]").

10                                      (2)    Prejudice

11        Even where counsel's performance is found to be deficient, in order to prevail on such a

12   claim a petitioner is required to show that counsel's conduct prejudiced him.  *Strickland*, 466

13   U.S. at 691-92.  To establish prejudice, a petitioner must demonstrate that there is "a reasonable

14   probability that, but for counsel's unprofessional errors, the result of the proceeding would have

15   been different."  *Id.* at 694.  A reasonable probability is one "sufficient to undermine confidence

16   in the outcome" but is "less than the preponderance more-likely-than-not standard."  *Summerlin*,

17   427 F.3d at 640, 643 (quoting *Strickland*, 466 U.S. at 693-94).  Nonetheless, "[t]he likelihood of

18   a different result must be substantial, not just conceivable."  *Richter*, 562 U.S. at 112.  Prejudice

19   is established if "there is a reasonable probability that at least one juror" would have found the

20   defendant not guilty.  *Wiggins*, 539 U.S. at 537; *see also Clark*, 769 F.3d at 728 (In making this

21   assessment, the court "compare[s] the evidence that actually was presented to the jury with the

22   evidence that might have been presented had counsel acted differently.") (quoting *Murtishaw v.*

23   *Woodford*, 255 F.3d 926, 940 (9th Cir. 2001)); *accord Hernandez v. Chappell*, 923 F.3d 544,

24   551 (9th Cir. 2019).

25        A court need not determine whether counsel's performance was deficient before

26   examining the prejudice suffered by the petitioner because of the alleged deficiencies.

27   *Strickland*, 466 U.S. at 697.  Since the petitioner must affirmatively prove prejudice, any claim

28   of deficient performance on the part of counsel that does not result in prejudice must necessarily

                                              34

1   fail.

2       c.  Analysis

3         *(i)*  *Deficient Conduct*

4     Petitioner argues that guilt phase counsel was deficient by failing reasonably to

5   investigate, develop, and present then available expert testimony relating to his alcohol

6   intoxication and its affect upon his mental state at the time of the crime. (Doc. No. 38 at 89.)

7   Specifically, he argues that given the facts and circumstances of this case, expert testimony

8   would have assisted the jury's understanding of the scientific manner in which alcohol affects

9   one's faculties.  (Doc. No. 45 at 22 citing Evid. Code § 801(a).[5])

10     Petitioner observes the guilt phase testimony of Richard Diaz, that petitioner was

11   drinking on the night the night of and prior to the capital crime (Doc. No. 27-4 at AGO011240)

12   (5 RT 1263)) and according to Rafael Avila, he appeared to be "too drunk" to drive to the crime

13   scene (*id.* at AGO011241) (5 RT 1264)); *see also* Doc. No. 27-9 at AGO12605-06 (10 RT

14   2564-2565)); that petitioner fell on his way into the Durbin home because he was drunk and

15   Diaz assisted him up (Doc. No. 27-4, AGO11246-47 (5 RT 1269-1270)); and that the

16   prosecutor conceded during  penalty phase closing argument that petitioner "had been drinking

17   and was intoxicated at the time he committed these crimes" (Doc. No. 27-9 at AGO12582) (10

18   RT 2542)).  Petitioner observes that he accidentally twice fired his weapon in the back seat of

19   the car when fleeing the crime scene.  (Doc. No. 27-9 at AGO12606 (10 RT 2565).)

20     Petitioner observes that in 2010, state habeas defense psychologist, Dr. Paul Good, an

21   expert on alcohol and drug abuse (Doc. No. 31-2 at AGO16376-78) reviewed:

22        [J]ury instructions for CALJIC 4.21, voluntary intoxication
     related to specific intent; jury instructions for CALJIC 8.85,

23        penalty phase factors, particularly subdivision (h), impaired
     capacity due to effects of intoxication; appellant's opening brief

24        pages 13-17, 25-27; relevant portions of the transcript of Richard
     Diaz's testimony from Mr. Rangel's trial; relevant portions of the

25        transcript of Richard Diaz's testimony from the trial of Mr.
     Rangel's son, Pedro Ill; relevant portions of the transcript of Mr.

26

---

27   [5] Section 801 provides in pertinent part, that "If a witness is testifying as an expert, his testimony in the form of an
opinion is limited to such an opinion as is: (a) Related to a subject that is sufficiently beyond common experience

28   that the opinion of an expert would assist the trier of fact[.]

1
2
3

> Rangers testimony from the trial of Mr. Rangel's son; the
> declaration of Pedro Enriquez Rangel III, dated May 4, 2010; and
> the testimony of criminalist for the state Department of Justice
> from reporter's transcript pages 1717, 1718.

4   (Doc. No. 31-2 at AGO16376.)   Based thereon, Dr. Good found that petitioner may have been

5   intoxicated at the time of the crime, and if so, his mental state would likely have been

6   compromised. (*Id.*) Particularly, Dr. Good concluded that:

7
8
9
10
11

> If Petitioner were intoxicated at the time of the offense: the
> alcohol induced effects described above could have interfered
> with his capacity to accurately perceive and understand the
> circumstances leading up to the offense, to premeditate and to
> deliberate a plan of action, and to control his behavior. If Mr.
> Rangel was intoxicated at the time of the offense, the alcohol
> induced effects described above could have created a condition in
> which he did not in fact deliberate or control his behavior.

12   (Doc. No. 38 at 86 citing Doc. No. 31-2 at AGO16377-78.)

13        Petitioner faults guilt phase counsel for failing to present such an expert on alcohol

14   intoxication at the guilt penalty phase.   (Doc. No. 38 at 85; *id.* at 87 citing *Hinton v. Alabama*,

15   571 U.S. 263, 274-75 (2014) (failure to obtain expert evidence has been held to be deficient

16   performance).)

17        Respondent argues that petitioner's proffer does not suggest prejudicially deficient

18   performance.   (Doc. No. 43 at 52.)   He argues that Dr. Good offered only speculation, and

19   suggests any retained expert on alcohol impairment could do no more.   (*Id.*)   He suggests that

20   trial counsel may have been strategically motivated in not further developing available evidence

21   of petitioner's intoxication, *e.g.*, that such additional evidence would have been redundant

22   and/or within the jury's common knowledge.   (*Id.*)   Especially so, respondent argues, as Dr.

23   Good did not ever meet with petitioner or evaluate him – instead relying upon portions of the

24   trial and appellate records in reaching his opinions.   (Doc. No. 43 at 50 citing Doc. No. 31-2 at

25   AGO16376.)

26        Respondent argues that Dr. Good's findings were contrary to evidence admitted at trial

27   that petitioner's conduct during and immediately after the crime did not suggest impaired

28   capacity to accurately perceive and understand the surrounding circumstances, deliberate, and

1    control his actions.  (Doc. No. 43 at 52-53.)  For example, he points to petitioner's statements to

2    the other perpetrators in the getaway car that he had shot Chuck Durbin because he believed that

3    Chuck was going to get a gun (Doc. No. 43 at 52 citing Doc. No. 27-4 at AGO11253-55 (5 RT

4    1276-1278); *see also* Doc. No. 21 at 198), and argues that had trial counsel retained an alcohol

5    impairment expert, that expert's testimony similarly would have been unpersuasive.

6        Respondent argues that upon deferential review, petitioner has failed to pass through the

7    §2254(d)(1)(2) gateway.  (Doc. No. 43 at 53.)  He argues that petitioner has not shown any

8    "violation of the Constitution or law or treaties of the United States" under § 2254(a).  (*Id.*)

9        Here, the court finds that the state supreme court reasonably could reject the Claim.

10   First, petitioner does not argue much less demonstrate on the factual record that trial counsel's

11   investigation of the voluntary intoxication defense presented at the guilt phase was deficient.

12   The record reflects the absence of any forensic evidence of intoxication, and that trial counsel

13   presented percipient witness testimony as to petitioner's alcohol consumption and its apparent

14   effect upon him around the time of the capital crime.  (*See e.g.*,  Doc. No. 27-4 at AGO011240

15   (5 RT 1263); *id.* at AGO011241 (5 RT 1264); Doc. No. 27-9 at AGO12605-06 (10 RT 2564-

16   2565); Doc. No. 27-4, AGO11246-47 (5 RT 1269-1270); Doc. No. 27-9 at AGO12606 (10 RT

17   2565).)    As noted, the prosecutor conceded during penalty phase closing argument that

18   petitioner "had been drinking and was intoxicated at the time he committed these crimes" (Doc.

19   No. 27-9 at AGO12582 (10 RT 2542).)    Relatedly, the jury was instructed on voluntary

20   intoxication, that:

21           In the crimes of murder in the first degree and attempted murder
             of the first degree, a necessary element is the existence in the
22           mind of the defendant of the mental state of premeditation and
             deliberation.
23
             If the evidence shows that the defendant was intoxicated at the
24           time of the alleged crime, you should consider that fact in
             deciding whether defendant had the required mental state.
25
             If from all the evidence you have a reasonable doubt whether the
26           defendant formed that mental state, you must find that he did not
             have such mental state.
27

28   (Doc. No. 22-4 at 231 [CALJIC 4.21 as modified].)

1

2

3

> Intoxication of a person is voluntary if it results from the willing use of any intoxicating liquor, drug or other substance, knowing that it is capable of an intoxicating effect or when he willingly assumes the risk of that effect.

4

> Voluntary intoxication includes the voluntary ingestion, injecting or taking by any other means of any intoxicating liquor, drug or other substance.

5

6

(Doc. No. 22-4 at 232 [CALJIC 4.22].)

7

8

9

10

11

12

13

14

15

The state supreme court reasonably could conclude that expert testimony such as that proffered would not have furthered, and potentially may have weakened the primary guilt phase defense, that Diaz and/or Jesse Rangel were responsible for the shootings.   (*See* Doc. No. 38 at 58; Doc. No. 27-3 at 79-94; Doc. No. 27-8 at AGO12194-203 (9 RT 2173-82)); *Burt v. Titlow*, 571 U.S. 12, 22-23 (2013) ("absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance' ") (quoting *Strickland*, 466 U.S. at 689).   Especially so, as Dr. Good's opinions reflect only the possibility that alcohol interfered with petitioner's cognitive processes related to *mens rea* defenses.   For example, Dr. Good's habeas declaration states simply that:

16

17

18

19

20

> Alcohol is a central nervous system depressant that is absorbed by the stomach, enters the bloodstream and goes to all tissues and the brain. The effects of alcohol vary depending on many factors but some impairments are discernible after only a few drinks and include difficulty walking, blurred vision, slurred speech, slowed reaction times and impaired memory. With respect to cognitive functioning, alcohol is known to interfere with perception, judgment, problem solving and decision making.

21

22

23

24

25

26

(Doc. No. 38 at 86 citing Doc. No. 31-2 at AGO16377.)   This is understandable as Dr. Good was brought in as a state habeas expert ten years after the crime, merely reviewed a cold record that contained no reliable quantitative information as to the amount of alcohol petitioner consumed leading up to the crime and the amount of alcohol in his bloodstream at times relevant.   Moreover, Dr. Good did not interview or examine petitioner, or interview witnesses. Nothing suggests Dr. Good was impeded from doing so.

27

28

Furthermore, guilt phase counsel argued that petitioner's voluntary intoxication impacted his ability to premeditate murder.   (*See e.g.*, Doc. No. 38 at 58 citing Doc. No. 27-8 at

1   AGO12223-24 (9 RT 2200-2201).)  As discussed above, the jury was aware that petitioner had

2   been drinking and heard from contemporaneous witnesses that petitioner was intoxicated

3   around the time of the crime.  Petitioner never claimed his involvement in the capital crime

4   raised issues of alcohol intoxication and impairment.  Instead, the noted record evidence

5   suggested petitioner's intentional armed assault upon the Durbin home, where Uribe was

6   present, in order to get back at Uribe for shooting Little Pete; that petitioner believed Durbin

7   was going for a gun and so shot him; and that petitioner fled the crime scene, disposed of the

8   weapons used, and attempted to create a false alibi.

9          The state supreme court reasonably could find the general surmise proffered by Dr.

10  Good is not in the nature of expert opinion that would have assisted the jury.  Dr. Good's

11  findings and opinions, based upon his review of select portions of a cold trial record, presented

12  nothing more than speculation relating to the extent, if any, that alcohol might have impaired

13  petitioner's perception, judgment, problem solving, decision making, and ability to form *mens*

14  *rea*.  For example, Dr. Good concedes in his 2010 state habeas declaration that "[t]he actual

15  amount of alcohol consumed is difficult to estimate based on the eyewitness accounts."  (Doc.

16  No. 31-2 at AGO16377.)  Dr. Good reaches the unremarkable conclusion that if petitioner was

17  intoxicated at the time of the capital crime, then the effects of alcohol could have impeded his

18  ability to deliberate and control his behavior.  (Doc. No. 31-2 at AGO16377-78.)  The state

19  supreme court reasonably could find trial counsel was not deficient by failing to develop this

20  type of generic expert opinion on commonly known effects of alcohol.  Especially so here,

21  given the absence of any forensic evidence ascertaining petitioner's level of intoxication.

22  Relatedly, trial counsel argued to the jury that Penal Code section 190.3 factor "h":

23          [R]ecognizes what we all know, that excess consumption of
            alcohol causes lower inhibitions and causes people to do what
24          they wouldn't otherwise do if they weren't intoxicated. We also
            know when it comes to driving or comes to other acts, that people
25          who have been, who are intoxicated, worse, people that are drunk
            are not capable of exercising sound judgment.
26

27  (Doc. No. 27-9 at AGO12606 (10 RT 2565).)

28          The state supreme court reasonably could find the jury was free to draw such inferences

                                                    39

1    from the same evidence Dr. Good considered, without his assistance.  The jury had before it

2    evidence of petitioner's cognitive functionality at times just prior to, during, and after the crime.

3    The jury heard the witness testimony discussed above, that petitioner had been drinking shortly

4    before the capital crime, and that he appeared somewhat intoxicated at the crime scene.  The

5    jury also heard the noted evidence suggesting petitioner acted deliberately on his plan to get

6    back at Uribe; that he enlisted armed confederates to track down Uribe in the Durbin home

7    while others including children were present; that he entered the Durbin home with Little Pete,

8    who shot Uribe dead; that petitioner grabbed Durbin as the latter was running through the living

9    room and shot him in the head and upper body; and that petitioner stated in the getaway car that

10   he shot Durbin because he thought Durbin was running to get a gun.  (*See e.g.*, Doc. No. 27-4 at

11   AGO11240-56 (5 RT 1263-79); *cf.* Doc. No. 21 at 157, 198.)

12            Even if Dr. Good's habeas statements could be credited as expert opinion, the jury

13   already was aware of the facts suggesting how petitioner's alcohol consumption affected him

14   that night, as discussed above.  *See e.g.*, *Gonzales v. Martel*, No. C04-0084CRB(PR), 2009 WL

15   1175619 at *9 (N.D. Cal. Apr. 28, 2009) (trial counsel not ineffective by failing to call

16   intoxication expert to testify on the possible consequences of alcohol intoxication); *cf. Miller v.*

17   *Terhune*, 510 F. Supp. 2d 486, 490-91 (E.D. Cal. 2007) (trial counsel ineffective by filing to

18   present expert testimony on effects of alcohol on the brain and mental state where defendant had

19   documented extreme alcohol intoxication approaching a level at which coma and death can

20   occur; defendant stated "he hadn't meant to kill" the victim; and the expert could opine that

21   defendant acted without intent to kill).  The jury also heard and presumably followed the noted

22   instruction on voluntary intoxication.  For the reasons stated, the state supreme court reasonably

23   could find expert testimony such as that proffered by Dr. Good would not have assisted jurors in

24   their consideration of such matters.

25            Finally, while petitioner suggests that the absence of expert opinion on the effects of

26   alcohol consumption denied jurors' consideration of the scientific basis by which alcohol

27   impacts a person, the state supreme court reasonably could find the jury in this case was not

28   impeded thereby, for the reasons stated.

1    In sum, the state supreme court reasonably could find the absence of expert opinion on

2 the effects of alcohol consumption did not impede the jury in its consideration of the evidence

3 of petitioner's intoxication and participation in the capital crime and related ability to form *mens*

4 *rea*, and that trial counsel was not deficient at the guilt phase by failing to develop such opinion.

5                    *(ii)      Prejudice*

6    Petitioner argues that absent guilt phase counsel's deficient performance, there is a

7 reasonable probability that he would not have been convicted of the first degree murder and

8 sentenced to death.  (Doc. No. 38 at 89.)  Especially so, he argues, given the agreement of the

9 defense and prosecution that he was intoxicated at the time of the crime.

10    However, the state supreme court reasonably could find that petitioner failed to

11 demonstrate a reasonable probability of a different outcome absent guilt phase counsel's

12 allegedly deficient conduct.  That court reasonably could find that guilt phase counsel did

13 adequately investigate and present a voluntary intoxication defense based on then available,

14 evidence of intoxication.  For the reasons discussed above, petitioner has not demonstrated that

15 expert opinion such as that proffered by Dr. Good, even if steeped in the science of intoxication,

16 would have assisted the jury by adding to their fund of common knowledge.  (Evid. Code §

17 801(a).)

18    For example, the guilt phase jury considered the noted evidence of petitioner's

19 intoxication and his conduct and statements during and after the crime.  Defense counsel argued

20 as a secondary defense that petitioner's voluntary intoxication impacted his ability to

21 premeditate murder, and the jury considered whether and the extent to which petitioner's

22 voluntary intoxication impacted his ability to premediate murder, and as evidence in mitigation.

23 (*See e.g.*, Doc. No. 38 at 58 citing Doc. No. 27-8 at AGO12223-24 (9 RT 2200-2201); Doc. No.

24 27-9 at AGO12605-06 (10 RT 2564-65).)  Petitioner does not explain how or why expert

25 testimony on the science underlying intoxication suggests a reasonable probability of a different

26 guilt phase verdict given the dearth of foundational facts regarding the extent to which

27 petitioner may have been intoxicated.  "[S]peculation about what an expert could have said is

28 not enough to establish prejudice."  *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997); *see*

1  *also Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (speculation that a helpful expert

2  could be found or would testify on petitioner's behalf insufficient to establish prejudice).  The

3  state supreme court reasonably could find the argument in favor of *Stickland* prejudice is

4  unsupported in the factual record, and unpersuasive on the circumstances of this case.

5       Additionally, the noted evidence otherwise before the jury supported petitioner's

6  premeditation and intent to kill.  Particularly, the jury had before it evidence of petitioner's

7  motive, cultivated over a number of days, to get back at victim Uribe based on petitioner's

8  belief that Uribe had shot Little Pete in the head.  The jury knew this was the reason petitioner,

9  Little Pete, Rafael Avila, and Richard Diaz, three of them armed, went looking for Uribe on the

10  night of the capital crime.  *See Mayfield v. Woodford*, 270 F.3d 915, 925–26 (9th Cir. 2001) ("In

11  light of the strong inculpatory evidence presented by the State at trial, we find it unlikely that a

12  competent performance by [trial counsel] Ames would have altered the jury's verdict.").

13             d.       Conclusions

14       A fair-minded jurist could find the state supreme court's denial of Claim XI as guilt

15  phase ineffective assistance was not contrary to, or an unreasonable application of, clearly

16  established Federal law, as determined by the Supreme Court, or based on an unreasonable

17  determination of the facts in light of the evidence presented in the state court proceeding.  28

18  U.S.C. § 2254(d).

19       Claim XI as guilt phase ineffective assistance of counsel shall be denied.

20  C.   Claims Alleging Trial Court Error at the Guilt Phase – Evidentiary Error

21       *1.   Claim III*

22       Petitioner alleges that the trial court erred at the guilt phase by admitting, as a

23  declaration against interest, unreliable hearsay statements by his son, Little Pete, a non-

24  testifying accomplice, without rights to confrontation, violating his rights under the Sixth and

25  Fourteenth Amendments.  (Doc. No. 38 at 61-65.)

26             a.       State Court Direct and Collateral Review

27       Claim III allegations were raised on direct appeal (Doc. No. 28-11 at AGO13537-59),

28  and denied on the merits, as follows:

Admission of hearsay statements

Defendant contends that admitting hearsay statements by Little Pete and Mary Rangel violated his rights under the confrontation clause of the Sixth Amendment to the federal Constitution. (Crawford v. Washington (2004) 541 U.S. 36, 59–60, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (Crawford ).) We disagree.

As noted above, Jesse Rangel testified that Little Pete telephoned him twice on the night of the murders and made incriminating statements, and made further incriminating statements to him in person during their visit to Frank Sr.'s house in Fresno. Erica Rangel, Jesse's wife, testified to statements Mary Rangel made to defendant. (See ante, 200 Cal.Rptr.3d at pp. 276–278, 367 P.3d at pp. 658– 660.) Over defendant's objection, the trial court admitted Little Pete's statements as statements against interest and Mary Rangel's statements as adoptive admissions. (Evid. Code §§ 1221, 1230.)

Defendant claims that admitting Little Pete's and Mary Rangel's statements violated his Sixth Amendment right to confront the witnesses against him. In Crawford, supra, 541 U.S. 36, 124 S.Ct. 1354, the United States Supreme Court overruled Ohio v. Roberts (1980) 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (Roberts ), which had held that the confrontation right does not bar admission of the out-of-court statements of an unavailable witness if the statements "bear[ ] adequate 'indicia of reliability.' " Rejecting this approach, Crawford held that, in general, admission of "testimonial" statements of a witness who was not subject to cross-examination at trial violates a defendant's Sixth Amendment right of confrontation, unless the witness is unavailable and the defendant had a prior opportunity for cross-examination. (Crawford, at pp. 59–60, 68, 124 S.Ct. 1354.) Although the court in Crawford "did not offer an exhaustive definition of 'testimonial' statements," the court has since clarified that "a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial" (Ohio v. Clark (2015) 576 U.S. ——, —— – ——, 135 S.Ct. 2173, 2179– 2180, 192 L.Ed.2d 306)—that is to say, unless the statements are given in the course of an interrogation or other conversation whose " 'primary purpose ... is to establish or prove past events potentially relevant to later criminal prosecution.' " (Id. at p. 2180, quoting Davis v. Washington (2006) 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224; see Ohio v. Clark, at pp. 2180– 2181 [noting that "the primary purpose test is a necessary, but not always sufficient, condition for the exclusion of out-of-court statements under the Confrontation Clause"].) Under this test, "[s]tatements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." (Id. at p. 2182.) The court in Ohio v. Clark, however, "decline[d] to adopt a rule that statements to individuals who are not law enforcement officers are categorically outside the Sixth Amendment." (Ibid.) A court also considers the formality " 'of the situation and the interrogation' " in

determining the primary purpose of a challenged statement. (Id. at p. 2180.) "In the end, the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" (Ibid.; see id. at p. 2183.)

### a. Forfeiture

The Attorney General asserts that defendant has forfeited his confrontation clause challenge to Mary Rangel's statements because he failed to object on this ground at his 1998 trial. In 1998, governing law in California held that admission of a hearsay statement as an adoptive admission did not implicate the defendant's Sixth Amendment confrontation right. (People v. Silva (1988) 45 Cal.3d 604, 624, 247 Cal.Rptr. 573, 754 P.2d 1070 (Silva ); People v. Preston (1973) 9 Cal.3d 308, 315–316, 107 Cal.Rptr. 300, 508 P.2d 300 (Preston ).) This court had stated: "[B]y reason of the adoptive admissions rule, once the defendant has expressly or impliedly adopted the statements of another, the statements become his own admissions, and are admissible on that basis as a well-recognized exception to the hearsay rule. (See Ohio v. Roberts (1980) 448 U.S. 56, 65–66, 100 S.Ct. 2531, 65 L.Ed.2d 597.) Being deemed the defendant's own admissions, we are no longer concerned with the veracity or credibility of the original declarant. Accordingly, no confrontation right is impinged when those statements are admitted as adoptive admissions without providing for cross-examination of the declarant."[7] (Silva, at p. 624, 247 Cal.Rptr. 573, 754 P.2d 1070.)

------------------------------FOOTNOTE--------------------------------

n.7  As defendant notes, even after *Crawford, supra,* 541 U.S. 36, 124 S.Ct. 1354, this court has at times applied a similar analysis to hold that admission of a hearsay statement as an adoptive admission does not implicate a defendant's Sixth Amendment confrontation right. (See, e.g., *People v. Jennings* (2010) 50 Cal.4th 616, 660–662, 114 Cal.Rptr.3d 133, 237 P.3d 474; *People v. Combs* (2004) 34 Cal.4th 821, 842, 22 Cal.Rptr.3d 61, 101 P.3d 1007.) We need not consider this issue here because Mary Rangel's statements were not testimonial in any event.

---------------------------END FOOTNOTE----------------------------

In light of Silva and Preston, defendant's failure to object on confrontation clause grounds during his 1998 trial "'was excusable, since governing law at the time ... afforded scant grounds for objection.' [Citation.] '"[W]e have excused a failure to object where to require defense counsel to raise an objection 'would place an unreasonable burden on defendants to anticipate unforeseen changes in the law and encourage fruitless objections in other situations where defendants might hope that an established rule of evidence would be changed on appeal.'"'" [Citation.]" (Edwards, supra, 57 Cal.4th at p. 705, 161 Cal.Rptr.3d 191, 306 P.3d 1049.) Defendant's argument is based

on the United States Supreme Court's decision in Crawford, which was not issued until well after his trial concluded. As the United States Supreme Court has observed, the "Crawford rule is flatly inconsistent with the prior governing precedent, Roberts, which Crawford overruled." (Whorton v. Bockting (2007) 549 U.S. 406, 416, 127 S.Ct. 1173, 167 L.Ed.2d 1.) We therefore conclude that in a case tried before Crawford, a defendant does not forfeit a Crawford challenge by failing to raise a confrontation clause objection at trial. (See People v. Chism (2014) 58 Cal.4th 1266, 1287–1288, fn. 8, 171 Cal.Rptr.3d 347, 324 P.3d 183 ["[B]ecause defendant's counsel could not have anticipated Crawford's sweeping changes to federal confrontation clause case law, he did not forfeit this claim by failing to object to the admission of [the] statements on federal constitutional grounds," but instead raising only a hearsay challenge.]; accord, People v. Kopatz (2015) 61 Cal.4th 62, 88, 186 Cal.Rptr.3d 797, 347 P.3d 952; see People v. Pearson (2013) 56 Cal.4th 393, 462, 154 Cal.Rptr.3d 541, 297 P.3d 793 [Crawford "represents an unforeseen change in the law 'that competent and knowledgeable counsel reasonably could [not] have been expected to have anticipated' at defendant's [pre-Crawford] trial, and excuse[s] his failure to object."].)[8]

------------------------------FOOTNOTE--------------------------------

n.8  As to other claims in which defendant alleges for the first time that the error complained of violated his federal constitutional rights, the new claims are not forfeited to the extent that in doing so defendant has "raised only a new constitutional 'gloss' on claims preserved below.... However, '[n]o separate constitutional discussion is required, or provided, when rejection of a claim on the merits necessarily leads to rejection of [the] constitutional theory....' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364, 178 Cal.Rptr.3d 185, 334 P.3d 573 (*Bryant, Smith and Wheeler* ).)

------------------------------END FOOTNOTE------------------------------

We acknowledge that our approach to this issue has not been entirely consistent. (See, e.g., People v. Hajek and Vo (2014) 58 Cal.4th 1144, 1214, 171 Cal.Rptr.3d 234, 324 P.3d 88 [defendant forfeited Crawford challenge in case tried before Crawford by failing to object on confrontation grounds, but Crawford challenge lacked merit in any event]; People v. Lopez (2013) 56 Cal.4th 1028, 1065, 157 Cal.Rptr.3d 570, 301 P.3d 1177 [same]; People v. Riccardi (2012) 54 Cal.4th 758, 801, fn. 21, 144 Cal.Rptr.3d 84, 281 P.3d 1 [same]; Riccardi, at pp. 826–827, fn. 33, 144 Cal.Rptr.3d 84, 281 P.3d 1 [same]; People v. Dement (2011) 53 Cal.4th 1, 22–23, 133 Cal.Rptr.3d 496, 264 P.3d 292 (Dement ) [same].) To the extent these cases suggest that counsel may be faulted for failing to object on Crawford grounds in a case tried before Crawford was decided, we now expressly reject any such suggestion.

45

We also clarify that the relevant inquiry is not, as some of our cases might be read to suggest, whether the defendant's Crawford challenge relies on the same facts and legal standards as a challenge made on hearsay or other state law grounds. (See People v. Gutierrez (2009) 45 Cal.4th 789, 809, 812, 89 Cal.Rptr.3d 225, 200 P.3d 847 [confrontation clause claim not forfeited on appeal when only a hearsay objection was asserted below, either because the new argument does not invoke facts or legal standards different from those the trial court was asked to apply or the appellate claim "is the kind that required no trial court action to preserve it"]; see also, e.g., People v. Loy (2011) 52 Cal.4th 46, 66, 127 Cal.Rptr.3d 679, 254 P.3d 980 [citing People v. Gutierrez for the proposition that a defendant may raise a confrontation clause challenge on appeal "to the extent he argues that the erroneous overruling of the objection actually made also had the consequence of violating his federal constitutional rights"].) A Crawford objection generally requires a court to consider whether statements are testimonial, and, if so, whether a witness was unavailable and the defendant had a prior opportunity for cross-examination. This invokes different legal standards than, for example, a hearsay objection, which generally requires a court to consider whether the foundational requirements for admission of particular hearsay have been satisfied. (See People v. Redd (2010) 48 Cal.4th 691, 730, fn. 19, 108 Cal.Rptr.3d 192, 229 P.3d 101 [objection that asserted hearsay exception lacked foundation "presented legal issues different from those underlying an objection that the admission of testimony would violate the confrontation clause"].) For present purposes, however, the relevant question is whether requiring defense counsel to raise an objection " ' "would place an unreasonable burden on defendants to anticipate unforeseen changes in the law." ' " (Edwards, supra, 57 Cal.4th at p. 705, 161 Cal.Rptr.3d 191, 306 P.3d 1049.) Because that standard is satisfied here, we conclude that defendant has not forfeited his Crawford claim.

### b. Merits

Turning to the merits of defendant's confrontation clause claim, we conclude the statements by Little Pete and Mary Rangel were not made to law enforcement officers, nor were they otherwise made under circumstances suggesting a primary purpose of creating evidence for defendant's prosecution. The statements therefore were not testimonial. (Cf. Ohio v. Clark, supra, 576 U.S. at p. ——, 135 S.Ct. at p. 2181 [three-year-old's statements to his preschool teachers not testimonial because they "clearly were not made with the primary purpose of creating evidence for [the defendant's] prosecution"].) Thus their admission did not violate defendant's rights under the confrontation clause.

Defendant further contends that, even if the statements were nontestimonial, they were unreliable under Ohio v. Roberts, supra, 448 U.S. 56, 100 S.Ct. 2531, and for that reason should have been excluded under the confrontation clause. Defendant's

argument rests on a misapprehension of the confrontation guarantee as elaborated in Crawford. The court in Crawford explained that while "the Clause's ultimate goal is to ensure reliability of evidence, ... it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner"—that is, by ensuring that testimonial hearsay be "test[ed] in the crucible of cross-examination." (Crawford, supra, 541 U.S. at p. 61, 124 S.Ct. 1354.) As the court has since affirmed, "[i]t is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." (Davis v. Washington, supra, 547 U.S. at p. 821, 126 S.Ct. 2266, italics added.) Thus, "the court has made clear that Roberts, supra, 448 U.S. 56, 100 S.Ct. 2531, and its progeny are overruled for all purposes, and retain no relevance to a determination whether a particular hearsay statement is admissible under the confrontation clause." (People v. Cage (2007) 40 Cal.4th 965, 981, fn. 10, 56 Cal.Rptr.3d 789, 155 P.3d 205.)

Defendant further argues that admission of Mary Rangel's out-of-court statement violated his right to confront the witnesses against him because his silence did not manifest his adoption or belief in the truth of his wife's statement. He argues that he "was not in a position to protest since anything he said would seem to be an accusation of his own son and moreover would be guaranteed to launch a further domestic quarrel with his wife." Whether defendant's silence manifested his adoption or belief in the truth of his wife's accusation was an issue of fact for the jury to determine. The trial court did not err in admitting the evidence.

For the first time in his reply brief, defendant asserts that Little Pete's statements to Jesse Rangel should be considered testimonial because "Jesse was recruited as a police agent" in New Mexico. Defendant explains that Jesse gave a statement to police in New Mexico and was flown back to Madera at county expense. This claim is forfeited. "Obvious reasons of fairness militate against consideration of an issue raised initially in the reply brief." (Varjabedian v. City of Madera (1977) 20 Cal.3d 285, 295, fn. 11, 142 Cal.Rptr. 429, 572 P.2d 43.) The claim also lacks merit. Even if these facts were sufficient to demonstrate that Jesse was a police agent, Jesse went to New Mexico after defendant and Little Pete made their incriminating statements to him. Whatever Jesse's motives may have been in later describing those conversations to law enforcement officials, defendant identifies no reason to think that Little Pete made the statements in question in the course of a conversation whose primary purpose was to create evidence for defendant's later prosecution.

Defendant also contends for the first time in his reply brief that the trial court erred under Evidence Code section 1230[,][9] in admitting Little Pete's statements to Jesse Rangel because Jesse had a motive to lie and his accurate testimony concerning the details of the crime could be explained by his own involvement. Defendant conceded below that Little Pete's statements were

47

statements against penal interest, but claimed they were insufficiently reliable to be admissible under Evidence Code section 1230.

-----------------------------FOOTNOTE----------------------------------

n.9 Evidence Code section 1230 provides in relevant part: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, ... so far subjected him to the risk of ... criminal liability ... that a reasonable man in his position would not have made the statement unless he believed it to be true."

----------------------------END FOOTNOTE----------------------------

Again, "[i]t is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party." (People v. Tully (2012) 54 Cal.4th 952, 1075, 145 Cal.Rptr.3d 146, 282 P.3d 173.) In any event, the argument lacks merit. Here, defendant simply challenges Jesse Rangel's trustworthiness. We have previously rejected the argument that "in considering the admissibility of evidence offered under" Evidence Code section 1230 "the trial court could properly consider the credibility of the in-court witness," and observed that "[n]either the hearsay rule nor its exceptions are concerned with the credibility of witnesses who testify directly to the jury." (People v. Cudjo (1993) 6 Cal.4th 585, 608, 25 Cal.Rptr.2d 390, 863 P.2d 635 (Cudjo ).)

*Rangel*, 62 Cal. 4th at 1213-19.

    b.    Legal Standard

       *(i)*    *Trial Court Error*

The standard for trial court error is set out in section VIII A 1 b (i), herein.

       *(ii)*    *Confrontation Clause Error*

The Sixth Amendment grants a criminal defendant the right "to be confronted with the witnesses against him." "The 'main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.*' " *Fenenbock v. Director of Corrections for California*, 692 F.3d 910, 919 (9th Cir. 2012) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986)) (emphasis in original). The Confrontation Clause forbids the introduction of out-of-court "testimonial" statements unless the witness is unavailable and the defendant has had the chance to cross-examine the witness previously. *Samia v. United States*, No. 22-196, 2023 WL 4139001 at *5 (U.S. June 23, 2023) (citing *Crawford v. Washington*, 541 U.S. at 53–54).

1   Violations of the Confrontation Clause are subject to *Chapman* harmless error analysis.  *Van*

2   *Arsdall*, 475 U.S. at 684.

3                   c.      Analysis

4           Petitioner argues that admission of statements by non-testifying and separately tried co-

5   defendant Little Pete, as recounted by Jesse Rangel (previously a suspect in the case),

6   implicating petitioner in the capital crime (Doc. No. 38 at 61 citing Doc. No. 22-2 at

7   AGO02105 (10 CT 2207)), denied him rights to confrontation and due process (Doc. No. 38 at

8   65).  Particularly, he argues that:

> The admission of Little Pete's statements as recounted by Jesse
> Rangel violated Petitioner's confrontation and due process rights.
> Under *Ohio v. Roberts*, the law at the time, they were certainly
> unreliable as Jesse Rangel was a primary suspect. Under *Lilly v.
> Virginia*, Little Pete's statements, as a non-testifying accomplice,
> were unreliable. And given that the Supreme Court has not
> definitively held what are and are not testimonial statements, their
> admission violated Petitioner's Sixth and Fourteenth Amendment
> rights.

14  (Doc. No. 38 at 65.)

15          As noted above, the California Supreme Court found that:

> Also on the night of October 7, 1995, during the 10:00 o'clock
> news, Jesse Rangel,  who was in Fresno, received a telephone call
> from Little Pete. Little Pete told Jesse he "got Juan." Later that
> night, Jesse was awakened by a second call from Little Pete, who
> sounded drunk and was laughing. Little Pete said he had killed
> "Juan," and that defendant, "Richard, [and] Rafael" also were
> involved. Defendant then came on the line laughing and said he
> "put those motherfuckers on ice."

21  *Rangel*, 62 Cal. 4th at 1201.

22          The record reflects that counsel motioned *in limine* to keep Little Pete's alleged

23  statements out of the trial on Confrontation Clause grounds.  (Doc. No. 38 at 61 citing Doc. No.

24  22-2 at AGO02105 (10 CT 2207).)  The prosecutor countered that Little Pete's statements were

25  admissible as declarations against interest under *People v. Greenberger*, 58 Cal. App. 4th 298,

26  329 (1997) and sufficiently reliable under *Ohio v. Roberts*, 448 U.S. 56 (1980).  (Doc. No. 38 at

27  61-62 citing Doc. No. 22-2 at AGO02132-35 (10 CT 2234-2237).)  The trial court denied the

28  motion following argument and hearing, finding the statements sufficiently reliable to be

49

1    admitted over Confrontation Clause objections.   (*Id.* citing Doc. No. 27-2 at AGO10768 (3 RT

2    810).)

3        Petitioner argues that Little Pete's hearsay statements, to the extent testimonial, were

4    admitted in violation of his confrontation rights under *Crawford*.   (Doc. No. 38 at 64 citing

5    *Crawford*, 541 U.S. at 51-52, 59.)

6        Respondent responds that petitioner fails to demonstrate any violation of the

7    Constitution or law or treaties of the United States under § 2254(a) and fails to pass through the

8    § 2254(d)(1)(2) gateway.  (Doc. No. 43 at 32.)

9        The court finds the state supreme court reasonably denied the Claim, for the reasons

10   stated by that court and those discussed below.

11       In 2004, the United States Supreme Court held in *Crawford* that the Confrontation

12   Clause bars the state from introducing into evidence out-of-court statements which are

13   "testimonial" in nature unless the witness is unavailable and the defendant had a prior

14   opportunity to cross-examine the witness, regardless of whether such statements are deemed

15   reliable.  541 U.S. at 42, 51, 68.  The *Crawford* rule applies only to hearsay statements that are

16   "testimonial" in nature and does not bar the admission of non-testimonial hearsay statements.

17   *Id.; see also Whorton v. Bockting*, 549 U.S. 406, 420 (2007) ("[T]he Confrontation Clause has

18   no application to" "out-of-court non-testimonial statements.")

19       Although the Court in *Crawford* declined to provide a comprehensive definition of the

20   term "testimonial," it stated that "[s]tatements taken by police officers in the course of

21   interrogations are . . . testimonial under even a narrow standard."  *Crawford*, 541 U.S. at 52.

22   The court also provided the following "formulations" of a "core class" of testimonial

23   statements:  (1) "ex parte in-court testimony or its functional equivalent – that is, material such

24   as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-

25   examine, or similar pretrial statements that declarants would reasonably expect to be used

26   prosecutorially;" (2) "extrajudicial statements . . . contained in formalized testimonial materials,

27   such as affidavits, depositions, prior testimony, or confessions;" and (3) "statements that were

28   made under circumstances which would lead an objective witness reasonably to believe that the

1   statement would be available for use at a later trial." *Id.* at 51-52; *see also Samia*, No. 22-196,

2   2023 WL 4139001 at *1 ([F]ormal, Mirandized confession to authorities is testimonial[.]").

3   The court in *Crawford* pointed out that the Sixth Amendment Confrontation Clause "does not

4   bar the use of testimonial statements for purposes other than establishing the truth of the matter

5   asserted." *Id.* at 59 n.9 (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)).  However, "state

6   evidence rules do not trump a defendant's constitutional right to confrontation," and a reviewing

7   court must ensure "that an out-of-court statement was introduced for a '*legitimate*, nonhearsay

8   purpose' before relying on the not-for-its-truth rationale to dismiss the application of the

9   Confrontation Clause." *Williams v. Illinois*, 567 U.S. 50, 78 (2012) (citing *Street*, 471 U.S. at

10  417) (emphasis in original).

11         Here, the state supreme court reasonably could find Little Pete's statements fell outside

12  the core class of testimonial statements under *Crawford*.  As that court noted:

13         The statements by Little Pete and Mary Rangel were not made to
           law enforcement officers, nor were they otherwise made under
14         circumstances suggesting a primary purpose of creating evidence
           for defendant's prosecution. The statements therefore were not
15         testimonial.

16  *Rangel,* 62 Cal. 4th at 1217.  Petitioner has not demonstrated legal or factual error in these

17  regards.   The state supreme court reasonably could reject his argument based upon the

18  *Aranda/Bruton* line of cases, that Little Pete's statements were unreliable and should have been

19  excluded on that basis.[6]  (Doc. No. 38 at 61 citing *People v. Aranda*, 63 Cal.2d 518 (1965),

20  *superseded by statute as stated in People v. Capistrano*, 59 Cal. 4th 830 (2014), *overruled by*

21  *People v. Hardy*, 5 Cal. 5th 56 (2018); *Bruton v. United States*, 391 U.S. 123 (1968); *see also*

22  Doc. No. 38 at 63 citing *Lilly v. Virginia*, 527 U.S. 116, 131 (1999) (confession of a non-

23  testifying accomplice found inadmissible under the Sixth Amendment on *Bruton* grounds

24  because such statements were inherently unreliable).)

25         In *Bruton*, the Supreme Court held that a defendant is deprived of his Sixth Amendment

26  right of confrontation when a facially incriminating confession of a non-testifying co-defendant

---

[6] The record reflects that the trials of petitioner and Little Pete were severed on *Aranda/Bruton* grounds.  (Doc. No. 22-1 at AG001735.)

1    is introduced at their joint trial, even if the jury is instructed to consider the confession only

2    against the co-defendant.[7]  391 U.S. at 135-36; *see also United States v. Hernandez-Orellana*,

3    539 F.3d 994, 1001 (9th Cir. 2008) (quoting *United States v. Mitchell*, 502 F.3d 931, 965 (9th

4    Cir. 2007)) (same).  However, after the *Crawford* decision, "[i]t is . . . necessary to view *Bruton*

5    through the lens of *Crawford*," and "the threshold question in every case is whether the

6    challenged statement is testimonial.  If it is not, the Confrontation Clause 'has no application.' "

7    *United States v. Figueroa-Cartagena*, 612 F.3d 69, 85 (1st Cir. 2010) (citing *Bockting*, 549 U.S.

8    at 420).

9         Petitioner has not demonstrated that *Bruton* and its progeny survive *Crawford* for

10    purposes of the Confrontation Clause.  *Samia*, No. 22-196, 2023 WL 4139001 at *5 (citing

11    *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 329 (2009)) (THOMAS, J., concurring)

12    (explaining that "the Confrontation Clause is implicated by extrajudicial statements . . .

13    contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or

14    confessions" (internal quotation marks omitted)); *Giles v. California,* 554 U.S. 353, 376 (2008)

15    ("[O]nly *testimonial* statements are excluded by the Confrontation Clause."); *Bockting,* 549

16    U.S. at 420 (Confrontation Clause has "no application" to non-testimonial statements); *Smith v.*

17    *Chavez*, 565 Fed. Appx. 653 (9th Cir. 2014) *cert. denied*, 574 U.S. 918 (2014)[8] (*Bruton* is not

18    violated by admission of non-testimonial out-of-court statement made by non-testifying co-

19    defendant); *Parra v. Lizarraga*, No. CV 17-5946-VBF (KS), 2018 WL 6835980 at *12 (C.D.

20    Cal. Nov. 9, 2018), *report and recommendation adopted*, No. ACV1705946VBFKS, 2018 WL

21    6831532 (C.D. Cal. Dec. 27, 2018) (citing *Lucero*, 902 F.3d at 988) (only testimonial co-

22    defendant statements are subject to the federal Confrontation Clause limits established

23    in *Bruton); Hundley v. Montgomery*, No. 2:12-CV-3051-JKS, 2014 WL 1839116 at **10-11

24

25    [7] In *People v. Aranda*, 63 Cal. 2d 518 (1965), the California Supreme Court held that at a joint trial, a co-
      defendant's extrajudicial statements inculpating another defendant must be excluded, even if the co-defendant
26    testified at trial.  *Aranda* was abrogated in part in 1982 by an amendment to the California Constitution.  *See also*
      *People v. Boyd*, 222 Cal. App. 3d 541, 562 (1990) ("Thus, to the extent *Aranda* required exclusion of inculpatory
27    extrajudicial statements of co-defendants, even when the co-defendant testified and was available for cross-
      examination at trial, *Aranda* was abrogated by Proposition 8.").

28    [8] Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36–3(b).

1   (E.D. Cal. May 8, 2014) ("Although the Ninth Circuit has not expressly held so, other circuits

2   have concluded that *Bruton* must be viewed through the lens of *Crawford,* and

3   that *Bruton* therefore does not apply to non-testimonial statements.");  *Hurtado v. Long*, No. CV

4   14-8068 MWF (KS), 2017 WL 11647753 at *17 (C.D. Cal. Jan. 26, 2017), *report and*

5   *recommendation adopted,* No. CV 14-8068-MWF (KS), 2017 WL 11647830 (C.D. Cal. Mar. 9,

6   2017) (it is not "clearly established" whether *Aranda/Bruton* still applies post-*Crawford); cf.*

7   *Jensen v. Pliler,* 439 F.3d 1086, 1090 (9th Cir. 2006) (declining to decide whether the firmly

8   rooted hearsay exception or particularized guarantees of trustworthiness test enunciated

9   in *Roberts,* 448 U.S. at 65-66  (*abrogated by Crawford,* 541 U.S. at 68), is still the applicable

10   law for non-testimonial evidence under the Confrontation Clause); *Mayes v. Premo*, 766 F.3d

11   949, 963 (9th Cir. 2014) (a *post-Crawford* application of Confrontation Clause under *Roberts* in

12   an AEDPA case).

13        For the same reasons, petitioner's citation to the *pre-Crawford* case of *Lilly v. Virginia*,

14   for the proposition that Little Pete's statements were inadmissible on grounds of unreliability,

15   reasonably could be seen by the state supreme court as lacking persuasive weight.  (Doc. No. 38

16   at 64-65 citing *Lilly*, 527 U.S. at 120, 133 (statements of a non-testifying accomplice that

17   contained some statements against the accomplice's interest and others that inculpated the

18   accused" were not admissible under the Sixth Amendment because such statements were

19   presumptively unreliable).)

20        Accordingly, post-*Crawford*, the rule set forth in *Bruton*, which is premised on the

21   Confrontation Clause, does not apply to statements which are non-testimonial.  *Lucero v.*

22   *Holland,* 902 F.3d 979, 987-88 (9th Cir. 2018) ("We agree [with every circuit court to consider

23   the issue] that only testimonial co-defendant statements are subject to the federal Confrontation

24   Clause limits established in *Bruton*."), *cert. denied,* __U.S.__, 139 S. Ct. 1180 (2019)*; United*

25   *States v. Dargan*, 738 F.3d 643, 651 (4th Cir. 2013); *United States v. Berrios*, 676 F.3d 118, 128

26   (3rd Cir. 2012); *United States v. Smalls*, 605 F.3d 765, 768 n.2 (10th Cir. 2010); *United States*

27   *v. Johnson*, 581 F.3d 320, 326 (6th Cir. 2009); *United States v. Taylor*, 509 F.3d 839, 850 (7th

28   Cir. 2007); *see also Smith*, 565 Fed. Appx. at 653 (explaining that *Bruton* only applies "to

1   statements that violate the Confrontation Clause" and are themselves "testimonial" under

2   *Crawford*); *Hundley*, 2014 WL 1839116, **11-13 (the circuit courts which have considered the

3   issue "appear to have unanimously concluded that where a statement is non-testimonial, neither

4   *Crawford* or *Bruton* apply.").

5        It follows that the state supreme court reasonably could reject petitioner's further

6   argument that Little Pete's hearsay statements, even if non-testimonial, denied him

7   confrontation rights because these statements were the unreliable under *Roberts*.  (Doc. No. 38

8   at 63 citing *Roberts*, 448 U.S. at 66 (statements of an unavailable declarant admissible under the

9   Confrontation Clause if the statements bore an "adequate indicia of reliability" such as falling

10  within a firmly rooted hearsay exception or bearing particular guarantees of trustworthiness).)

11       Petitioner's suggestion that *Crawford* is not clearly established authority applicable to

12  this proceeding (Doc. No. 45 at 13 citing *Bruton*, 391 U.S. at 135-136) reasonably could be

13  rejected.  The *Crawford* Court issued its new rule of criminal procedure while petitioner's direct

14  appeal was pending and is clearly established authority in this case.  *Bockting*, 549 U.S. at 416

15  (new rule of criminal procedure is generally applicable to cases that are still on direct review).

16  As discussed above, *Bruton* does not survive *Crawford*.  *Lucero*, 902 F.3d at 988 (only

17  testimonial co-defendant statements are subject to the federal Confrontation Clause limits

18  established in *Bruton)*.

19       Finally, the state supreme court reasonably could find the Claim states no due process

20  violation.  State court rulings on admissibility of evidence are not a basis for federal habeas

21  relief unless Petitioner was denied a fundamentally fair trial.  *Estelle v. McGuire*, 502 U.S. 62,

22  68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state court

23  determinations on state law questions."); *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995)

24  (same).  To the extent petitioner argues that Little Pete's hearsay statements were errantly

25  admitted under a state law hearsay exception for declarations against interest, an error of only

26  state law is not a basis for federal habeas relief.  *McGuire*, 502 U.S. at 72-73.  Furthermore, to

27  the extent petitioner argues that admission of Little Pete's allegedly unreliable statements

28  denied him a fair trial (Doc. No. 38 at 64-65), he does not point to facts in the evidentiary record

1  in support, or explain why the jury was unable to appropriately weigh the admissible evidence

2  and the credibility of testifying witnesses such as Jesse Rangel.   The state supreme court

3  reasonably could find that admission of Little Pete's statements at testified to by Jesse Rangel

4  did not deny petitioner a fundamentally fair trial.  *See Rangel*, 62 Cal. 4th at 1213-19.

5               d.      Conclusions

6       A fair-minded jurist could find the state supreme court's denial of the Claim was not

7  contrary to, or an unreasonable application of, clearly established Federal law, as determined by

8  the Supreme Court, or based on an unreasonable determination of the facts in light of the

9  evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

10      Claim III shall be denied.

11  D.   Claims Alleging Trial Court Errors at the Penalty Phase – Instructional Error

12      *1.   Claim VII*

13      Petitioner alleges that the trial court erred at the penalty phase by refusing to give trial

14  counsel's proffered modified version of CALJIC 8.85,[9] and Special Instruction No. 8, relating

15  to mitigating motive for the killing of Juan Uribe, violating his rights under the Eighth and

16  Fourteenth Amendments.[10]  (Doc. No. 38 at 74-78.)

17              a.      State Court Direct and Collateral Review

18      The Claim VII allegations were raised on direct appeal (Doc. No. 28-11 at AGO13703-

19  18), and denied by the California Supreme Court on the merits, as follows:

20

21          Defendant contends the trial court erroneously refused to instruct
            the jury that defendant's motive for killing Uribe was a mitigating
22          factor. In his proposed instructions he requested the trial court
            instruct the jury to consider "[w]hether or not the victim in whole,
23          or in part, contributed to the extreme mental or emotional state of
            the defendant." There was no discussion of this proposed
24          instruction, nor was the proposed instruction read to the jury. The
            claim is therefore forfeited. (See People v. Homick (2012) 55
25          Cal.4th 816, 871, 150 Cal.Rptr.3d 1, 289 P.3d 791 [failure to
            press for a ruling on a requested limiting instruction forfeits any
26          claim of error].)

27  ─────────────
    [9] Variously referred to as CALJIC 8.88 by trial counsel.
28  [10] Petitioner, in the § 2254 petition, states the modified CALJIC 8.88 was requested during the guilt phase.  (Doc.
    No. 38 at 74.)  Still, the court observes the instruction relates to the penalty phase.  (*See* e.g., Doc. No. 38 at 74-78.)

1
2
3
4
5
6

Defendant also requested that the court instruct the jury: "You may consider the motive for the commission of the crime as a mitigating factor which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any other aspect of the defendant's character or background that the defendant offers as a basis for a sentence less than death." The court refused this instruction, saying it was confusing, given that the prosecutor would argue the motive evidence was aggravating. The court correctly stated that both parties could argue motive and that it was up to the jury to decide whether the motive evidence was aggravating or mitigating.

7
8
9
10
11
12
13

Defendant asserts the jury understood the court's instruction in the language of Penal Code section 190.2, factor (k), to provide that "motive was not something which could be considered at all in mitigation." That instruction provided that the jury may consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character, background or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." There is no reasonable likelihood the jury understood that instruction to provide that it could not consider defendant's motive as a mitigating factor.

14    *Rangel*, 62 Cal. 4th at 1233.

15         b.    Legal Standard

16              (i)    *Trial Court Error*

17    The standard for trial court error is set out in section VIII A 1 b (i), herein.

18              (ii)    *Instructional Error*

19    To obtain federal habeas relief for instructional error, a petitioner must show that the

20    instruction given the jury so infected the entire trial that the resulting conviction violates due

21    process. *McGuire*, 502 U.S. at 72 (1991) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

22    "A court reviewing a claim of jury instructional error on federal habeas review first

23    considers whether the erroneous instruction amounted to a constitutional error." *Reno v. Davis*,

24    46 F.4th 821, 841 (9th Cir. 2022) (citing *Morris v. Woodford*, 273 F.3d 826, 833 (9th Cir.

25    2001)).  A constitutional error is established where "the ailing instruction by itself so infected

26    the entire trial that the resulting conviction violates due process."  *Id.* (citing *Henderson v.*

27    *Kibbe*, 431 U.S. 145, 154  (1977)) (quoting *Naughten*, 414 U.S. at 147 (1973)).

28    The harmless error analysis applies to instructional errors as long as the error at issue

1   does not categorically "vitiate all the jury's findings." *Hedgpeth v. Pulido,* 555 U.S. 57, 61

2   (2008) (citing *Neder v. U.S.*, 527 U.S. 1, 11 (1999)) (quoting *Sullivan v. Louisiana,* 508 U.S.

3   275 (1993)).  "If a federal habeas court finds constitutional error in the jury instructions, the

4   court must then determine whether the erroneous instruction had a "substantial and injurious

5   effect or influence in determining the jury's verdict." *Reno,* 46 F. 4th at 841 (citing *Brecht,* 507

6   U.S. at 637); *see also Hedgpeth,* 555 U.S. at 60-61 (finding various forms of instructional error

7   to be trial errors subject to harmless error analysis).

8            c.     Analysis

9        Petitioner argues the trial court's erroneous refusal to give his modified CALJIC 8.85

10  instruction and his Special Instruction No. 8 prevented the jury from fully considering

11  mitigating evidence of his motive for committing the capital crime.  (*See e.g.*, Doc. No. 27-9 at

12  AGO12456-58 (10 RT 2418-20).)  He argues the instructions were necessary because the jury

13  "must be allowed to give full consideration and full effect to mitigating circumstances." (Doc.

14  No. 38 at 78 citing *Penry v. Johnson,* 532 U.S. 782, 797 (2001).)  He argues that catchall factor

15  "k" was insufficient to give full effect to such  mitigating evidence.  (Doc. No. 45 at 18.)  He

16  argues the trial court's refusal to give the instructions on mitigating motive was severely

17  prejudicial.  (Doc. No. 38 at 78.)

18       Respondent argues that the jury was properly instructed on the Penal Code §190.3

19  aggravating and mitigating circumstances upon which CALJIC 8.85 instructs.  (Doc. No. 43 at

20  40-41 citing Doc. No. 27-9 at AGO12642-44 (10 RT 2601-03).)  He argues the state supreme

21  court reasonably found the jury was not precluded from giving mitigating weight to evidence of

22  petitioner's motive whether presented at the guilt or the penalty phase.  (*Id.*)  He observes trial

23  counsel argued mitigating motive to the jury.  (Doc. No. 43 at 41 citing Doc. No. 27-9 at

24  AGO12601-02 (10 RT 2560-61); *see also* Doc. No. 27-3 at AGO11035-36 (4 RT 1067-68);

25  Doc. No. 20-42, AGO11299-301 (5 RT 1321-23).)

26       Respondent argues that on deferential review, petitioner fails to pass through the §

27  2254(d)(1)(2) gateway, and that petitioner has failed to demonstrate any actual prejudice as

28  required under § 2254(a).  (Doc. No. 43 at 39.)  Particularly, he argues that petitioner has not

1    demonstrated instructional error rising to the level of a due process violation, i.e. that the

2    alleged error so infected the entire trial that it rendered the resulting conviction "fundamentally

3    unfair."   (Doc. No. 43 at 39-40 citing *McGuire*, 502 U.S. at 62, 67, 71-73 (an ambiguous

4    instruction did not violate the defendant's due process rights where there was no "reasonable

5    likelihood" that the jury interpreted the instruction in a constitutionally impermissible way).)

6    Especially so, respondent argues, as the omission of an instruction is "less likely to be

7    prejudicial than a misstatement of the law."  (*Id.* citing *Kibbe*, 431 U.S. at  155.)

8         Respondent argues that in any event, the alleged instructional error was harmless under

9    *Brech*t, i.e. the error, considered in the whole context of the case, did not have a substantial and

10   injurious effect or influence on the jury's verdict.  (Doc. No. 43 at 40 citing *Calderon v.

11   Coleman*, 525 U.S. 141, 147 (1998) (*citing Brecht*, 507 U.S. at 637-38); *California v. Roy*, 519

12   U.S. 2, 6 (1996) (per curiam) (holding that a federal habeas court reviews erroneous or omitted

13   jury instructions for harmless error); *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997)

14   (applying *Brecht* to omitted jury instruction claim).)

15        The  record  reflects  that  petitioner  proposed  to  modify  the  standard  CALJIC  8.85

16   instruction regarding Penal Code § 190.3 penalty phase factors for consideration, by making the

17   italicized changes below:

18       In determining which penalty is to be imposed on the defendant,
19       you shall consider all of the evidence which has been received
         during any part of the trial of this case, except as you may be
20       hereafter instructed. You shall consider, take into account and be
         guided by the following factors, if applicable:

21       (a) The circumstances of the crime of which the defendant was
22       convicted in the present proceeding.

23       (b) The presence or absence of criminal activity by the defendant,
         other than the crime[s] for which the defendant has been tried in
24       the present proceedings, which involved the use or attempted use
         of force or violence or the express or implied threat to use force or
25       violence.

26       (c) The presence or absence of any prior felony conviction, other
         than the crimes for which the defendant has been tried in the
27       present proceedings.

28       (d) Whether or not the offense was committed while the defendant
         was  under  the  influence  of  extreme  mental  or  emotional

disturbance.

*(e) Whether or not the victim in whole, or in part, contributed to the extreme mental or emotional state of the defendant.*

(e*f*) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

(f*g*) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

(g*h*) Whether or not the defendant acted under extreme duress or under the substantial domination of another person.

(h*i*) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication.

(i*j*) The age of the defendant at the time of the crime.

(j*k*) Whether or not the defendant was an accomplice to the offense and the extent of his participation in the commission of the offense.

(k*l*) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial. You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle.

(Doc. No. 38 at 74-75 citing Doc. No. 22-4 at AGO02520-21 (12 CT 2540-41).)  The trial court rejected the modified instruction, and instructed the jury with the standard  CALJIC 8.85.  (Doc. No. 22-4 at AGO02555-57 (12 CT 2575-77); *see also* Doc. No. 38 at 75.)

The record reflects that petitioner also proposed penalty phase Special Instruction No. 8, that:

You may consider the motive for the commission of the crime as a mitigating factor which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any other aspect of the defendant's character or background that the defendant offers as a basis for sentence less than death.

(Doc. No. 38 at 75 citing Doc. No. 22-4 at AGO02455; *People v. Cox*, 53 Cal. 3d 618, 672

1  (1991), *disapproved by People v. Doolin*, 45 Cal. 4th 390 (2009); *People v. Easley*, 34 Cal. 3d

2  878, n.10 (1983), *receded from by People v. Murtishaw*, 48 Cal. 3d 1001 (1989).)  The trial

3  court rejected Special Instruction No. 8 (Doc. No. 22-4 at AGO02571 (12 CT 2590)) stating it

4  was confusing and observing that both sides intended to argue motive under (Penal Code

5  §190.3) factor "a" or factor "k" and that "it's up to the jury to determine whether it's a factor

6  "a" or factor "k."  (Doc. No. 38 at 76 citing Doc. No. 27-9 at AGO12456-57 (10 RT 2418-19);

7  *see also* Doc. No. 27-9 at AGO12575 (10 RT 2535).)  Trial counsel's offer to cross-reference

8  factor "k" in the Special Instruction also was rejected by the trial court.  (Doc. No. 38 at 76

9  citing Doc. No.27-9 at  AGO12457 (10 RT 2419).)

10      The record reflects the guilt phase jury was instructed regarding motive, that:

11      Motive is not an element of the crime charged and need not be
        shown. However, you may consider motive or lack of motive as a
12      circumstance in this case. Presence of motive may tend to
        establish the defendant is guilty. Absence of motive may tend to
13      show the defendant is not guilty.

14

15  (Doc. No. 38 at 75 citing Doc. No. 22-4 at AGO02710 [CALJIC 2.51].)

16      At the conclusion of the penalty phase, the trial court instructed the jury to disregard all

17  other instructions given in other phases of this trial.  (Doc. No. 22-4 at AGO02519; Doc. No.

18  27-9 at AGO12636 [CALJIC 8.84.1]; 12 CT 2539; 10 RT 2595).)  As noted, the trial court also

19  instructed the jury with the standard CALJIC 8.85, including that:

20      You shall consider, take into account and be guided by the
        following (Penal Code §190.3) factors, if applicable:
21

22          a. The circumstances of the crime of which the defendant
            was convicted in the present proceeding and the existence
23          of the special circumstance found to be true.

24          […]

25          k. Any other circumstance which extenuates the gravity of
            the crime even though it is not a legal excuse for the crime
26          and any sympathetic or other aspect of the defendant's
            character, background or record that the defendant offers
27          as a basis for a sentence less than death, whether or not
            related to the offense for which he is on trial.

28

60

1  (Doc. No. 38 at 77 citing Doc. No. 27-9, AGO12642-44 (10 RT 2601-03).)

2       Here, the state supreme court reasonably could reject the Claim.  In evaluating a claim of

3  instructional error, a single instruction is not viewed in isolation, but rather in the context of the

4  overall charge.  *Spivey v. Rocha*, 194 F.3d 971, 976 (1999).  "[T]he proper inquiry . . . is

5  whether there is a reasonable likelihood that the jury has applied the challenged instruction in a

6  way that prevents the consideration of constitutionally relevant evidence."  *Boyde v. California,*

7  494 U.S. 370, 380 (1990).

8       Additionally, a reviewing court does not engage in a technical parsing of the

9  instruction's language, but instead approaches the instructions in the same way that the jury

10  would -- with a "commonsense understanding of the instructions in the light of all that has taken

11  place at the trial."  *Johnson v. Texas*, 509 U.S. 350, 368 (1993).  Lastly, federal courts presume

12  that juries follow instructions, including cautionary instructions.  *Weeks v. Angelone*, 528 U.S.

13  225, 234 (2000); *see also Boyde*, 494 U.S. at 381-85; *Tan v. Runnels*, 413 F.3d 1101, 1115

14  (2005).

15       The state supreme court reasonably could find petitioner failed to demonstrate the jury

16  was unable to give full effect to mitigating evidence of motive in the absence of his noted

17  requested instructions.  In this case, both sides argued their respective positions on aggravating

18  and mitigating evidence of motive.  The jury heard evidence that petitioner was motivated by

19  his belief that victim Juan Uribe had in the preceding days shot his son Little Pete in the head,

20  requiring stitches.  (*See e.g.*, Doc. No. 38 at 74 citing Doc. No. 27-3 at AGO11035-37 (4 RT

21  1067-69); Doc. No. 27-4 at AGO11301 (5 RT 1323).)  The jury heard evidence that on the

22  evening of the killings, petitioner had voiced his desire to get back at whoever shot his son,

23  (Doc. No. 38 at 74 citing Doc. No. 27-4 at AGO11239 (5 RT 1262); *cf.* Doc. No. 21 at 157);

24  and that after the shooting, petitioner stated that he quit his job because he needed to protect his

25  son and leave the area which was becoming "pretty violent."  (*Id.* citing  Doc. No. 26-3 at

26  AGO09637 (2 SCT 407).)

27       Both sides argued motive at the guilt phase.  The prosecutor argued that evidence of

28  motive was aggravating: that petitioner was motived to avenge the disrespect shown by Uribe's

1    shooting of Little Pete, and that Chuck Durbin, while trying to save his children, got in the way.

2    (Doc. No. 38 at 75-76; *see also* Doc. No. 27-9 at AGO12456 (10 RT 2418); AGO12589-90 (10

3    RT 2549-1250); Doc. No. 27-4 at AGO11239 (5 RT 1262); Doc. No. 27-8 at AGO12166-67 (9

4    RT 2145-2146).)

5        Trial counsel argued the mitigating value of the motive evidence at the penalty phase:

6    that petitioner was motivated by the outrage he felt over his son's brush with near death when a

7    bullet grazed his head, that petitioner wanted his son to put this behind him, and that petitioner

8    was concerned his son could be killed.  (*Id.* citing Doc. No. 27-9 at AGO12601-02 (10 RT

9    2560-61).)  Trial counsel also argued that Jesse Rangel must have been motivated to shoot

10   Uribe because Jesse previously had shot up Uribe's car.  (Doc. No. 38 at 75; Doc. No. 27-8 at

11   AGO12197-98 (9 RT 2176-77).)

12       The state supreme court reasonably could find the jurors were free to fully consider such

13   argument and evidence under factors "a" and "k".  Particularly, petitioner failed to show that the

14   trial court was unreasonable in finding that Special Instruction No. 8 would be confusing to the

15   jury given that both parties intended to argue their respective positions on motive, and that it

16   was up to the jury to determine whether motive was properly categorized under factor "a" or

17   factor 'k".  (*See* Doc. No. 27-9 at AGO12642-44 (10 RT 2601-03), AGO12456-57 (10 RT

18   2418-19).)  Similarly, that court reasonably could find the trial court's instruction that jurors

19   disregard at the penalty phase the instructions given to them in the guilt phase, including the

20   above noted CALJIC 2.51 regarding motive, did not preclude full consideration of mitigating

21   evidence of motive including under factors "a" and "k."

22       As noted, the omission of an instruction is less likely to be prejudicial than a

23   misstatement of the law.  *Walker v. Endell*, 850 F.2d 470, 475 (9th Cir. 1987).  Thus, a habeas

24   petitioner whose claim involves a failure to give a particular instruction bears an "especially

25   heavy burden."  *Villafuerte*, 111 F.3d at 624 (quoting *Kibbe*, 431 U.S. at 155).  The state

26   supreme court reasonably could find petitioner failed carry this heavy burden given the overall

27   charge to the jury (*see* Doc. No. 22-4 at AGO02539-64 (12 CT 2559-84)) and the noted

28   evidence and argument of motive before the jury at the penalty phase.

1     Finally, assuming arguendo the alleged instructional error, the state supreme court

2  reasonably could find only harmless error.   In determining whether a petitioner proceeding

3  pursuant to § 2254 suffered actual prejudice from an instructional error, a federal court must

4  determine whether, in light of the record as a whole, the error had a substantial and injurious

5  effect or influence in determining the jury's verdict. *Pulido*, 555 U.S. at 62; *see also Brecht,*

6  507 U.S. at 637-38.  A "substantial and injurious effect" means a "reasonable probability" that

7  the jury would have arrived at a different verdict absent the instructional error. *Clark v. Brown*,

8  450 F.3d 898, 916 (9th Cir. 2006).

9     Here, in addition to the evidence of motive, the jury had before it evidence of

10  petitioner's character: that prior to the capital crime, he was a kind and responsible father, a law

11  abiding member of the community, and deeply concerned for the welfare of Little Pete and his

12  other family members.  (*See e.g.*, Doc. No. 27-9 at AGO12609-10, AGO12633-34.)

13     The jury also had before it the prosecution's noted aggravating evidence raised by the

14  crime: that petitioner carried out a planned, armed assault not to protect, but rather to retaliate

15  for the shooting of Little Pete, and in the course thereof entered an occupied third party home

16  and shot Durbin, a relative bystander, in the head.  (*See e.g.,* Doc. No. 27-9 at AGO12589-90

17  (10 RT 2549-1250); Doc. No. 27-4 at AGO11239 (5 RT 1262); Doc. No. 27-8 at AGO12166-67

18  (9 RT 2145-2146).)

19     Accordingly, petitioner has not shown the state supreme court erred in finding "no

20  reasonable likelihood the jury understood [CALJIC 8.85] to provide that it could not consider

21  defendant's motive as a mitigating factor." *Rangel*, 62 Cal. 4th at 1233.  That court also

22  reasonably could find no reasonable probability of a different sentencing outcome absent the

23  alleged instructional error.  Moreover, if the instructions given were error as a matter of state

24  law, that alone is not a basis for federal habeas corpus relief. *Lewis v. Jeffers*, 497 U.S. 764,

25  780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *McGuire*, 502

26  U.S. at 71-72 ("[T]he Due Process Clause does not permit the federal courts to engage in a

27  finely tuned review of the wisdom of state evidentiary rules"); *see also Clark,* 450 F.3d at 904.

28  /////

d.      Conclusions

A fair-minded jurist could find the state supreme court's denial of the Claim was not contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

Claim VII shall be denied.

### 2.    *Claim VIII*

Petitioner alleges that the trial court erred by refusing his Special Instruction No. 11, that mitigation need not be proven beyond a reasonable doubt and must be found if there is any substantial evidence to support it, violating his rights under the Eighth and Fourteenth Amendments.  (Doc. No. 38 at 79-80.)

a.      State Court Direct and Collateral Review

Claim VIII allegations were raised on direct appeal (Doc. No. 28-11 at AGO13719-24), and denied by the California Supreme Court on the merits, as follows:

Assessment of mitigating evidence

> Defendant contends the trial court erroneously refused to instruct the jury that mitigating circumstances need not be proved beyond a reasonable doubt. The United States Supreme Court has held a trial court need not so instruct. (Kansas v. Carr (2016) 577 U.S. – ——, ——, 136 S.Ct. 633, 642, 193 L.Ed.2d 535 ["our case law does not require capital sentencing courts 'to affirmatively inform the jury that mitigating circumstances need not be proved beyond a reasonable doubt' "]; accord, Samayoa, supra, 15 Cal.4th at p. 862, 64 Cal.Rptr.2d 400, 938 P.2d 2.)

*Rangel*, 62 Cal. 4th at 1233-34.

b.      Legal Standard

*(i)     Trial Court Error*

The standard for trial court error is set out in section VIII A 1 b (i), herein.

*(ii)    Instructional Error*

The standard for instructional error is set out in section VIII D 1 b (ii) herein.

c.      Analysis

64

Petitioner argues the trial court erred by rejecting his Special Instruction No. 11 which stated in pertinent part that:

> "A mitigating circumstances does not have to be proved beyond a reasonable doubt to exist.   You must find that a mitigating circumstance exists if there is any substantial evidence to support it."

(Doc. No. 38 at 79 citing Doc. No. 22-4 at AGO02459 (12 CT 2479; Doc. No. 27-9 at AGO12458-59 (12 CT 2479, 2592-93; 10 RT 2420-21).)   He points to a state supreme court case upholding such instructional language as consistent with the Eighth Amendment.   (Doc. No. 38 at 79 citing *People v. Wharton*, 53 Cal.3d 522, 600-601, n.23 (1991).)

Petitioner also argues the trial court erred by failing to instruct the jury with any penalty phase standard of proof.   (Doc. No. 38 at 80 citing Doc. No. 27-9 at AGO12635-47 (10 RT 2594-2606).)

Respondent counters that petitioner fails to pass through the § 2254(d)(1)(2) gateway, and that petitioner fails to demonstrate any "violation of the Constitution or law or treaties of the United States" under § 2254(a).   (Doc. No. 43 at 43-44.)   He argues the state supreme court reasonably found that the trial court was not required "to affirmatively inform the jury that mitigating circumstances need not be proven beyond a reasonable doubt."   (Doc. No. 43 at 42-43 citing *Rangel*, 62 Cal. 4th at 1233–34; *Kansas v. Carr*, 577 U.S. 108, 118-19 (2016).)   He argues that petitioner does not point to any contrary federal authority and fails to carry his "especially heavy" burden of showing trial court error by failure to give an instruction.   (Doc. No. 43 at 43 citing *Kibbe*, 431 U.S. at 155.)

The record reflects that the trial court rejected Special Instruction No. 11 on grounds that:

> It does not mention anything about aggravating.   Single aggravating incident may outweigh single mitigating circumstances.   There's authority on that. People vs. Hines, H-i-n-e-s 1997 case reported at 15 Cal. 4th 997, 1068 . . . It's considered argumentative.

(Doc. No. 27-9 at AGO12458-59 (10 RT 2420-2421).)

Here, the court finds the state supreme court reasonably could reject the Claim.  The

65

1    capital sentencing determination by California jurors is moral and normative and does not

2    require unanimous written findings pursuant to a standard of proof or presumption in favor of

3    life.  *See e.g.,  People v. Weaver*, 26 Cal. 4th 876, 984–87 (2001).  The Supreme Court has held

4    that no "specific method of balancing mitigating and aggravating factors in a capital sentencing

5    proceeding is constitutionally required."  *Kansas v. Marsh*, 548 U.S. 163, 175 (2006).

6    Moreover, that Court has stated "our case law does not require capital sentencing courts to

7    affirmatively inform the jury that mitigating circumstances need not be proved beyond a

8    reasonable doubt."  *Carr*, 577 U.S. at 119-20.

9         California's death penalty sentencing scheme has been consistently upheld as

10   constitutional by the Supreme Court.  *Tuilaepa v. California*, 512 U.S. 967, 975-80 (1994);

11   *Pulley v. Harris*, 465 U.S. 37, 53 (1984); *see also Williams v. Calderon*, 52 F.3d 1465, 1485

12   (1995) (failure to require a specific finding that death is the appropriate penalty beyond a

13   reasonable doubt does not render California's death penalty statute unconstitutional).

14        Petitioner has not pointed to clearly established Supreme Court authority that under

15   California's death penalty statute, penalty phase determinations implicate any burden of proof

16   much less a reasonable doubt standard of proof.  *See Floyd v. Filson*, 949 F.3d 1128, 1144

17   (observing that the federal courts of appeals have uniformly rejected the argument that *Apprendi*

18   *v. New Jersey*, 530 U.S. 466 (2000) and *Ring v. Arizona*, 536 U.S. 584 (2002) require a

19   reasonable doubt instruction at the penalty phase because a jury's balancing inquiry in a capital

20   case is a subjective and moral one, not a factual one).  (*See* Claim XVII, *post*.)  Particularly,

21   *Apprendi* does not require a jury to find beyond a reasonable doubt the applicability of a

22   specific section 190.3 sentencing factor.  *Tuilaepa*, 512 U.S. at 975.

23        As discussed above, the penalty phase jury was instructed properly on CALJIC 8.85

24   regarding the Penal Code § 190.3 sentencing factors for consideration.

25        Relatedly, the jury was instructed that:

26        [A]n aggravating factor is any fact, condition, or event attending
          the commission of a crime, which increases its guilt or enormity
27        or adds to its injurious consequences which is above and beyond
          the elements of the crime itself.

28

66

1

2

3

> A mitigating circumstance is any fact, condition, or event which does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty.

4

(Doc. No. 27-9 at AGO12646 (10 RT 2605); *see also* Doc. No. 38 at 80), and that:

5

6

7

> To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole.

8

(Doc. No. 27-9 at AGO12646-47 (10 RT 2605-06); *see also* Doc. No. 38 at 80.)

9

Given the instructions as a whole, petitioner has not demonstrated the jury was

10

prevented from full consideration of mitigating evidence, weighing sentencing circumstances,

11

and rendering an individualized sentence determination.  As noted, California's death penalty

12

statute and pattern instructions have been upheld as constitutional by the Supreme Court.

13

*Tuilaepa*, 512 U.S. at 975-80; *Pulley*, 465 U.S. at 53; *see also Williams*, 52 F.3d at 1485.

14

Petitioner's suggestion that his burden of showing prejudice is lessened because he

15

specifically requested the omitted instruction is unpersuasive.  He points to Henderson and

16

observes in that case, unlike here, the trial counsel did not request the omitted instruction.  (Doc.

17

No. 45 at 19-20 citing *Henderson*, 431 U.S. at 154.)   While the *Henderson* court found

18

"remote" the probability that the omitted and unrequested instruction before it substantially

19

affected the jury deliberations, 431 U.S. at 155, that court did not suggest its prejudice

20

determination would have been different had the trial court rejected the requested instruction.

21

Particularly, the *Henderson* court's acknowledgment that "[a]n omission, or an incomplete

22

instruction, is less likely to be prejudicial than a misstatement of the law[,]" does not suggest

23

otherwise.

24

In sum, the state supreme court reasonably could find petitioner failed to carry his heavy

25

burden of showing the trial court committed constitutional error by omitting his Special

26

Instruction No. 11.  Mere state law instructional error, if any there be, is not a basis for federal

27

habeas relief.  *McGuire*, 502 U.S. at 71-72.

28

/////

67

d.     Conclusions

A fair-minded jurist could find the state supreme court's denial of the Claim was not contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

Claim VIII shall be denied.

*3.     Claim IX*

Petitioner alleges that the trial court erred by refusing instruction that favorable treatment of an accomplice is mitigating evidence, violating his rights under the Eighth and Fourteenth Amendments.  (Doc. No. 38 at 81-82.)

a.     State Court Direct and Collateral Review

Claim IX allegations were raised in the direct appeal (Doc. No. 28-11 at  AGO13719, AGO13724-28), and denied on the merits, as follows:

> Defendant further contends the trial court erroneously refused to instruct the jury that it could consider as mitigating the "favorable treatment received by someone you personally believe to be an accomplice." "We have consistently held that evidence of an accomplice's sentence or of the leniency granted an accomplice is irrelevant at the penalty phase because ' "it does not shed any light on the circumstances of the offense or the defendant's character, background, history or mental condition." ' " (*Maciel, supra,* 57 Cal.4th at p. 549, 160 Cal.Rptr.3d 305, 304 P.3d 983.)

*Rangel*, 62 Cal. 4th at 1234.

b.     Legal Standard

*(i)     Trial Court Error*

The standard for trial court error is set out in section VIII A 1 b (i), herein.

*(ii)     Instructional Error*

The standard for instructional error is set out in section VIII D 1 b (ii) herein.

c.     Analysis

Petitioner argues the state supreme court erred in rejecting the claim because favorable treatment of an accomplice may be considered by the jury as mitigating evidence under CALJIC 8.85 (Penal Code § 190.3) factor "a" as a "circumstance of the offense."  (Doc. No. 45 at 20.)

1   He argues the state supreme court unreasonably found that such evidence does not shed any

2   light on the circumstances of the offense.  (*Id.* citing *Rangel*, 62 Cal. 4th at 1234.)

3       Petitioner supports the argument by observing that, of the potential accomplices

4   involved in the capital crime, i.e. Richard Diaz (who testified he was outside the house), Jesse

5   Rangel (who was initially a suspect and who was identified by Cindy Durbin), Little Pete (who

6   was a co-defendant and not yet tried), and Rafael Avila (initially charged but who absconded

7   and was never arrested), only petitioner received the death penalty.  He argues this disparity

8   implicates the Eighth Amendment.  (Doc. No. 45 at 20-21 citing *Lockett v. Ohio*, 438 U.S. 586,

9   604 (1978) (capital juries may not be precluded from considering, as mitigating factors, any

10  aspects of a defendant's character or of the circumstances of the offense that the defendant

11  proffers as a basis for a sentence less than death); *see also* Doc. No. 38 at 81.)

12      The record reflects that petitioner's Special Instruction No. 16  read:

13          You may consider and weigh as a circumstance in mitigation
            under factor ["a"] the favorable treatment received by someone
14          you personally believe to be an accomplice.

15

16  (Doc. No. 38 at 81 citing Doc. No. 22-4 at AGO02464 (12 CT 2484).)  The record further

17  reflects the trial court refused the instruction without discussion.  (Doc. No. 27-9 at AGO12460

18  (10 RT 2422).)

19      Petitioner goes on to argue the state supreme court's rejection of the claim was

20  unreasonable because the Supreme Court has found evidence of disparity in sentence to be

21  mitigating evidence where allowed by state law.  (Doc. No. 38 at 81 citing *Parker v. Dugger,*

22  498 U.S. 308 (1991) (disparity in sentencing characterized as mitigating evidence under Florida

23  law).  Relatedly, petitioner observes other states recognize disparity in treatment of accomplices

24  as being mitigation evidence.  (Doc. No. 38 at 81-82 citing *State v. Bearup*, 211 P.3d 684, 694-

25  695 (Ariz. 2009) (*en banc*); *Woldt v. People*, 64 P.3d 256, 260 n.8 (Colo. 2003) (*en banc*);

26  *Garden v. State*, 844 A.2d 311, 317 (Del. 2004), *superseded by statute as stated in Gattis v.*

27  *State*, 955 A. 2d 1276 (Del. 2008); *Jeffries v. State*, 222 So.3d 538, 548 (Fla. 2017), *abrogation*

28  *recognized by Cruz v. State*, 2023 WL 4359497 (Fla. July 6, 2023); *People v. Gleckler*, 411

1    N.E.2d 849, 858- 861 (Ill. 1980); *State v. Deiterman*, 29 P.3d 411, 423 (Kan. 2001); *Bryant v.*
2    *State*, 824 A.2d 60, 78 (Md. 2003); and *State v. Dean*, 54 N.E.3d 80, 146 (Ohio 2015).)

3         Respondent argues the proposed instruction was properly rejected because evidence of
4    disparate treatment of an accomplice is irrelevant to Penal Code § 190.3 (CALJIC 8.85) factors
5    "a" and "k" and thus not itself mitigating evidence.  (Doc. No. 43 at 45 citing *Lockett*, 438 U.S.
6    at 604 (the state court may not exclude as mitigating evidence "any aspect of a defendant's
7    character or record and any of the circumstances of the offense that the defendant proffers as a
8    basis for a sentence less than death.").)

9         Respondent argues that *Parker* is distinguishable because it is based upon application of
10   Florida's death penalty statute and limited to the facts of the case. (Doc. No. 43 at 46, citing
11   *Parker*, 498 U.S. at 310-23 (advisory sentencing jury's consideration of evidence that none of
12   defendant's accomplices had received the death penalty and its recommendation of life
13   sentence, later rejected by trial judge, was remanded to state supreme court to reconsider the
14   defendant's death sentence in light of the record, the sentencing hearing, and the trial judge's
15   findings).)

16        Respondent argues that on deferential review, petitioner fails to pass through the §
17   2254(d)(1)(2) gateway, and that petitioner fails to demonstrate any "violation of the
18   Constitution or law or treaties of the United States" under § 2254(a).  (Doc. No. 43 at 46.)

19        The court finds that the state supreme court reasonably could reject the Claim.
20   California's death penalty statute has been upheld notwithstanding that it does not provide for
21   inter-case proportionality.   Federal constitutional guarantees of due process and equal
22   protection, and against cruel and unusual punishment do not require inter-case proportionality
23   review on appeal.  *Pulley*, 465 U.S. at 50-51 ("There is thus no basis in our cases for holding
24   that comparative proportionality review by an appellate court is required in every case in which
25   the death penalty is imposed and the defendant requests it."); *see also People v. Mai* 57 Cal.4th
26   986, 1057 (2013) ("The federal constitutional guarantees of due process and equal protection,
27   and against cruel and unusual punishment (U.S. Const., 6th, 8th, and 14th Amends.), do not
28   require inter-case proportionality review on appeal.").

California's death penalty process, which narrows the class of death eligible offenders to less than the definition of first-degree murder and permits consideration of all mitigating evidence, has been approved by the Supreme Court. *Tuilaepa*, 512 U.S. at 972-79; *Pulley*, 465 U.S. at 38.

As discussed above, the penalty phase jury was instructed properly on weighing aggravating and mitigating factors,  (Doc No. 27-9 at AGO12646 (10 RT 2605); *see also* Doc. No. 38 at 80), and that:

> To return a judgment of death it must "be persuaded  that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."

(Doc. No. 27-9 at AGO12646-47 (10 RT 2605-06); *see also* Doc. No. 38 at 80.)

Petitioner has not demonstrated the instructions considered in their entirety left the jury unable to give full consideration to mitigating evidence, weigh sentencing circumstances, and render an individualized sentencing determination.  (Doc. No. 22-4 at 134 [CALJIC 1.01]); 2*Tuilaepa*, 512 U.S. at 975-80; *Pulley*, 465 U.S. at 53;; *see also Williams*, 52 F.3d at 1485.

In sum, the state supreme court reasonably could find petitioner failed to carry his heavy burden of showing constitutional error by omitting his Special Instruction No. 16.  Any mere state law instructional error, if any there be, is not a basis for federal habeas relief. *McGuire*, 502 U.S. at 71-72.

### d.    Conclusions

A fair-minded jurist could find the state supreme court's denial of the Claim was not contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

Claim IX shall be denied.

## E.   Claims Alleging Trial Court Error at the Penalty Phase – Evidentiary Error

### 1.    *Claim IV*

Petitioner alleges that the trial court erred by excluding evidence that victim Chuck

Durbin had a high level of methamphetamine in his system, victim Juan Uribe was Chuck Durbin's drug dealer, and that drug dealing was going on at the Durbin home at the time of the capital crime, violating his rights under the Eighth and Fourteenth Amendments.  (Doc. No. 38 at 66-68.)

### a.   State Court Direct and Collateral Review

Claim IV allegations were raised on direct appeal (Doc. No. 28-11 at AGO13657-76), and denied on the merits, as follows:

#### 1. Exclusion of mitigating evidence

During the defense case in the guilt phase, Fitzsimmons testified he had used methamphetamine at the Durbin residence about 10 to 15 minutes before the attack. Defendant contends that the trial court erred by excluding evidence that murder victim Juan Uribe was a drug dealer, victim Chuck Durbin was Uribe's client and had a high level of methamphetamine in his system at the time of his death, and there was drug paraphernalia in the Durbin home at the time of the murders.[15] Defendant asserts the "prosecution was offered a clear and direct path to demonstrate that both [victims] were moral beacons, adept at the task of parenting, whose presence would be missed," "Uribe was cast as particularly useful in providing income to the family," although "the source of his income was excluded," and "Chuck Durbin was cast as a moral guidepost for his family members."

-----------------------------FOOTNOTE---------------------------------

n.15 The trial court permitted defendant to ask Martha Melgoza, Juan Uribe's girlfriend, if she was aware of Uribe's acts of violence, and how that affected her relationship with him, but the defense ultimately declined to do so.

---------------------------END FOOTNOTE-----------------------------

Just as a prosecutor may present evidence rebutting a defendant's evidence of his good character (People v. Rodriguez (1986) 42 Cal.3d 730, 791, 230 Cal.Rptr. 667, 726 P.2d 113), a defendant may present evidence rebutting the prosecution's evidence of a victim's good character (People v. Duff (2014) 58 Cal.4th 527, 564–565, 167 Cal.Rptr.3d 615, 317 P.3d 1148 (Duff )). Nonetheless, when a prosecutor presents evidence rebutting evidence of a defendant's good character, "the scope of rebuttal must be specific, and evidence presented or argued as rebuttal must relate directly to a particular incident or character trait defendant offers in his own behalf." (Rodriguez, at p. 792, fn. 24, 230 Cal.Rptr. 667, 726 P.2d 113.) Thus, when a defendant's mitigating evidence pertains solely to difficulties he has

encountered in his life and not his good character, the prosecutor is precluded from introducing on rebuttal bad character evidence regarding the defendant. (People v. Loker (2008) 44 Cal.4th 691, 725, 80 Cal.Rptr.3d 630, 188 P.3d 580; People v. Ramirez (1990) 50 Cal.3d 1158, 1193, 270 Cal.Rptr. 286, 791 P.2d 965 (Ramirez ).) Similarly, when the prosecution's evidence simply describes the effect the victim's death has had on his family and friends, a defendant is generally precluded from introducing bad character evidence regarding the victim. (Duff, at p. 565, 167 Cal.Rptr.3d 615, 317 P.3d 1148; People v. Boyette (2002) 29 Cal.4th 381, 445, 127 Cal.Rptr.2d 544, 58 P.3d 391 (Boyette ).)

"The right to present rebuttal, or 'negative,' victim impact evidence to counter evidence offered by the People in their penalty case-in-chief is subject to the usual evidentiary constraints that proffered evidence must be relevant and more probative than prejudicial. [Citations.] We review the trial court's decision to limit or exclude rebuttal victim impact evidence on these grounds for abuse of discretion." (Duff, supra, 58 Cal.4th at p. 565, 167 Cal.Rptr.3d 615, 317 P.3d 1148.)

Here, the prosecution evidence focused on the effect of the murders on surviving family members and a friend, and not on the victims' character. (See ante, pt. I.B.1.) Thus the evidence "left no misleading portrayal of the victim to which the defendant's proffered negative impact evidence might offer relevant rebuttal." (Duff, supra, 58 Cal.4th at p. 565, 167 Cal.Rptr.3d 615, 317 P.3d 1148.) "Testimony from the victims' family members was relevant to show how the killings affected them, not whether they were justified in their feelings due to the victims' good nature and sterling character. Accordingly, defendant was not entitled to disparage the character of the victims...." (Boyette, supra, 29 Cal.4th at p. 445, 127 Cal.Rptr.2d 544, 58 P.3d 391.) Although Uribe's mother did testify without elaboration he was a "good brother" to his sisters and made sure the family was fed and the bills were paid, the testimony did not suggest that Uribe was uninvolved in misconduct, and the trial court therefore did not abuse its discretion in determining that the testimony did not open the door to evidence of Uribe's drug dealing. (See Ramirez, supra, 50 Cal.3d at p. 1193, 270 Cal.Rptr. 286, 791 P.2d 965.)

Defendant also contends that excluding this evidence "deprived the defense of an opportunity to argue that dangerous drug users were in the Durbin house, helping to explain if not excuse the use of deadly force." More specifically, he argues that "[a] self defense response would have been considered as more reasonable in view of evidence that the occupants of the Durbin house were engaged in a pattern of serious drug abuse." As previously explained (see ante, pt. II.B.4.b.(1)(ii)), defendant had no right to claim imperfect self-defense because he was the initial aggressor and Durbin's response to a home invasion by armed assailants was legally justified. Defendant's argument that he should have been permitted to introduce evidence of the victims' drug use to shore up his self-defense argument is unpersuasive.

1    *Rangel*, 62 Cal. 4th at 1230–32.

2                    b.    Legal Standard

3                         (i)    *Trial Court Error*

4          The standard for trial court error is set out in section VIII A 1 b (i), herein.

5                         (ii)    *Fair and Reliable Verdict*

6          A defendant is entitled to a fair and reliable verdict based upon an individualized

7    determination of the appropriate sentence given his record and character.  *Harris*, 465 U.S. at

8    52.

9          The Eighth Amendment requires full consideration of "any aspect of the defendant's

10   character or record and any of the circumstances of the offense that the defendant proffers as a

11   basis for a sentence less than death."  *Lockett,* 438 U.S. at 604; *see also Eddings v. Oklahoma*,

12   455 U.S. 104, 113-114 (1982) (sentencer must consider any relevant mitigating evidence).

13                       (iii)    *Victim Impact Evidence*

14         "Evidence about a victim's characteristics and the impact of a murder on the victim's

15   family is relevant and admissible at a death penalty sentencing proceeding.  Admission of such

16   evidence will only be deemed unconstitutional if it is so unduly prejudicial that it renders the

17   sentence fundamentally unfair.").  *Payne v. Tennessee*, 501 U.S. 808, 825 (1991) (overruling

18   *Booth v. Maryland*, 482 U.S. 496, 502, 507, 509 n.10 (1987) which held that the Eighth

19   Amendment prohibited the consideration of a victim impact statement during capital sentencing

20   proceedings).  The *Payne* Court stated that "We are now of the view that a State may properly

21   conclude that for the jury to assess meaningfully the defendant's moral culpability and

22   blameworthiness, it should have before it at the sentencing phase evidence of the specific harm

23   caused by the defendant."  *Id.*

24                    c.    Analysis

25         Petitioner argues that the victim impact evidence admitted at trial under *Payne* "falsely

26   portrayed the victims as upstanding citizens," and that he should have been allowed to rebut it.

27   (Doc. No. 38 at 68.)  For example, Cindy Durbin, Chuck Durbin's wife, told police no one was

28   allowed in the house who did drugs.  (Doc. No. 38 at 66 citing Doc. No. 27-4 at AGO11213 (5

1    RT 1236).)  Randy Durbin testified that his older brother Chuck was a father figure upon whom

2    he depended.  (Doc. No. 27-9 at AGO12430 (10 RT 2393).)  Maria Sanchez, Juan Uribe's

3    mother, testified that her son always made sure the bills were paid.  (Doc. No. 27-9 at

4    AGO12447-48 (10 RT 2410-2411).)

5         Petitioner argues that such victim impact testimony "should have been balanced by the

6    true facts that Chuck Durbin and Juan Uribe both dealt and used drugs in a house where

7    children were living."  (Doc. No. 38 at 68.)   He points to evidence that (1) Chuck Durbin

8    obtained methamphetamine from victim Uribe (Doc. No. 27-4 at AGO11207 (5 RT 1230)) and

9    had a high level of methamphetamine in his system when he died (Doc. No. 38 at 66 citing Doc.

10   No. 20-2 at AGO00293 (2 CT 445); *see also* Doc. No. 27-4 at AGO11207 (5 RT 1230));

11   *Rangel*, 62 Cal. 4th at 1230-31; (2) there was a drug scale on the kitchen table (Doc. No. 27-3 at

12   AGO10873 (4 RT 907)), (3) Richard Fitzsimmons testified that he had used methamphetamine

13   right before the intruders came into the house (Doc. No. 27-7 at AGO12047 (8 RT 2035)), and

14   (4) many people were seen coming and going from the house, indicating probable drug activity

15   (Doc. No. 27-4 at AGO11114 (5 RT 1139)).

16        Especially so, petitioner argues, as the trial court excluded evidence of drug use and

17   dealing at the guilt phase.  (Doc. No. 27-4 at AGO11224 (5 RT 1247).)  He argues that trial

18   counsel renewed their request to admit such evidence at the penalty phase in order to balance

19   the prosecution's victim impact evidence portraying Chuck Durbin as a loving father and heroic

20   victim and avoid perpetrating a "fraud on the jury."  (Doc. No. 38 at 67, citing Doc. No. 27-9 at

21   AGO12357 (10 RT 2322); Doc No. 27-9 at AGO12373-74 (10 RT 2337-38); Doc. No. 27-9 at

22   AGO12436 (10 RT 2399); *see also* Doc. No. 27-9 at AGO12449 (10 RT 2412).)  However, the

23   prosecutor argued the drug evidence was irrelevant, and the trial court agreed.  (Doc. No. 38 at

24   67 citing Doc. No. 27-9 at AGO12437 (10 RT 2400).)

25        Petitioner concludes that the trial court's exclusion of the evidence of drug use and

26   dealing denied him the right to present a complete mitigation defense, including any "aspect of

27   a defendant's [sic] character or record and any of the circumstances of the offense that the

28   defendant proffers as a basis for a sentence less than death."  (Doc. No. 38 at 68 citing *Lockett*,

1  438 U.S. at  604; *Boyde*, 494 U.S. at 382; *see also* Doc. No. 38 at 67 citing *Washington v.*

2  *Texas*, 388 U.S. 14, 22 (1967); *Chambers*, 410 U.S. at 302; *Crane v. Kentucky*, 476 U.S. 683,

3  690 (1986).)

4      Respondent counters that petitioner fails to pass through the § 2254(d)(1)(2) gateway,

5  and that petitioner has failed to demonstrate any  "violation of the Constitution or law or treaties

6  of the United States under § 2254(a)."  (Doc. No. 43 at 34.)  Particularly so, he argues, given the

7  trial court's wide latitude to exclude evidence that is not relevant.  (Doc. No. 43 at 34 citing

8  *Crane*, 476 U.S. at 690, *Chambers*, 410 U.S. at 302.)

9      Petitioner replies that the state supreme court unreasonably rejected the claim under §

10  2254(d)(1)(2) because the trial court unreasonably applied *Payne* in rejecting the evidence

11  proffered by trial counsel.  (Doc. No. 45 at 14-15.)  He argues the proffered evidence was

12  relevant because the jury was not otherwise aware that Durbin and Uribe were drug addicted

13  and/or drug dealing and that drug trafficking was taking place in the house where children lived.

14  (*Id.* at 16.)  He distinguishes on this basis the authority relied upon by the state supreme court in

15  rejecting this Claim.  (*Id.* citing *Rangel*, 62 Cal. 4th at 1230-32 which in turn cites *People v.*

16  *Boyette*, 29 Cal. 4th 381, 445 (2002) (rejecting defendant's proffered evidence impugning the

17  character of the victims where the jury was otherwise aware of such evidence).)

18      The court again observes that a claim of state law error arising from the erroneous

19  admission of evidence may merit federal habeas relief only if "the admission of the evidence so

20  fatally infected the proceedings as to render them fundamentally unfair." *Jammal v. Van de*

21  *Kamp*, 926 F.2d 918, 919 (1991); *see also McGuire*, 502 U.S. at 68-73; *Johnson*, 63 F.3d at

22  930.  A claim of error arising from admission of victim impact evidence is amenable to this type

23  of analysis.  *See Gretzler v. Stewart*, 112 F.3d 992, 1009 (9th Cir. 1997).

24      Here, the state supreme court reasonably could find the trial court did not err in finding

25  that the proffered rebuttal victim impact evidence was irrelevant and inadmissible under Penal

26  Code § 190.3(a) as a circumstances of the offense.  *See e.g., People v. Jurado*, 38 Cal. 4th 72,

27  130-31 (2006) ("In California, the prosecution may introduce evidence of the specific harm

28  caused by a defendant's crime at the penalty phase in aggravation as a circumstance of the crime

1   [while] irrelevant information or inflammatory rhetoric was not allowable.").  The district court

2   is bound by the state court's interpretation of California law.  *Bradshaw v. Richey*, 546 U.S. 74,

3   76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including

4   one announced on direct appeal of the challenged conviction, binds a federal court sitting in

5   habeas corpus.")

6       Furthermore, the state supreme court's analysis is consistent with Federal law regarding

7   admissibility of victim impact evidence.   "Victim impact evidence is simply another form or

8   method of informing the sentencing authority about the specific harm caused by the crime in

9   question, evidence of a general type long considered by sentencing authorities."  *Payne*, 501

10  U.S. at 825.   Given this authority, the state supreme court's affirmance of the trial court's

11  rejection of the rebuttal victim impact evidence as irrelevant to the penalty decision was not an

12  unreasonable application of clearly established Federal law.   The Supreme Court has "never

13  questioned the power of States to exclude evidence through the application of evidentiary rules

14  that themselves serve the interests of fairness and reliability - even if the defendant would prefer

15  to see that evidence admitted."  *Crane*, 476 U.S. at 690; *see also Schriro v. Landrigan*, 550 U.S.

16  465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state

17  court's determination was incorrect but whether that determination was unreasonable - a

18  substantially higher threshold.").

19      The state supreme court reasonably could find the proposed rebuttal victim impact

20  evidence raised negative character traits of the victims not fairly raised by the prosecution's

21  evidence of only the direct impacts of the loss suffered by the victims' relatives.  *See e.g.*,

22  *People v. Monterroso,* 34 Cal.4th 743, 778-779 (2004) (upholding the exclusion of irrelevant

23  mitigating evidence).   In so doing, that court specifically observed the jury was not presented

24  with "[a] misleading portrayal of the victim to which the defendant's proffered negative impact

25  evidence might offer relevant rebuttal."  *Rangel*, 62 Cal. 4th at 1231.  Petitioner has not shown

26  the trial court's admission of the prosecution's victim impact evidence was itself error.  *See*

27  *Greztler*, 112 F.3d at 1009, citing *Payne*, 501 U.S. at 825.

28      Additionally, that court reasonably could find harmless any error in excluding the

1   proposed rebuttal evidence.  For example, the jury was aware of the testimony of penalty phase

2   witness Fitzsimmons, that methamphetamine was being used in the Durbin home in the minutes

3   preceding the shooting.  *See* Doc. No. 27-7 at AGO12047-48 (8 RT 2035-2036); *Rangel*, 62

4   Cal. 4th at 1230; *see also Boyette*, 29 Cal.4th at 445 (rejecting defendant's rebuttal character

5   evidence where the jjury was otherwise aware of it).  Moreover, nothing in the prosecution's

6   victim impact presentation suggested that the victims were themselves uninvolved in

7   wrongdoing.  *Rangel*, 62 Cal. 4th at 1231.

8             d.    Conclusions

9        A fair-minded jurist could find the state supreme court's denial of the Claim was not

10  contrary to, or an unreasonable application of, clearly established Federal law, as determined by

11  the Supreme Court, or based on an unreasonable determination of the facts in light of the

12  evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

13       Claim IV shall be denied.

14       *2.    Claim V*

15       Petitioner alleges that the trial court erred by admitted testimony of Cindy Durbin that

16  her daughter died of the flu one year after the killing of her husband Chuck, and her son had

17  autism, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (Doc.

18  No. 38 at 69-71.)

19            a.    State Court Direct and Collateral Review

20       Claim V allegations were raised on direct appeal (Doc. No. 28-11 at AGO13677-89),

21  and denied on the merits, as follows:

22            Defendant contends that the trial court erred in admitting evidence
             that Chuck Durbin's daughter Natasha died nearly two years after
23           her father's murder, and that his son had a relatively mild form of
             autism. This evidence was properly introduced to show the effect
24           of the murder on Cindy Durbin, who testified it was difficult to
             deal with her daughter's death without her husband. The jury also
25           could reasonably infer it was difficult to deal with her son's
             disability without Chuck's assistance. (People v. Brown (2004) 33
26           Cal.4th 382, 397–398, 15 Cal.Rptr.3d 624, 93 P.3d 244 [their
             recollections "simply served to explain why they continued to be
27           affected by [the] loss"].)

28

1  *Rangel*, 62 Cal. 4th at 1232.

2          b.     Legal Standard

3               *(i)*    *Trial Court Error*

4  The standard for trial court error is set out in section VIII A 1 b (i), herein.

5               *(ii)*   *Fair and Reliable Verdict*

6  The standard for a fair and reliable verdict is set out in section VIII E 1 b (ii), herein.

7               *(iii)*  *Victim Impact Evidence*

8  The standard for victim impact evidence is set out in section VIII E 1 b (iii), herein.

9          c.    Analysis

10       Petitioner argues that the trial court errantly admitted irrelevant, inflammatory, non-

11  statutory aggravating victim impact evidence under Penal Code section 190.3 in the form of

12  Cindy Durbin's testimony that after her husband's death, she was left to face the death of her

13  daughter, Natasha, from the flu one year later, as well as son's autism.  (Doc. No. 38 at 70-71,

14  citing *People v. Kelly*, 42 Cal. 4th 763, 798 (2007) (upholding the exclusion of irrelevant

15  aggravating evidence); *People v. Boyd,* 38 Cal. 3d 762, 776 (1985); *People v. Edelbacher*, 47

16  Cal. 3d 983, 1033 (1989); and *People v. Wright,* 48 Cal. 3d 168, 220 (1989), *opinion vacated by*

17  *People v. Wright*, 48 Cal. 3d 168 (1989).)

18       Particularly, petitioner argues the trial court's failure to exclude the testimony denied

19  him a fair and reliable sentence as a matter of federal constitutional law because the jury was led

20  to believe Natasha's death and Brett's autism were related to Chuck Durbin's death.  (Doc. No.

21  38 at 71 citing *Gardner v. Florida*, 430 U.S. 349, 362 (1977) (finding a denial of due process

22  where death judgment based upon information in an undisclosed presentence report); *Caldwell*

23  *v. Mississippi,* 472 U.S. 320, 332 (1985) (denial of due process where death judgment based on

24  availability of appellate review, a factor wholly irrelevant to the penalty process); *Johnson v.*

25  *Mississippi*, 486 U.S. 578, 589 (1988) (denial of due process where death judgment based on

26  evidence of prior conviction which was "materially inaccurate" because conviction was later

27  reversed on appeal).)

28       Respondent responds that petitioner fails to pass through the § 2254(d)(1)(2) gateway,

1   and that petitioner has failed to demonstrate any "violation of the Constitution or law or treaties

2   of the United States under § 2254(a)."  (Doc. No. 43 at 35.)  He argues that "[a] State may

3   legitimately conclude that evidence about the victim and about the impact of the murder on the

4   victim's family is relevant to the jury's decision as to whether or not the death penalty should be

5   imposed."  (*Id*. citing *Payne,* 501 U.S. at 827.)

6       Here, the trial court denied trial counsel's *in limine* motion to exclude victim impact

7   evidence that was inflammatory, irrelevant, and more prejudicial than probative.  (*See e.g.,* Doc.

8   No. 38 at 69.)  Particularly, trial counsel argued that the exclusion of the drug evidence

9   (discussed above in Claim IV) combined with the admission of evidence of Natasha's death,

10   which was wholly unrelated to his culpability, was "so emotionally charged it is clearly going to

11   divert the attention [of the] jury from the task of deciding based on [petitioner's] actions

12   whether he should receive the death penalty" or life without parole.  (Doc. No. 27-9 at

13   AGO12377  (10 RT 2341).)

14       The trial court allowed the testimony (*see* Doc. No.27-9 at AGO12376-78 (10 RT 2340-

15   42)) after hearing prosecution argument that Natasha's death was proper victim impact evidence

16   because Cindy's husband was not there to help her get through it.  (Doc. No. 22-3 at

17   AGO02339-46; Doc. No. 27-9 at AGO12361-62 (10 RT 2326-2327); *see also* 11 CT 2400.)

18       The record reflects Cindy Durbin testified at the penalty phase that Natasha, who had

19   died of influenza the prior year, was affected most by her husband's death; that her son Brett

20   had difficulty communicating as he was "autistic slightly;" and that her new husband could not

21   console her pain in these regards.  (Doc. No. 38 at 69-70 citing Doc. No. 27-9 at AGO12469-70

22   (10 RT 2431-32).)  The prosecutor asked: "And did the fact that Chuck was not there to help

23   you and console you in that situation have any effect on your ability to deal with that death?"

24   (*Id.* citing Doc. No. 27-9 at AGO12471 (10 RT 2433).)  Trial counsel's objection, that the

25   question was leading the witness, was overruled.  (*Id.*)

26       Trial counsel then moved for a mistrial:

27           Mr. Litman: At this time we make a mistrial for this penalty phase
            based on the testimony elicited particularly from Cindy Durbin

28           and from the other witnesses, the other family members. We just

1    feel that this evidence has crossed the line of what *Payne*
     envisions and *Payne* rule[d] was admissible. I mean, you have
2    people in here crying, sobbing. You have jurors crying.

3    […]

4    No admonition to the jury would be adequate. And in particular,
     when you have the testimony that we objected to, this testimony
5    about Natasha passing away, which I would submit is highly
     prejudicial. And you have testimony elicited that Ms. Durbin
6    hasn't dealt with the death of her daughter. I mean, just highly
     inflammatory. And I just submit there's no way that due process
7    and a fair trial can result with that kind of testimony.

8    (Doc. No. 38 at 70 citing Doc. No.27-9 at AGO12479 (10 RT 2441).)  The trial court denied the

9    motion, stating:

10        I don't think there's any error in the testimony.  It all goes to
          victim impact.  It was fair.  It was reasonable.  It was reasonably
11        under control.  So your motion is denied.

12

13   (Doc. No. 27-9 at AGO12480 (10 RT 2442).)

14        Here, the court finds the state supreme court reasonably denied the Claim.  That court

15   reasonably could find unpersuasive petitioner's argument that the trial court erred in its fact

16   finding process and misapplied *Payne* to the facts it found.  (*Cf.* Doc. No. 45 at 16-17.)  The

17   trial court held a hearing on the admissibility of the evidence, considered the parties' argument

18   and briefing and stated its reasoning for finding the evidence admissible and within *Payne*.

19   Petitioner has not explained how or why the trial court's fact finding, and its application of

20   *Payne* in this instance, was not only deficient, but unreasonable.

21        As discussed above, evidence regarding the impact of a murder on the victim's family is

22   relevant and admissible at the penalty phase.  *Payne*, 501 U.S. at 825 ("We are now of the view

23   that a State may properly conclude that for the jury to assess meaningfully the defendant's moral

24   culpability and blameworthiness, it should have before it at the sentencing phase evidence of the

25   specific harm caused by the defendant.").

26        At the least, the trial court in this case, reasonably could find Cindy Durbin's noted

27   testimony was relevant to how Chuck's death impacted her in the years that followed, including

28   in her role as mother to Natasha and Brett.  Petitioner has not demonstrated that *Payne* is clearly

1  established authority precluding admission of the testimony, and that the state supreme court

2  erred in this regard.

3  　　　　As discussed above, a claim of state law error arising from the erroneous admission of

4  evidence, including victim impact evidence, may merit federal habeas relief only if "the

5  admission of the evidence so fatally infected the proceedings as to render them fundamentally

6  unfair." *Payne*, 501 U.S. at 825; *Jammal*, 926 F.2d at 919; *Gretzler*, 112 F.3d at 1009.  Here,

7  the state supreme court reasonably could find Cindy Durbin's testimony went to the continuing

8  impact of Chuck's death and was not "unduly inflammatory," for the reasons stated by that

9  court and the trial court.  *See Rangel*, 62 Cal. 4th at 1232, citing *People v. Brown*, 33 Cal.4th

10  382, 397-398 (2004) (enduring, direct impacts of defendant's crimes are "plainly relevant").

11  Petitioner's argument that his criminal conduct had no impact on Natasha's dying and Brett's

12  autism fails to acknowledge the impact of these events upon Cindy Durbin and is unpersuasive.

13  (*See* Doc. No. 45 at 16-17.)

14  　　　　　　　d.　　Conclusions

15  　　　　A fair-minded jurist could find the state supreme court's denial of the Claim was not

16  contrary to, or an unreasonable application of, clearly established Federal law, as determined by

17  the Supreme Court, or based on an unreasonable determination of the facts in light of the

18  evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

19  　　　　Claim V shall be denied.

20  　　*3.*　　　*Claim VI*

21  　　　　Petitioner alleges that the trial court erred by admitting hearsay statements attributed to

22  Chuck Durbin's deceased daughter Natasha, violating his confrontation rights under the Sixth

23  and Fourteenth Amendments.  (Doc. No. 38 at 72-73.)

24  　　　　　　　a.　　State Court Direct and Collateral Review

25  　　　　Claim VI allegations were raised on direct appeal (Doc. No. 28-11 at AGO13690-702),

26  and denied on the merits, as follows:

27

28  　　　　　　　Defendant contends that admitting statements Durbin's daughter
　　　　　　　Natasha made to an officer and to her grandmother on the night of

the murders prejudicially violated his rights under the confrontation clause. Assuming, without deciding, that the confrontation clause applies to penalty phase evidence, we reject defendant's contention.

As noted above, Durbin's daughter Natasha died from influenza nearly two years after Durbin was killed. At trial, Corporal Ciapessoni testified he was the first officer to arrive at Durbin's house on the night of the murders, and found Cindy Durbin in the kitchen with her three crying children. Natasha told Corporal Ciapessoni she had been asleep in the living room and awoke to see two unfamiliar men in the kitchen. She heard one of the men say, "Juan, you disappointed us," and then heard gunshots. She then observed two men leave the residence. Natasha thought she could identify the men.

Durbin's children were later taken by their grandmother, Ginger Colwell, to Colwell's house. Natasha told Colwell, "[G]randmother, they were calling Juan a traitor." Colwell asked if Chuck said anything. Natasha said he told her to run and hide. Natasha put a pillow over her two siblings, and "pulled the covers up so they wouldn't get hurt."

Natasha's statements to her grandmother "clearly were not made with the primary purpose of creating evidence for [defendant's] prosecution." (Ohio v. Clark, supra, 576 U.S. at p. ——, 135 S.Ct. at p. 2181.) Hence they were not testimonial and, thus, were properly admitted. (Ibid.) Even assuming Corporal Ciapessoni's testimony was erroneously admitted, that error was harmless beyond a reasonable doubt. Evidence of Natasha's statement to Corporal Ciapessoni was cumulative to her statement to her grandmother and to Cindy Durbin's guilt phase testimony that one of the attackers said " Juan was a traitor."

*Rangel*, 62 Cal. 4th at 1232-33.

b.    Legal Standard

(i)    *Trial Court Error*

The standard for trial court error is set out in section VIII A 1 b (i), herein.

(ii)    *Confrontation Clause Error*

The standard for Confrontation Clause error is set out in section VIII C 1 b (ii), herein.

c.    Analysis

Petitioner argues that the trial court erred by admitting, over trial counsel's hearsay and Confrontation Clause objections, the following statements made by Chuck Durbin's deceased daughter Natasha:

- To Detective Ciapessoni upon his arrival at the capital crime scene on October 7, 1995, that Natasha saw two men in the kitchen area. One of them said, "Juan, you disappointed us." (Doc. No. 38 at 72 citing Doc. No. 27-9 at AGO12385, AGO12425-27 (10 RT 2349, 2388-2390).)

- To Cindy Durbin, that Natasha saw the guy shoot Chuck. And she saw Chuck fighting with one of them. (*Id.* citing Doc. No. 27-9 at AGO12469 (10 RT 2431).)

- To Ginger Colwell, that "grandmother, they were calling Juan a traitor." (Doc. No. 27-9 at AGO12477-78 (10 RT 2439-2440)); and that after her father told her to "run and hide," she put a pillow over [---] "Savanna's head and it went over Brett's head." (*Id.* citing Doc. No. 27-9 at AGO12478 (10 RT 2440).)

Petitioner argues that "at a minimum," these statement were testimonial (Doc. No. 38 at 72-73 citing *Davis v. Washington*, 547 U.S. 813, 822 (2006)) and as such inadmissible under *Crawford* because he was not afforded cross-examination (*id.*).

Respondent argues that petitioner fails to pass through the § 2254(d)(1)(2) gateway, and that petitioner has failed to demonstrate any "violation of the Constitution or law or treaties of the United States under § 2254(a)." (Doc. No. 43 at 35.) Particularly, he argues that petitioner fails to identify any clearly established federal authority that "the confrontation clause would apply at the penalty phase to preclude introduction of Natasha's statements." (Doc. No. 43 at 36 citing *Mitchell*, 502 F.3d at 966 (the Confrontation Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted); *Crawford*, 541 U.S. at 59 n.9 (same).)

Petitioner replies that the trial court erred in admitting Natasha's statements; the error was not harmless; and the state supreme court unreasonably rejected the Claim. (Doc. No. 45 at 17-18 citing *Davis*, 547 U.S. at 822.)

The record reflects that during *in limine* motions, the prosecution indicated its intention to introduce the statements of Natashia during the penalty phase. (Doc. No. 27-9 at AGO12345-47) (10 RT 2310-12).) Trial counsel objected under *Payne*, the Eighth and Fourteenth Amendments, and on grounds the fact of Natasha's death was more prejudicial than probative under Evidence Code section 352. (Doc. No. 27-9 at AGO12348, AGO12361, AGO12366-67, AGO12391) (10 RT 2313, 2326, 2331-32, 2355, respectively).) The trial court, out of the presence of the jury, held a hearing under Evidence Code section 402 on the

1   admissibility of Natasha's statements.   Corporal Ciapessoni testified to Natasha's noted

2   statements (Doc. No. 27-9 at AGO12383-85 (10 RT 2347-49)), as did Natasha's grandmother,

3   Ginger Collwell (Doc. No. 27-9 at AGO12386-88 (10 RT 2350-52)).   Trial counsel objected to

4   the testimony on grounds it would divert attention from the penalty determination (Doc. No. 27-

5   9 at AGO12389 (10 RT 2353)), and on Confrontation Clause grounds (Doc. No. 27-9 at

6   AGO12391 (10 RT 2355)).   The trial court overruled the objections, finding Natasha's

7   statements went to "the facts and circumstances of the crime," and were admissible hearsay

8   under Evidence Code section 1240 as statements made under stress or excitement.   (Doc. No.

9   27-9 at AGO12390-91 (10 RT 2354-55).)   The trial court also found the statements were

10   reliable and trustworthy given Natasha's excitement at the time.   (*Id.*)

11       As discussed above, the Confrontation Clause bars the state from introducing into

12   evidence out-of-court statements which are "testimonial" in nature unless the witness is

13   unavailable and the defendant had a prior opportunity to cross-examine the witness, regardless

14   of whether such statements are deemed reliable.   The *Crawford* rule does not bar the admission

15   of non-testimonial hearsay statements.   *Crawford*, 541 U.S. at 42, 51, 68; *see also Whorton*,

16   549 U.S. at 420 ("[T]he Confrontation Clause has no application to" "out-of-court non-

17   testimonial statements.")   A statement is testimonial only when its primary purpose is the

18   development of evidence to support a prosecution.   *Davis*, 547 U.S. at 822; *Michigan v. Bryant*,

19   562 U.S. 344, 359 (2011) ("[T]he most important instances in which the [Confrontation] Clause

20   restricts the introduction of out-of-court statements are those in which state actors are involved

21   in a formal, out-of-court interrogation of a witness to obtain evidence for trial.").

22       Here, the state supreme court reasonably could reject the Claim on grounds Natasha's

23   statements were non-testimonial under *Crawford*.   Natasha's statements to her grandmother

24   were made hours after the grandmother had removed the children from the crime scene; while

25   Natasha was still frightened.   The grandmother asked Natasha what happened and Natasha

26   responded as above.   The noted record does not suggest and petitioner has not shown the

27   statements were elicited or made as evidence for use in court   The state supreme court

28   reasonably could find these statements to be outside the core of statements considered

85

1   testimonial under *Crawford*.

2        Furthermore, the state supreme court reasonably could find corporal Ciapessoni's

3   interview of Natasha was directed to the ongoing emergency and thus not testimonial in nature.

4   *See e.g., Bryant*, 562 U.S. at 358 ("When, as in *Davis*, the primary purpose of an interrogation is

5   to respond to an "ongoing emergency," its purpose is not to create a record for trial and thus is

6   not within the scope of the Clause."). The interview took place minutes after Natasha's parents

7   had been shot; Natasha and her siblings still were in tears; and the suspects still were at large.

8   The *Crawford* Court indicated that "[s]tatements taken by police officers in the course of

9   interrogations are . . . testimonial under even a narrow standard," and that a "core class" of

10  testimonial statements includes "statements that were made under circumstances which would

11  lead an objective witness reasonably to believe that the statement would be available for use at a

12  later trial." 541 U.S. at 51-52.

13       Corporal Ciapessoni was a first responder to the scene of a double homicide with the

14  shooters still at large. The state supreme court reasonably could find his interview of Natasha

15  and her statements went to the ongoing emergency, not later trial. *See Davis*, 547 U.S. at 822

16  (statements to police regarding ongoing emergencies are non-testimonial). For example, the

17  corporal elicited from Natasha that she thought she could identify the two intruders. (Doc. No.

18  27-9 at AGO12387-88, AGO12425-27 (10 RT 2351-52, 2388-90, respectively).) Petitioner has

19  not pointed to facts in the record indicating that Natasha's statements were made as part of any

20  formal police interrogation, had any degree of formality or solemnity, or were procured with the

21  primary purpose of creating an out-of-court substitute for trial testimony.

22       Finally, the state supreme court reasonably could find the admission of Natasha's

23  statements to corporal Ciapessoni, if trial court error, was harmless under *Brecht* and AEDPA,

24  for the reasons stated by that court. As noted, violations of the Confrontation Clause are subject

25  to harmless error analysis. *Van Arsdall*, 475 U.S. at 684. As noted, the Supreme Court recently

26  clarified that, "[w]hen a state court has ruled on the merits of a state prisoner's claim, a federal

27  court cannot grant relief without first applying both the test this court outlined in *Brecht* and the

28  one Congress prescribed in AEDPA." *Davenport*, 142 S. Ct. at 1517; *see also Sansing*, 41 F.

1    4th at 1050 (same).   "[S]atisfying *Brecht* is only a necessary, not a sufficient, condition to

2    relief. AEDPA too must be satisfied."   *Davenport*, 142 S. Ct. at 1520; *see also Chapman*, 386

3    U.S. at 24; *Ayala*, 576 U.S. at 269.   Natasha's non-testimonial statements testified to by her

4    grandmother, Ginger Colewell, were cumulative of her statements to corporal Ciapessoni, and

5    to her mother.   (Doc. No. 27-9 at AGO12469, AGO12477-78 (10 RT 2431, 2439-40,

6    respectively)); *Rangel*, 62  Cal. 4th at 1232-33.

7              d.       Conclusions

8         A fair-minded jurist could find the state supreme court's denial of the Claim was not

9    contrary to, or an unreasonable application of, clearly established Federal law, as determined by

10   the Supreme Court, or based on an unreasonable determination of the facts in light of the

11   evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

12        Claim VI shall be denied.

13   F.     Claims Alleging Ineffective Assistance of Counsel – Penalty Phase

14         *1.       Claim XI*

15        Petitioner alleges that counsel was ineffective by failing to present mitigating testimony

16   from an expert on alcohol impairment, violating his rights under the Sixth and Fourteenth

17   Amendments.  (Doc. No. 38 at 85-89.)

18              a.       State Court Direct and Collateral Review

19        Claim XI allegations were raised in the state habeas petition (Doc. No. 29-1 at

20   AGO14476-81), and summarily denied on the merits (Doc. No. 31-7 at AGO16725).

21              b.       Legal Standard

22              *(i)       Ineffective Assistance of Counsel*

23        The standard for ineffective assistance of counsel is set out in section VIII B 1 b (i),

24   herein.

25              c.       Analysis

26              *(i)       Deficient Conduct*

27        Petitioner revisits allegations discussed above in the context of ineffective assistance at

28   the guilt phase, and contends that trial counsel was similarly deficient at the penalty phase by

1   failing reasonably to investigate, develop and present mitigating expert opinion regarding

2   petitioner's alcohol intoxication and its affect upon his mental state at the time of the crime.

3   (Doc. No. 38 at 86-89 citing *Hinton*, 571 U.S. at 275-75 (failure to obtain expert evidence has

4   been held to be deficient performance).)

5        Particularly, he argues expert testimony would have assisted the jury's understanding of

6   the scientific manner in which alcohol affects one's faculties, when considering lingering doubt

7   and facts and circumstances of the crime suggesting impaired mental state due to voluntary

8   intoxication.  (Doc. No. 38 at 89; Doc. No. 45 at 22 citing Evid. Code § 801(a); Pen. Code §

9   190.3(a)(k).)

10       Respondent argues that petitioner has not shown penalty phase counsel was

11   prejudicially deficient because expert opinion such as that proffered by Dr. Good merely

12   speculates as to commonly understood evidence already before the jury.  (Doc. No. 43 at 52-

13   53.)  He also argues penalty phase counsel may have been strategically motivated in not further

14   developing petitioner's intoxication.  For example, he suggests that such expert testimony

15   would not have added materially to the jury's fund of knowledge, and that Dr. Good's findings

16   were contrary to evidence admitted at trial suggesting that at the time of the capital crime

17   petitioner's retained his capacity to accurately perceive and understand the surrounding

18   circumstances and to deliberate and control his actions.  (*Id.*)

19       Respondent acknowledges that during the trial, the prosecutor conceded petitioner was

20   intoxicated on the night of the crime and argued that intoxication should be considered by the

21   jury under Penal Code section 190.3(k) (i.e. as a circumstance that lessens the gravity of the

22   crimes).  (Doc. No. 43 at 50.)

23       The court, in the discussion above, has observed evidence of petitioner's voluntary

24   intoxication at the time of the capital crime.  Richard Diaz testified at the guilt phase that

25   petitioner was drinking on the night of and prior to the capital crime (Doc. No. 27-4 at

26   AGO011240 (5 RT 1263)) and that he was "too drunk" to drive to the crime scene (*id.* at

27   AGO011241 (5 RT 1264)); Doc. No. 27-9 at AGO12605-06 (10 RT 2564-2565)); that

28   petitioner fell on his way into the Durbin home because he was drunk and Diaz had to assisted

1   him to his feet (Doc. No. 27-4 at AGO11246-47 (5 RT 1269-1270); *accord see* Doc. No. 31-1

2   at 255); and that petitioner accidentally twice fired his weapon in the back seat of the car when

3   fleeing the crime scene (Doc. No. 27-9 at AGO12606 (10 RT 2565)).   The prosecutor conceded

4   during penalty phase closing argument that petitioner "had been drinking and was intoxicated at

5   the time he committed these crimes."   (Doc. No. 27-9 at AGO12582 (10 RT 2542).)

6        Also as discussed above, in 2010 state habeas defense psychologist, Dr. Paul Good, an

7   expert on alcohol and drug abuse (Doc. No. 31-2 at AGO16376-78) reviewed:

8   > [J]ury instructions for CALJIC 4.21, voluntary intoxication
9   > related to specific intent; jury instructions for CALJIC 8.85,
    > penalty phase factors, particularly subdivision (h), impaired
10  > capacity due to effects of intoxication; appellant's opening brief
    > pages 13-17, 25-27; relevant portions of the transcript of Richard
11  > Diaz's testimony from Mr. Rangel's trial; relevant portions of the
    > transcript of Richard Diaz's testimony from the trial of Mr.
12  > Rangel's son, Pedro Ill; relevant portions of the transcript of Mr.
    > Rangel's testimony from the trial of Mr. Rangel's son; declaration
13  > of Pedro Enriquez Rangel III, dated May 4, 2010; testimony of a
    > criminalist for the state Department of Justice from reporter's
14  > transcript pages 1717, 1718.

15  (Doc. No. 31-2 at AGO16376.)   Based thereon, Dr. Good found that Petitioner may have been

16  intoxicated at the time of the crime, and if so, his mental state would likely have been

17  compromised.   (*Id.*)   Particularly, Dr. Good concluded that:

18  > If Petitioner were intoxicated at the time of the offense: the
19  > alcohol induced effects described above could have interfered
    > with his capacity to accurately perceive and understand the
20  > circumstances leading up to the offense, to premeditate and to
    > deliberate a plan of action, and to control his behavior.   If Mr.
21  > Rangel was intoxicated at the time of the offense, the alcohol
    > induced effects described above could have created a condition in
22  > which he did not in fact deliberate or control his behavior.

23  (Doc. No. 38 at 86 citing Doc. No. 31-2 at AGO16377-78.)

24       Here, the court finds that the state supreme court reasonably could reject the Claim as

25  directed to the penalty phase.   For the reasons discussed above, the state supreme court

26  reasonably could find trial counsel's investigation of the voluntary intoxication defense was not

27  deficient.   Particularly so, as the record does not include any forensic evidence of petitioner's

28  intoxication.   (*See e.g.*,  Doc. No. 27-4 at AGO011240 (5 RT 1263); *id.* at AGO011241 (5 RT

1  1264); Doc. No. 27-9 at AGO12605-06 (10 RT 2564-2565); Doc. No. 27-4 at AGO11246-47 (5

2  RT 1269-1270); Doc. No. 27-9 at AGO12606 (10 RT 2565).)

3  The state supreme court reasonably could conclude that expert testimony such as that

4  proffered by Dr. Good would not have furthered, and potentially might have weakened the

5  primary guilt phase defense, that Diaz and/or Jesse Rangel were responsible for the shootings.

6  (*See e.g.*, Doc. No. 38 at 58; Doc. No. 27-3 at 79-94; Doc. No. 27-8 at AGO12194-203 (9 RT

7  2173-82).)  That court reasonably could find Dr. Good's opinions were drawn solely from his

8  review of a portion of a cold trial record; go to commonly known effects of alcohol

9  consumption; and raise the mere possibility that alcohol interfered with petitioner's cognitive

10 processes related to *mens re*a defenses.  (*See e.g.*, Doc. No. 38 at 86 citing Doc. No. 31-2 at

11 AGO16377-78.)

12 Furthermore, the jury was aware that petitioner had been drinking and heard from

13 contemporaneous witnesses that petitioner was intoxicated around the time of the crime.

14 Petitioner never claimed his involvement in the capital crime raised issues of alcohol

15 intoxication and impairment.   Instead, the noted record evidence suggested petitioner's

16 intentional armed assault upon the Durbin home, where Uribe was present, in order to get back

17 at Uribe for shooting Little Pete; that petitioner believed Durbin was going for a gun and so shot

18 him; and that petitioner fled the crime scene, disposed of the weapons used, and attempted to

19 create a false alibi.

20 Thus, the state supreme court reasonably could find the general surmise proffered by Dr.

21 Good is not in the nature of expert opinion that would have assisted the jury.  (*See e.g.*, Doc.

22 No. 31-2 at AGO16377-78.)  That court reasonably could find trial counsel was not deficient by

23 failing to develop as expert opinion the commonly known effects of alcohol for use at the

24 penalty phase.  Notably, trial counsel argued to the jury that Penal Code section 190.3 factor

25 "h":

26         [R]ecognizes what we all know, that excess consumption of
           alcohol causes lower inhibitions and causes people to do what
27         they wouldn't otherwise do if they weren't intoxicated. We also
           know when it comes to driving or comes to other acts, that people
28         who have been, who are intoxicated, worse, people that are drunk

1  are not capable of exercising sound judgment.

2  (Doc. No. 27-9 at AGO12606 (10 RT 2565).)

3  The state supreme court reasonably could find the penalty phase jury was free to draw

4  such inferences from the same evidence of intoxication considered by Dr. Good, without his

5  assistance. (*See e.g.*, Doc. No. 27-4 at AGO11240-56 (5 RT 1263-79).)

6  As discussed above, both sides argued the intoxication evidence at penalty phase

7  closing. The prosecutor conceded that petitioner was intoxicated at the time of the crime and

8  stated simply that intoxication should be considered under factor "k", not factor "h."[11]  (Doc.

9  No. 27-9 at AGO12582-83 (10 RT 2542).)  Defense counsel argued in closing that intoxication

10  is mitigating under factor "h."  (Doc. No. 27-9 at AGO12605-06 (10 RT 2564-2565).)  Defense

11  counsel pointed to the testimony of Diaz that petitioner was drunk, which according to counsel

12  caused petitioner to act "out of character" and impaired his ability to conform his actions to the

13  law and "unlocked the rage."  (*Id.* at AGO12633-34  (10 RT 2592-93).)  Defense counsel also

14  argued lingering doubt - albeit not specifically directed to evidence of intoxication.  (Doc. No.

15  27-9 at AG12625 (10 RT 2584).)

16  Even if Dr. Good's state habeas statements could be credited as expert opinion, the jury

17  was well aware of the facts suggesting how petitioner's alcohol consumption affected him that

18  night, as discussed above.  *See Gonzales*, 2009 WL 1175619 at *9 (trial counsel not ineffective

19  by failing to call intoxication expert to testify on the possible consequences of alcohol

20  intoxication); *cf. Miller*, 510 F. Supp. 2d at 490-91 (trial counsel ineffective by filing to present

21  expert testimony on effects of alcohol on the brain and mental state where defendant had

22  documented extreme alcohol intoxication approaching a level at which coma and death can

23  occur; defendant had stated "he hadn't meant to kill" the victim; and the expert could opine that

24  defendant acted without intent to kill).

25  While petitioner suggests that the absence of expert opinion on the effects of alcohol

26

27  ———————————

[11] As noted above, Penal Code section 190.3(h) provides "Whether or not at the time of the offense the capacity of
the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was

28  impaired as a result of mental disease or defect or the effects of intoxication."

1    consumption denied jurors' consideration of the scientific basis by which alcohol impacts a

2    person, the state supreme court reasonably could find expert testimony like Dr. Good's would

3    not have assisted the penalty phase jury any more than it would have assisted the guilt phase

4    jury.  As noted, Dr. Good concedes in his 2010 state habeas declaration that "[t]he actual

5    amount of alcohol consumed is difficult to estimate based on the eyewitness accounts."  (Doc.

6    No. 31-2 at AGO16377.)  He opines only on the possible consequences of alcohol intoxication,

7    that if petitioner was intoxicated at the time of the capital crime, then the effects of alcohol

8    could have impeded his ability to deliberate and control his behavior.  (Doc. No. 31-2 at

9    AGO16377-78); *see also Gonzales*, 2009 WL 1175619 at *9.  Significantly, he offers no

10    opinion based upon any forensic or scientific evidence of intoxication.  *Cf. Miller*, 510 F. Supp.

11    2d at 490-91.

12        In sum, the state supreme court reasonably could find the absence of expert opinion on

13    the effects of alcohol consumption at the penalty phase did not impede the jury in its

14    consideration of mitigating evidence of petitioner's intoxication, and that trial counsel was not

15    deficient at the guilt phase by failing to develop such expert opinion.

16                    (ii)      Prejudice

17        Petitioner argues that "[h]ad an expert on alcohol abuse testified at the penalty phase

18    there is a reasonable probability that the jury would have seen his intoxication as [Penal Code

19    section 190.3(h) mitigating evidence] and would not have returned a death verdict."  (Doc. No.

20    38 at 89.)  Especially so, he argues, given the agreement of the defense and prosecution that

21    petitioner was intoxicated at the time of the crime.  (*Id.*)

22        However, the state supreme court reasonably could find that in balancing the mitigating

23    evidence presented and that which could have been presented absent counsel's allegedly

24    deficient conduct, petitioner has not demonstrated a reasonable probability of a different

25    sentencing outcome.  The jury already had found *mens rea* sufficient to support first degree

26    murder upon their consideration of the same evidence of voluntary intoxication opined upon by

27    Dr. Good.  (Doc. No. 27-4 at AGO11240-56  (5 RT 1263-79); Doc. No. 27-9 at AGO12605-06

28    (10 RT 2564-2565); Doc. No. 31-2); *see also Rangel*, 62 Cal. 4th at 1228.  The record reflects

1    that the penalty phase jury deliberated for 9 hours, suggesting the decision was not an especially

2    close one.  (Doc. No. 22-3 at AGO002371-73 (11 CT 2423-34).)  The state supreme court

3    reasonably could find expert testimony explaining readily apparent effects of intoxication raised

4    by the evidence before the jury would not have caused jurors to vary the mitigating weight of

5    such evidence.

6            Furthermore, as to lingering doubt, the jury considered the noted evidence of petitioner's

7    intoxication and his conduct and statements during and after the crime, as discussed above.

8    Defense counsel argued as a secondary defense that petitioner's voluntary intoxication impacted

9    his ability to premeditate murder, and the jury considered whether and the extent to which that

10   evidence had mitigating weight.  (*See e.g.*, Doc. No. 38 at 58 citing Doc. No. 27-8 at

11   AGO12223-24 (9 RT 2200-2201); Doc. No. 27-9 at AGO12605-06 (10 RT 2564-2565).)  The

12   jury also had before it the noted evidence of petitioner's motive and intent, cultivated over a

13   number of days, to get back at victim Uribe based on petitioner's belief that Uribe had shot his

14   son, Little Pete, in the head.  The jury knew this was the reason petitioner, Little Pete, Avila and

15   Diaz armed themselves and went looking for Uribe on the night of the capital crime.  *See*

16   *Mayfield*, 270 F.3d at 925–26 ("In light of the strong inculpatory evidence presented by the

17   State at trial, we find it unlikely that a competent performance by Ames would have altered the

18   jury's verdict.").

19          Finally, as discussed above, petitioner does not explain how or why expert testimony on

20   the science underlying intoxication suggests a reasonable probability of a different verdict given

21   the lack of scientific evidence quantifying petitioner's blood alcohol level.  *See Grisby*, 130

22   F.3d at 373; *Wildman*, 261 F.3d at 839

23                    d.     Conclusions

24          A fair-minded jurist could find the state supreme court's denial of Claim XI as penalty

25   phase ineffective assistance was not contrary to, or an unreasonable application of, clearly

26   established Federal law, as determined by the Supreme Court, or based on an unreasonable

27   determination of the facts in light of the evidence presented in the state court proceeding.  28

28   U.S.C. § 2254(d).

1    Claim XI as penalty phase ineffective assistance shall be denied.

2          *2.    Claim XII*

3          Petitioner alleges that counsel was ineffective by failing to present expert testimony on

4    mitigating cultural influences in his background, violating his rights under the Sixth and

5    Fourteenth Amendments.  (Doc. No. 38 at 90-94.)

6          a.    State Court Direct and Collateral Review

7          Claim XII allegations were raised in the state habeas corpus petition (Doc. No. 29-1 at

8    AGO14481-88), and summarily denied on the merits (Doc. No. 31-7 at AGO16725).

9          b.    Legal Standard

10          *(i)    Ineffecive Assistance of Counsel*

11          The standard for ineffective assistance of counsel is set out in section VIII B 1 b (i),

12    herein.

13          c.    Analysis

14          *(i)    Deficient Conduct*

15          Petitioner argues that trial counsel's failure to present an expert on social and cultural

16    issues pertaining to Hispanic migrant families was deficient performance under prevailing

17    professional norms and undermines confidence in the outcome as having produced a just result.

18    (Doc. No. 38 at 93 citing *Strickland*, 466 U.S. at 686.)  He argues that such an expert could have

19    explained to the jury the cultural milieu into which he was raised including evidence that his

20    parents were itinerant farm workers who moved the family from state to state looking for work

21    in the fields.  (Doc. No. 38 at 90.)

22          Petitioner acknowledges that prior to trial, defense counsel requested Dr. Juan Garcia,

23    Ph.D, a professor at California State University Fresno who specialized in social and cultural

24    issues including as to Hispanic migrant families in the Central Valley, interview petitioner and

25    draft a report on such issues implicated in petitioner's social history.  (Doc. No. 38 at 91; Doc.

26    No. 31-2 at AGO16389-90.)  Dr. Garcia interviewed petitioner prior to trial, on June 4, 1998,

27    and suggested conducting further investigation and development of the dynamics of Mexican

28    and Mexican-American families, for use as mitigating evidence.  *(Id.)*  Petitioner points out that

94

1    trial counsel thereafter discontinued communication with Dr. Garcia, and did not present any

2    cultural expert in mitigation at trial.   (*Id.*; Doc. No. 38 at 91 citing Doc. No. 29-1 at

3    AGO14483.)

4            Petitioner proffers evidence that in 2010, at the behest of petitioner's state habeas

5    defense team, Dr. Garcia again interviewed petitioner; reviewed a summary of trial evidence;

6    reviewed interviews of family members including brothers Frank and Joe Rangel, sister Petra

7    Medina, wife Maria Rangel, stepdaughters Deanna Ramirez, Endora Salas, and Carmina Garza,

8    and son Little Pete. (*See* Doc. No. 31-2 at AGO16390.)   Dr. Garcia also was provided and

9    reviewed petitioner's military and educational records.  (*Id.*; Doc. No. 38 at 91.)   The materials

10   Dr. Garcia reviewed included evidence that:

11
12               After Petitioner's son was wounded, the conflict between those
                 loyal to Uribe and those loyal to Little Pete escalated. Someone
13               shot up Uribe's car. Doc. No. 27-3; AGO11051; AGO11054;
                 AGO11066; AGO11068 (4 RT 1083, 1086, 1098, 1100). Uribe
14               and Chris Castaneda confronted Richard Diaz at a local market.
                 Doc. No. 27-4; AGO11318-20 (5 RT 1340-1342, 8 RT 1985). The
15               day before the shootings of Durbin and Uribe, Jesse Rangel and
                 Richard Diaz were seen carrying a gun under the seat of their Jeep
                 to get even with Uribe.
16
17               Petitioner's upbringing outside the mainstream of American
                 culture, combined with the effects of poverty, having to work in
18               the fields as a child, lack of education, and poor health,
                 contributed to the way he reacted to the very real threats to his
19               son. Petitioner also experienced trauma as a child due to his
                 father's alcoholism and the physical abuse he inflicted on family
20               members, in particular Petitioner's mother.

21   (Doc. No. 38 at 91-92; *see also* Doc. No. 27-7 at AGO12102 (8 RT 2088); Doc. No. 29-1 at

22   AGO14486-87.)

23           Petitioner observes Dr. Garcia's state habeas findings, that:

24               There are two main conclusions that may be drawn from
                 Petitioner's developmental and cultural history, as they relate to
25               the homicides on October 7, 1995. The first is that Mr. Rangel's
                 background left him poorly equipped to deal appropriately with a
26               challenge to the security of his family, particularly a threat to the
                 life of his only son. The second is related to the first: his cultural
27               background, coupled with any cognitive disabilities, predisposed
                 him to distrust the police and the criminal justice system, and left
28               him with few alternatives when faced with mortal danger to his

son.

> To the extent that Mr. Rangel suffers from learning disabilities and low intelligence, his available responses were correspondingly limited. For a person with such disabilities, cultural mores have a greater significance in determining conduct. Persons with low intelligence typically have more difficulty adapting to unusual and challenging situations, and are more likely to blindly follow predetermined cultural patterns.

> As a corollary to the above conclusions, it also appears that Mr. Rangel had very limited options when it came to dealing with the police. When Mr. Rangel's son was rushed to the hospital with a bullet graze to the head, this caused grave concern to his father. Mr. Rangel concluded that the police efforts were limited. The police interviewed Pedro III, and jotted down some notes, but other than that, the implication was clear that they were not going to do much more to apprehend the perpetrator.

> In this respect Mr. Rangel's attitudes were typical of his subculture. Historically, working class Hispanics are typically uncomfortable working with law enforcement or within the court system. This is a result of a history of law enforcement corruption in Mexico, as well as a history of discrimination and communication barriers experienced by Hispanics in the California legal system.

(Doc. No. 38 at 92-93; *see also* Doc. No. 31-2 at AGO16402-05.)

Petitioner observes Dr. Garcia's conclusions in his state habeas declaration, that:

> [T]he circumstances of the offense were significantly affected by Petitioner's cultural background: (1) Petitioner's response to his son's predicament was affected by his unique view of family loyalty and exaggerated by his cultural background; and (2) Petitioner's inability to call on assistance from authorities was the result of cultural conditioning.

(Doc. No. 38 at 91 citing Doc. No. 31-2 at AGO16402-03.)

Respondent argues that petitioner fails to provide federal authority that mitigating cultural influence evidence was required on the facts and circumstances of this case. (Doc. No. 43 at 55-56.) He argues that in any event, petitioner has not demonstrated an absence of trial tactics regarding Dr. Garcia and expert cultural opinion. (Doc. No. 43 at 55-56.) He argues that trial counsel, after consulting with Dr. Garcia, reasonably chose to present a penalty defense focused on petitioner's social history, redeeming characteristics and good character, and the stress of a father whose only son had been grazed by a bullet to the head. (Doc. No. 43 at 54.)

1      The court, on deferential review finds that the state supreme court reasonably could

2   reject the claim.  Petitioner has not proffered evidence that defense counsel failed reasonably to

3   investigate and develop petitioner's mitigating cultural influence including his rise from migrant

4   worker to U.S. Navy veteran, devoted family man, and responsible and valued employee of

5   FMC corporation.  (*See e.g.*, Doc. No. 31-2 at 186-226.)  In fact, trial counsel retained and

6   considered the preliminary review of Dr. Garcia, upon whose state habeas proffer petitioner

7   now relies.  Moreover, as respondent observes, during the penalty phase:

8   Joe Rangel, [petitioner's] youngest brother, testified about their
    difficult upbringing. Doc. No. 20-47, AGO12507-16 (10 RT
9   2469-2478). The family were itinerant farm workers who
    followed the crops. Doc. No. 20-47, AGO12508 (10 RT 2470).
10  The family moved to Madera where their father contracted
    tuberculosis and was sent to a sanitarium. Doc. No. 20-47,
11  AGO12508-09 (10 RT 2470-2471). [Petitioner] quit school and,
    without complaint, assisted their mother in providing for the
12  family by working in the fields. Doc. No. 20-47, AGO12509 (10
    RT 2471). [Petitioner's] sacrifices kept the family together and
13  enabled his younger siblings to continue their education. Doc. No.
    20-47, AGO12509- 10, AGO12514 (10 RT 2471-2472, 2476).
14  [Petitioner] 1 joined the Navy. Doc. No. 20-47, AGO12510 (10
    RT 2472). Joe admired [petitioner] for his decision and Joe
15  followed in [petitioner's] footsteps by joining the military. Doc.
    No. 20-47, AGO12510-11 (10 RT 2472-2473). When [petitioner]
16  returned from military service he met and married Mary, who
    already had a family. Doc. No. 20-47, AGO12512 (10 RT 2474).
17  Rangel assumed responsibility for providing for Mary's family.
    Doc. No. 20-47, AGO12512 (10 RT 2474). After the marriage,
18  Joe's contact with [petitioner] became "kind of sparse." Doc. No.
    20- 47, AGO12512-13 (10 RT 2474-2475). Their families were
19  not close. Doc. No. 20-47, AGO12515 (10 RT 2477). Jesse
    MacCrone grew up with [petitioner] as their families were both
20  farm worker families. Doc. No. 20-47, AGO12544-45 (10 RT
    2505-2506). Like [petitioner], MacCrone did not finish high
21  school because as the oldest children they were expected to
    financially help their families. Doc. 20-47, AGO12545 (10 RT
22  2506).

23  (Doc. No. 43 at 54.)

24      The state supreme court reasonably could find that penalty phase counsel reasonably

25  chose not to pursue a penalty defense steeped in cultural influence untethered from the facts and

26  circumstances of the crime, in favor of a penalty defense explaining how the crime was "out of

27  character" for petitioner and precipitated by his overwhelming concern, as a father and husband,

28  for the safety of his family including Little Pet.  (*See e.g.,* Doc. No. 27-9 at AGO12633-34.)

1   For example, that court could look to defense counsel's penalty phase argument, that:

> Little Pete was shot in the head. He went to the hospital. He needed stitches. And if that shot had been that much lower, his son could have been killed. His son could have been a vegetable. So I mean, this was very close to being a fatal or substantial injury to his son . . . [Petitioner] was concerned that his son could be killed. (Doc. No. 27-9 at AGO12601-02).

> [Y]ou heard about [petitioner], what kind of person he was from his friends, from his neighbors. You are asking yourself, why did this happen? How did a person who treated people so decently, who cared about people, how did he get involved in this? And I'm going to talk about another factor, about the alcohol. But I think it's reasonable to conclude under the evidence that it was that alcohol which unlocked his anger and unlocked his rage and caused him to act in a way that was inconsistent with the way that he acted the rest of his life . . . [Petitioner] has never during his 48 years of life on any other occasion other than October 7 1995 been involved in the force – use of force or threat of force against any person. (*Id.* at AGO12603.)

> [Petitioner] was a healer, he was a soother, he was a peacemaker. (*Id.* at AGO12604.)

> And you have heard the evidence that [petitioner] had never been arrested before. Never has a misdemeanor conviction, never has a felony conviction, nothing. So I think this is something you should bear in mind and factor into your decision-making process. (*Id.* at AGO12605.)

> The consumption of alcohol has to be the reason to explain why Mr. Rangel would act so out of character on October 7, 1995. (*Id.* at AGO12606.)

> I think what that evidence showed you beyond question, that there is an inherent good which makes up our client's persona. That there were good and positive qualities that made up the very core of his life. And that those good and positive qualities deserve to live on. The many acts of kindness, compassion and generosity that you heard about, those weren't isolated incidents. Those were a regular part of his life that he was doing and he wasn't asking for anything in return. And those deserve recognition in your verdict. (*Id.* at AGO12609.)

> Please judge Mr. Rangel not only by what happened on October 7, 1995, but by his life as an unselfish, loving, caring, trusting father, friend, co-worker and neighbor. (*Id.* at AGO12613.)

Moreover, the record evidence does not appear to support Dr. Garcia's opinion that petitioner and his parents and siblings were culturally conditioned to value and exhibit family bonds and loyalty even to the extent of acting outside the law. Petitioner's mother abandoned

1   the family for a year around the time petitioner's father was institutionalized with tuberculosis.

2   (Doc. No. 31-1 at AGO16062.)   Petitioner and his siblings largely went their own ways once

3   their father died, avoiding contact even when living close to one another.   (Doc. No. 31-1 at

4   AGO16049-50, AGO16064-66, AGO16080; Doc. No. 29-1 at AGO14557.)   Petitioner's

5   brother Joe stated in his habeas declaration that he felt petitioner "was not capable of the

6   crime[,]" that "[i]t was not how we were raised."   (Doc. No. 31-1 at AGO16066.)

7        Given the foregoing, and on the facts and circumstances of this case including

8   petitioner's social history as developed by defense counsel and presented at the penalty phase

9   following consultation with Dr. Garcia,   the state supreme court reasonably could find that

10   defense counsel reasonably determined not to further develop and present mitigating expert

11   testimony relating to Hispanic cultural influence.   That court reasonably could find defense

12   counsel adequately investigated such matters and thereupon determined to present a penalty

13   phase defense that would not have been further by expert testimony on Hispanic culture and

14   influence.

15        For example, the jury was aware of evidence suggesting that petitioner's participation in

16   the crime was motivated by his desire for retribution and to protect his son: Little Pete has been

17   shot in the head, petitioner believed Juan Uribe was responsible, and the police investigation of

18   Little Pete's shooting had not resulted in Uribe's arrest.   (*See* Doc. No. 38 at 92-93; Doc. No.

19   31-2 at AGO16404-05; *cf.* Doc. No. 21 at 157.)   On these facts, the state supreme court

20   reasonably could reject petitioner's suggestion that expert testimony regarding generalized

21   cultural influences and impediments raised by language and conceptual barriers seemingly

22   unimplicated here would have tended to diminish his culpability before the jury and assisted

23   their "reasoned moral response" to his mitigating evidence when considering the sentence.   (*See*

24   Doc. No. 38 at 93-94 citing *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007) (a

25   sentencing jury must be able to give a reasoned moral response to a defendant's mitigating

26   evidence when deciding whether to sentence him to death); Doc. No. 31-2 at 149-52.)

27        Thus, the state supreme court reasonably could find petitioner failed to overcome the

28   presumption that trial counsel's actions were reasonable.   *See Richter*, 562 U.S. at 104.

1    Moreover, nothing in defense counsel's observation that the retained penalty phase investigator,

2    Howard "Skip" Masters, was terminated during the engagement and his responsibilities were

3    delegated to the guilt phase investigator, Micki Hitchcock (Doc. No. 29-1 at AGO14482),

4    suggests otherwise or demonstrates that Masters' departure influenced defense team

5    consideration of Dr. Garcia as a penalty phase expert.

6                              *(ii)    Prejudice*

7            As above, petitioner argues that a cultural influence expert like Dr. Garcia would have

8    assisted the penalty phase jury in forming a "reasoned moral response" to the evidence before it.

9    (Doc. No. 38 at 93-94 citing *Abdul-Kabir*, 550 U.S. at 246; *Mak v. Blodgett*, 970 F.2d 614, 617,

10   620 (9th Cir. 1992) (granting penalty phase relief in part due to ineffective assistance of counsel

11   for failure to present any mitigating evidence of defendant's background, family relationships or

12   cultural dislocations including expert testimony to show the effects of cultural conflicts).)  He

13   argues that the failure to use a cultural expert had a substantial and injurious effect or influence

14   on the jury's verdict.  (Doc. No. 45 at 25 citing *Brecht*, 507 U.S. at 637-38.)

15          Respondent argues that petitioner has not demonstrated a reasonable probability of a

16   different sentencing determination had trial counsel presented expert opinion of mitigating

17   cultural influences.  (Doc. No. 43 at 56-57 citing *Pinholster*, 563 U.S. at 197 ("There comes a

18   point where a defense attorney will reasonably decide that another strategy is in order, thus

19   "mak[ing] particular investigations unnecessary.").)

20          Assuming arguendo that trial counsel was deficient by failing to present expert

21   testimony on cultural influences, the state supreme court reasonably could find no reasonable

22   probability of a different sentencing outcome absent such deficient conduct.  That court

23   reasonably could find the penalty phase investigation and defense were themselves reasonable,

24   and that the penalty defense presented would not have been further by expert testimony on

25   Hispanic culture and influence, for the reasons stated.

26          Especially so given the social history evidence presented to the jury that petitioner

27   overcame the difficult circumstances of his youth in a Hispanic migrant farmworker family.

28   The jury heard evidence that petitioner served in the U.S. Navy, achieved his G.E.D. while

1    serving, and received an honorable discharge.  The jury heard evidence that at the time of the

2    capital crime, petitioner was a responsible and law abiding member of the community,

3    unimpeded for decades by any cultural differences or conflicts.  (*Cf.* Doc. No. 38 at 93-94 citing

4    *Siripongs v. Calderon*, 35 F.3d 1308, 1315-16 (9th Cir. 1992) (trial counsel may be ineffective

5    for failure to at least consider the effect of defendant's unique cultural background on

6    defendant's conduct, including evidence that "might well have bridged a cultural gap between

7    the jury and the accused.")); *see also Mak,* 970 F.2d at 617, 620.  To the extent Dr. Garcia

8    opines that family loyalty and protection is normative  within the Hispanic culture, the state

9    supreme court reasonably could find the mitigating weight of such opinion would not raise a

10   reasonable probability of a different sentencing outcome.  That court reasonably could find

11   petitioner failed to establish a causal connection between such cultural norms and the facts and

12   circumstances of the instant capital crime.  Petitioner's social history, as presented at trial and

13   proffered in state habeas proceedings, does not suggest strong family bonds; concern for the

14   well-being of his son and family at a level beyond that of any other parent; or a belief driven by

15   cultural norms that the American criminal justice system could not be trusted.  (*See e.g.*, Doc.

16   No. 26-1 at 130.)  For example, a report of Little Pete's shooting was made to the police;

17   petitioner, a US Navy veteran who had spent his entire life in the US, was aware an

18   investigation had been opened into the shooting.  (*See* Doc. No. 31-2 at AGO16402-05.)

19          Also, the state supreme court reasonably could find that any mitigating value in cultural

20   influences likely would have been minimal given the facts and circumstances of this crime

21   readily suggested "vigilantism and revenge."  (Doc. No. 43 at 57; *cf.* Doc. No. 45 at 24-25.)  In

22   the absence of facts showing that cultural differences affected petitioner's decision making, the

23   state supreme court reasonably could find no reasonable probability of a different sentencing

24   outcome absent counsel's allegedly deficient conduct.

25          d.    Conclusions

26          A fair-minded jurist could find the state supreme court's denial of the Claim was not

27   contrary to, or an unreasonable application of, clearly established Federal law, as determined by

28   the Supreme Court, or based on an unreasonable determination of the facts in light of the

1  evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

2          Claim XII shall be denied.

3          *3.      Claim XIII*

4          Petitioner alleges that counsel was ineffective by failing to investigate and present

5  substantial mitigating evidence, violating his rights under the Sixth and Fourteenth

6  Amendments. (Doc. No. 38 at 95-103.)

7                  a.      State Court Direct and Collateral Review

8          Claim XIII allegations were raised in the state habeas petition (Doc. No. 29-1 at

9  AGO14488-622), and summarily denied on the merits (Doc. No. 31-7 at AGO16725).

10                 b.      Legal Standard

11                         *(i)      Ineffective Assistance of Counsel*

12         The standard for ineffective assistance of counsel is set out in section VIII B 1 b (i),

13 herein.

14                 c.      Analysis

15                         *(i)      Deficient Conduct*

16         Petitioner argues that trial counsel's investigation, development, and presentation of

17 mitigating evidence was inadequate and denied him a full-scope mitigation defense and an

18 individualized sentence.  He argues that trial counsel did not assemble and utilize an adequate

19 penalty phase defense team and retained experts.  (Doc. No. 38 at 95-103 citing *Penry v.*

20 *Lynaugh*, 492 U.S. 302, 317 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S.

21 304, 321 (2002) (citing *Lockett*, 438 U.S. at 604) (the sentencer may "not be precluded from

22 considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of

23 the circumstances of the offense that the defendant proffers as a basis for a sentence less than

24 death")); *see also Wiggins,* 539 U.S. at 521; *Eddings*, 455 U.S. at 112; ABA Guidelines 10.7,

25 10.10.1, 10.11.

26         Particularly, petitioner argues that: (1) the penalty phase defense investigator withdrew

27 prior to trial and was not replaced, and (2) trial counsel failed to develop and present penalty

28 phase expert testimony relating to petitioner's mental health issues.  (Doc. No. 38  at 95; Claim

1    XIV, *post*.)

2         As noted, the trial record reflects that:

3         Petitioner's younger brother Joe, who met with counsel only the
          day before trial, testified briefly to petitioner's: (1) life of poverty
4         and deprivation growing up in a migrant farm worker family, (2)
          dropping out of school after the eighth grade in order to work in
5         the fields and help support the family after his father was
          hospitalized with tuberculosis, and (3) enlistment in the Navy
6         after his father recovered.  (Doc. No. 38 at 95-96; 10 RT 2470-72)

7         Petitioner's childhood friend, Jesse Coronado MacCrone, testified
          that their families worked in the field; both boys started working
8         early to help out their families; petitioner joined the military and
          upon his return developed a good job history and took care of his
9         stepdaughters as it they were his own (10 RT 2505.)

10        Petitioner's stepdaughter Deanna Ramirez, Josephine Reyes
          whom petitioner helped raise, and Angela Chapa, Little Pete's
11        girlfriend, each testified to petitioner's caring, loving, and
          supportive character.  (10 RT 2481, 2513, 2520.)
12
          Three of petitioner's co-workers at FMC, Michael Percy, Jerry
13        Smith, and Ronald Edwards, testified that petitioner was
          professional, easy going, quiet, patient, a level person and a leader
14        – that he had a good attitude and was a nice guy.  Edwards also
          testified that petitioner was raising an extended family.  (12 RT
15        444, 2456, 2466.)

16        A neighbor and friend for over twenty years, George Helton,
          testified that petitioner was the best kind of neighbor you could
17        have, and pointed out petitioner's care for his sister-in-law
          Yolanda who suffered from Down's Syndrome.  (10 RT 2510.)
18

19        Petitioner points to the state habeas mitigation proffer, including multigenerational and

20   immediate family social history evidence, and notably declarations from his brother, sister,

21   wife, and stepdaughters, as evidence of the investigation that trial counsel should have

22   conducted, including then available social history evidence that:

23        Petitioner's grandparents were farmworkers who entered the US
          from Mexico, living essentially at a subsistence level, retaining
24        their Mexican culture and Spanish language practices.
          Petitioner's parents met in Texas; his father was born there and
25        his mother came to the US when she was around 8 years old.
          Petitioner's parents were not well educated.  While his father was
26        a US citizen who read and spoke English and Spanish, his mother
          read and spoke mostly Spanish and it is uncertain whether she
27        attained US citizenship.  Petitioner was one of seven children
          born in Texas into an extremely impoverished and deprived
28        itinerant farmworker family; petitioner's father was an abusive

alcoholic and a womanizer; petitioner was born with congenital syphilis, a condition that can cause developmental delays and cognitive impairment; the family moved from state to state following the crops during which time the children either worked alongside the parents or were left alone; petitioner was malnourished and schooling was sporadic; the fields where the family lived and worked were treated with toxic pesticides and fumigants creating a risk of long term neurological and respiratory impairment; petitioner's family lacked access to clean and sanitary facilities and medical care – his childhood asthma went untreated; petitioner's mother developed mental problems; when petitioner was 10 or 11 years old his family life improved and stabilized somewhat, and his schooling became more steady, when his father found permanent employment with a farmer near Madera California; petitioner, at age 16, was in the eighth grade, his grades were poor, he tested to an IQ score of 83; of the seven children only two graduated from high school; when his father contracted tuberculosis and was confined to a sanitarium, petitioner dropped out of the eighth grade and went back to work in the fields to help support the family, his mother returned to Mexico, and petitioner and his two younger brothers were left on their own; when his father was released from the sanitorium, petitioner joined the Navy at age 18, his aptitude testing score was in the lowest eligible group, suggesting cognitive deficits – he earned his General Equivalency Diploma (G.E.D.) while in the military; while in the Navy, petitioner was eventually cleared for full duty and shipped off to Guam, he sometimes drank alcohol to excess and he suffered accidents where he hit his head and once suffered a concussion; petitioner was honorably discharged from the Navy, returned to California, completed a Naval Reserve obligation, married a woman with three young girls and years later had a son, Little Pete; petitioner took in his mother, who returned from Mexico, and members of his extended family; petitioner continued to drink alcohol when things got difficult – shortly after his discharge from the Navy he was arrested for drunk driving; petitioner worked a variety of jobs, some of which exposed him to toxic chemical, until he secured permanent employment with Food Machinery Corporation ("FMC") in 1980, whereupon his financial circumstances improved and he was able to provide for his family; petitioner at times would drink heavily, as he did after Little Pete was grazed by a bullet to the head.

(*See* Doc. No. 38 at 95-103; Doc. No. 29-1 at AGO14488-622; Doc. No. 31-1 at AGO021-96.)

Respondent counters that the state supreme court reasonably denied the Claim given the deference afforded by *Strickland* and AEDPA.  (Doc. No. 43 at 59.)  He denies that petitioner has shown any violation of the Constitution or law or treaties of the United States" under § 2254(a).  (*Id.*)

Respondent further argues that petitioner does not describe the mitigation investigation

1   conducted by trial counsel, or state with specificity how and the extent to which that

2   investigation was deficient.  (Doc. No. 43 at 58.)   He argues that trial counsel presented "an

3   extensive case in mitigation that focused on petitioner's character, his positive influence on

4   other people's lives, and his concern for his son, Little Pete."  (Doc. No. 43 at 59.)   For

5   example, he observes that trial counsel presented mitigating testimony from petitioner's brother

6   Joe regarding their difficult upbringing.  (Doc. No. 43 at 58 citing Doc. No. 27-9 at AGO12507-

7   16 (10 RT 2469-78).)  He suggests that trial counsel may have been strategically motived to

8   avoid cumulative testimony of the commonly shared deprivation, abuse and neglect facing

9   immediate family members to avoid highlighting that petitioner was the only one who resorted

10   to murder.  (Doc. No. 43 at 58.)

11        Petitioner replies that respondent has failed to counter his proffer and authority that trial

12   counsel was deficient as alleged.  (Doc. No. 45 at 25-26.)

13        A capital defense attorney "has an affirmative duty not to simply accept the facts as they

14   might be presented at first blush, but rather to unearth for consideration at the sentencing phase

15   all relevant mitigation information."  *Doe v. Ayers*, 782 F.3d 425, 437 (9th Cir. 2015).

16        In the Ninth Circuit:

17
18           Although there are no hard and fast rules for what constitutes a
             reasonable mitigation investigation, we have emphasized the need
             for counsel to investigate the defendant's social background and
19           to obtain related personal records.[16] To fulfill this obligation,
             counsel must make efforts to discover any reasonably available
20           mitigating evidence, "includ[ing] inquiries into social background
             and evidence of family abuse." *Summerlin*, 427 F.3d at 630; *see
21           also Wiggins*, 539 U.S. at 524–25.

22           ------------------------------FOOTNOTE---------------------------------

23           n.16  The relevant ABA standards also confirm this duty. "It is the
             duty of the lawyer to conduct a prompt investigation of the
24           circumstances of the case and to explore all avenues leading to
             facts relevant to the merits of the case and the penalty in the event
25           of conviction." ABA Standards for Criminal Justice 4-4.1 (2d ed.
             1980). Investigation of "[i]nformation concerning the defendant's
26           background, education, employment record, mental and emotional
             stability, family relationships, and the like" as well as "mitigating
27           circumstances surrounding the commission of the offense itself"
             is "essential" to the defense attorney's role at sentencing. ABA
28           Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed.
             1980).

----------------------------END FOOTNOTE----------------------------

*Sanders v. Davis*, 23 F. 4th 966, 985 (9th Cir. 2022).

Here, the court finds the state supreme court reasonably could not have found trial counsel's penalty phase investigation to be constitutionally adequate. The state habeas proffer contains "classic mitigation evidence" that could have been discovered and presented at trial, but was not. *Stankewitz v. Wong,* 698 F.3d 1163, 1172 (9th Cir. 2012) ("*Stankewitz II*") (defining classic mitigation evidence as including a "tortured family history" and beatings from an alcoholic parent (quoting *Summerlin*, 427 F.3d at 631)); *see also Summerlin*, 427 F.3d at 635 (referring to "an abundance of available classic mitigation evidence concerning family history, abuse, physical impairments, and mental disorders").

The noted state record demonstrates that trial counsel did not develop then available social history of the type proffered by state habeas counsel. Especially so as to mitigating "red flag" evidence of petitioner's extremely disadvantaged upbringing and his potential for alcohol abuse, intellectual disability, and mental illness. Petitioner's unpresented social history includes evidence of specific risk factors for cognitive impairment such as an impoverished and deprived upbringing, lack of medical care, malnutrition, congenital syphilis, trauma, alcohol abuse, exposure to environmental toxins, and head trauma. Petitioner also proffers evidence of his low cognitive capacity with an IQ equivalent score of 83 at age sixteen and a full-scale IQ of 77 in 2010 at age 62; and potential manifestations thereof including underperformance in school and the military. (Doc. No. 31-2 at AGO16280.) The unpresented evidence is of the type which the Ninth Circuit has found relevant to assessing a petitioner's moral culpability, and sufficient to establish prejudice. *See e.g., Stankewitz II*, 698 F.3d at 1172; *Summerlin*, 427 F.3d at 635; *Wiggins*, 539 U.S. at 535; (*see also* Doc. No. 29-1 at AGO14502-610; Doc. No. 31-2 at AGO16265-98.)

Given the foregoing, trial counsel's deficient investigation precludes any possibility that counsel chose to cut short the mitigation investigation as a matter of reasonable trial tactics. *Wiggins*, 539 U.S. at 523-33.

1          *(ii)      Prejudice*

2          Petitioner argues that trial counsel's deficient conduct was prejudicial because had

3     counsel acted in an objectively reasonable fashion and presented petitioner's complete life

4     history, there is a reasonable probability at least one juror would have voted for life.  (Doc. No.

5     38 at 96 citing Doc. No. 27-9 at AGO12585-86 (10 RT 2545-46); Doc. No. 45 at 25-26.)  He

6     argues that the penalty jury was left with the prosecutor's argument discounting the mitigating

7     weight of petitioner's evidence which painted a false picture of petitioner's background and

8     childhood.  (*Id.*)  Particularly, he argues the personality and characteristics profile presented to

9     the jury, that he grew up in a loving, nurturing, and stable family and became a good citizen and

10    good employee and a productive and respected member of the community, was misleading.

11    (*Id.*)

12         Petitioner points to the proffered social history evidence of multigeneration poverty,

13    abuse, neglect, and alcohol abuse, and mental illness; hardships endured by his immediate

14    family including long hours working as migrant farmworkers; his childhood circumstances of

15    extreme poverty, emotional trauma, malnutrition, a nomad lifestyle, the lack of adequate

16    housing, schooling, and supervision, exposure to environmental toxins, and unavailability of

17    medical care including for his untreated syphilis and asthma.  He points to the proffered

18    evidence detailing his untreated alcohol abuse - such as the expert opinion of Dr. Garcia that

19    petitioner suffered blackouts from drinking and engaged in alcohol related behaviors that were

20    out of character for him.  (Doc. No. 29-1 at AGO14619.)  He points to his mental state proffer,

21    discussed below, that his brain damage and intellectual impairments were mitigating under

22    Penal Code section 190.3(d)(h).  (*See* Claim XIV, *post*.)

23         Respondent counters by arguing that petitioner's social history proffer is at best only

24    marginally mitigating, and at worst aggravating.  (Doc. No. 43 at 58.)  He points to the facts and

25    circumstances surrounding the cold-blooded, calculated murders committed by petitioner.  (*Id.*

26    at 59.)

27         The Ninth Circuit has stated that:

28              In assessing prejudice, we reweigh the evidence in aggravation

> against the totality of available mitigating evidence" to determine whether "there is a reasonable probability that at least one juror would have struck a different balance."

*Sanders*, 23 F.4th at 993 (citing *Wiggins*, 539 U.S. at 534, 537).

Here, the state supreme court reasonably could find that petitioner did not carry his burden of showing prejudice under the *Strickland* standard.  That court reasonably could find the mitigating weight of petitioner's unpresented social history evidence considered cumulatively with evidence otherwise before the jury did not raise a reasonable probability of a different sentencing outcome.

Petitioner argues that the jury was left with an incomplete and inaccurate picture of his social history, including traumas, abuses, and mental impairments that formed his character and behavior.  (*See e.g.*, Doc. No. 29-1 at AGO14615-22.)  But as discussed above, the penalty phase jury was aware that petitioner grew up in a migrant farmworker family.  The jury heard testimony from petitioner's younger brother Joe describing at least in general terms the poverty, deprivation, instability, neglect, abuse, lack of supervision, lack of schooling, lack of medical care, and related challenges he faced as a youth, and overcame.  This type of evidence, which the Supreme Court has found relevant to assessing a defendant's moral culpability, included positive character evidence that petitioner grew to be a caring, responsible and hardworking husband and parent, and furthered the mitigation defense that the capital crime was inconsistent with petitioner's personality and character.  *See Wiggins*, 539 U.S. at 535.

The state supreme court could note petitioner's failure to establish a causal connection between his social history proffer and the facts and circumstances of the capital crime.  That court reasonably could find a mitigation defense attributing the shooting of Uribe and Durbin to social history evidence decades removed from the shooting failed to explain petitioner's participation in the crime, and was inferior to the mitigation defense presented at trial which took cognizance of petitioner's personality and character at the time of the shooting.  (*Cf.* Doc. No. 38 at 101 citing *Penry*, 492 U.S. at 317 citing *Lockett*, 438 U.S. at 604) ("Evidence about the defendant's background and character is relevant because of the belief, long held by this

1  society, that defendants who commit criminal acts that are attributable to a disadvantaged

2  background . . . may be less culpable than defendants who have no such excuse.")

3      The state supreme court reasonably could find state habeas proffered evidence relating

4  to familial mental illness and petitioner's alleged neurological deficit and psychological

5  impairments and dysfunction did not detract measurably from the personality and character

6  profile presented to the jury, that at the time of the capital crime petitioner himself was neither

7  mentally ill nor dysfunctional.  (*See* Claim XIV, *post*.)  Notwithstanding the state habeas

8  proffered risk factors for cognitive disability, low average intellectual functioning, and

9  academic underperformance, the record reflects that petitioner earned his G.E.D. while in the

10  Navy, (Doc. No. 29-1 at AGO14576; Doc. No. 31-2 at AGO16278); and his neurological and

11  mental health were assessed as "normal" upon his employment as a firefighter with the U.S.

12  Forest Service in 1974 (Doc. No. 31-1 at 230).  Moreover, petitioner was able to advance in his

13  employment at FMC, where he showed the ability to improve and demonstrated leadership

14  skills.  (Doc. No. 29-1 at AGO14584-85.)  Notably, petitioner's state habeas mental state expert,

15  Dr. Khazanov, observed no obvious deficits in petitioner's conversational speech when she

16  interviewed him in 2010.  (Doc. No. 31-2 at AGO16278.)

17      Moreover, as to petitioner's involvement with alcohol, historically and at the time of the

18  capital crime, the jury of course knew that petitioner was intoxicated when he arrived at the

19  Durbin home.  Still, the jury found petitioner guilty beyond a reasonable doubt of the charged

20  crimes and found true the special circumstances.  The jury found that petitioner possessed the

21  required *mens rea* following consideration of evidence that petitioner was motivated to atone

22  for the shooting of his son; petitioner armed himself and enlisted others to search for the

23  responsible party, thought to be Uribe; petitioner entered the Durbin home where the victims

24  and others were gathered; petitioner was present in the home when Little Pete shot Uribe;

25  petitioner shot Durbin because he believed Durbin was going for a gun; and petitioner fled the

26  scene after the shooting, concocting a false alibi thereafter.

27      Additionally, while lingering doubt is "an extremely effective [penalty phase] argument

28  for defendants in capital cases,"  *Cox v. Ayers*, 613 F.3d 883, 898 (9th Cir. 2010) (quoting

1  *Lockhart v. McCree*, 476 U.S. 162, 181 (1986)), and the defense argued lingering doubt in this

2  case, the state supreme court reasonably could find the unpresented social history evidence

3  would not have raised a mitigating lingering doubt as to petitioner's culpability in the minds of

4  the penalty phase jurors, for the reasons stated.

5      At the end of the day, this is not a case where the jury rendered a death verdict based

6  upon a flawed profile of petitioner's personality and character at the time of the capital crime.

7  *Cf. Noguera v. Davis*, 5 F.4th 1020, 1043 (9th Cir. 2021) ("In this case, the jury recommended

8  the death penalty without knowing anything about [petitioner's]'s troubled background.").  As

9  discussed above, the penalty phase jury deliberated for 9 hours, suggesting the decision was not

10  an especially close one, and thereby the absence of prejudice.  (Doc. No. 22-3 at AGO002371-

11  73 (11 CT 2423-2434)); *cf. Stankewitz*, 365 F.3d at 724–25 ("*Stankewitz I*") (The jury's initial

12  hesitance in reaching a verdict in the penalty phase also weighs towards a finding of prejudice).

13              d.      Conclusions

14      A fair-minded jurist could find the state supreme court's denial of the Claim was not

15  contrary to, or an unreasonable application of, clearly established Federal law, as determined by

16  the Supreme Court, or based on an unreasonable determination of the facts in light of the

17  evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

18      Claim XIII shall be denied.

19      *4.    Claim XIV*

20      Petitioner alleges that counsel was ineffective by failing to investigate and present his

21  mitigating mental impairments, violating his rights under the Sixth and Fourteenth

22  Amendments.  (Doc. No. 38 at 104-11.)

23              a.      State Court Direct and Collateral Review

24      Claim XIV allegations were raised in the state habeas corpus petition (Doc. No. 29-1 at

25  AGO14622-52), and summarily denied on the merits (Doc. No. 31-7 at AGO16725).

26              b.      Legal Standard

27                  *(i)    Ineffective Assistance of Counsel*

28      The standard for ineffective assistance of counsel is set out in section VIII B 1 b (i),

1  herein.

2          c.      Analysis

3                  (i)     Deficient Conduct

4          Petitioner argues that trial counsel's investigation, development and presentation of

5  mitigating mental state evidence was inadequate, denying him a full-scope mitigation defense

6  and an individualized sentence.  He argues that trial counsel unreasonably failed to investigate

7  the mental state risk factors and evidence discussed above, and provide facts thereof to a mental

8  health expert to develop and present as a mitigating mental health defense.  (Doc. No. 38 at 107-

9  09 citing *Wiggins*, 539 U.S. at 535; *Penry*, 492 U.S. at 319; *Bean v. Calderon*, 163 F.3d 1073,

10  1079-80 (9th Cir. 1998) (recognizing the need to develop mitigating mental state evidence in

11  conjunction with necessary experts); *Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir. 2002)

12  (same).)

13          Particularly, petitioner faults trial counsel for failure to identify his mental illness or

14  cognitive impairments as an issue requiring the assistance of expert consultants and/or

15  testimony, and then, by extension, failing to investigate and/or to provide any information

16  necessary for such experts to reach conclusions regarding the significance and/or extent of those

17  impairments.  (Doc. No. 38 at 109.)  He argues that trial counsel "possessed evidence of [his]

18  mental illness that should have prompted further investigation."  (Doc. No. 38 at 109 citing

19  *James v. Ryan,* 679 F.3d 780, 808-09 (9th Cir. 2012), *certiorari granted and judgment vacated*

20  *by Ryan v. James*, 568 U.S. 1224 (2013), *affirmed in part, reversed in part, and remanded in*

21  *James v. Ryan*, 733 F.3d 911 (9th Cir. 2013), *certiorari denied, Ryan v. James*, 572 U.S. 1150

22  (2014); *Detrich v. Ryan,* 677 F.3d at 974-75, (trial counsel had seen initial psychological reports

23  which should have alerted him to issues), on *rehearing en banc, Detrich v. Ryan*, 740 F.3d 1237

24  (9th Cir. 2013).)

25          Petitioner supports his arguments by proffering the findings and conclusions of state

26  habeas defense expert Natsha Khazanov, Ph.D., a clinical psychologist.   (Doc. No. 38 at 104-

27  07; Doc. No. 31-2 at AGO16264-98.)   Dr. Khazanov examined petitioner in 2010 and

28  administered a battery of tests.  (Doc. No. 38 at 105 citing Doc. No. 31-2 at AGO16268-77.)

1    Dr. Khazanov also reviewed petitioner's historical data including educational, medical, work,

2    and military records, as well as declarations from numerous family members.  (*Id.*)

3        Dr. Khazanov found the cumulative impact of numerous factors apparent in petitioner's

4    full social history, overlooked by trial counsel, put petitioner at risk of, and suggested the

5    presence of organic brain injury secondary to apparent congenital syphilis, environmental

6    toxins, alcohol abuse, severe untreated childhood asthma, malnutrition, and a head injury while

7    in the military that caused him to be hospitalized for two days with a concussion.  (Doc. No. 38

8    at 104-05 citing Doc. No. 31-2 at AGO16272-75.)

9        Dr. Khazanov observed test scores from petitioner's school and military days that

10   indicated low intellectual functioning.  (*Id.* citing Doc. No. 31-2 at AGO16277.)  For example,

11   Dr. Khazanov points to petitioner's school records showing below grade level performance, a

12   historic IQ of 83 (i.e. low average), and a 2010 full-scale IQ score of 77 (borderline impaired

13   range).  (Doc. No. 31-2 at AGO16277-81.)  Dr. Khazanov also observed that petitioner's

14   miliary aptitude testing placed him at the lowest level fit for enlistment.  (*Id.*)

15       Dr. Khazanov opined that:

16               There are several indicators of possible brain damage in
                 [petitioner's] history, including experiences that put him at a very
17               high risk for neurological injury. Most significant are 1)
                 contracting syphilis at birth, 2) being exposed to pesticides during
18               childhood and early adulthood while performing farm work and
                 working in the crop dusting industry, 3) being exposed to nitrogen
19               oxides and sulphur dioxide while working at a glass company,
                 and 4) chronic and severe abuse of alcohol, a neurotoxin.
20

21               Brain damage is a cumulative process, where initial damage may
                 greatly compound the effects of subsequent injuries . . .
22               [petitioner's] exposure to multiple risk factors rendered him far
                 more vulnerable to organic damage.

23               [D]eficits in [petitioner's] right hemisphere, parietal lobes, and
                 frontal lobe have a serious impact on his functioning and behavior
24               . . . [and] impede his ability to accurately perceive, process, and
                 respond to visual information in [certain] situations . . . Thus,
25               even common life experiences such as going to a new school or
                 being in an unfamiliar neighborhood or place would be especially
26               stressful and difficult for him.

27               [Petitioner's] frontal lobe dysfunction impacts him on a daily
                 basis . . . [and] results . . . not only in deficient planning, but also
28               in deficient integration of past experience, i.e., a situational

                                    112

1    context, with ongoing activity.

2    [Petitioner's] abilities in many of these areas are compromised.
     He has deficits in attention, memory, and visuospatial skills, and
3    is slow to conceptualize abstract information. He has an impaired
     ability to plan organize, and monitor his behavior, as well as
4    difficulty considering alternative solutions. If substance abuse
     and/or emotionally traumatic circumstances are present, flexible,
5    adaptive behavior is unlikely to occur.

6    As many of the abilities assessed by these tests are not lost over
     time, it is my opinion, which I hold to a reasonable degree of
7    psychological certainty that the damage to [petitioner's] brain
     occurred at an early stage of his life. This opinion is supported by
8    the results of testing that was performed when [petitioner] was an
     adolescent and early adult. It is further my opinion, which I hold
9    to a reasonable degree of psychological certainty that these
     impairments are of an organic nature.

10

11   Given my findings, it is my opinion, which I hold to a reasonable
     degree of psychological certainty, that a neuropsychological
12   assessment of [petitioner] does reveal evidence of organic brain
     damage and that such findings would have been made had Mr.
13   Rangel been evaluated by a competent neuropsychologist at the
     time of his trial court proceedings in 1997-1998.

14   [Petitioner] suffers from significant impairment of his (1) parietal
     lobes and (2) frontal lobes, with more impairment evident in the
15   right hemisphere. He is unable to adequately plan complex
     actions, learn from his mistakes, or to shift his thinking or
16   behaviors in response to environmental or verbal cues. He is,
     moreover, largely unaware of these problems, and even when they
17   are pointed out to him, he simply lacks the capacity to adapt to
     changed circumstances. [Petitioner's] impairments are factors that
18   greatly contributed to his behavior, functioning and personality
     throughout his life. Any evaluation of [petitioner], whether
19   psychological, social or psychiatric, that does not include
     consideration of these impairments would be wholly misleading,
20   incomplete, and inaccurate.

21   (Doc. No. 31-2 at AGO16295-98; *see also* Doc. No. 38 at 105-07.)

22       In the context of the foregoing proffer, petitioner argues that:

23   W]here counsel is on notice that his client may be mentally
     impaired, counsel's failure to investigate his mental condition as a
24   mitigating factor in a penalty phase hearing, without a supporting
     strategic reason, constitutes deficient performance.
25

26   (Doc. No. 38 at 107-08); *see also Summerlin*, 427 F.3d at 632; *Detrich*, 677 F.3d 958; *Daniels*,

27   428 F.3d at 1202-1210; *Ake v. Oklahoma*, 470 U.S. 68, 80 (1985) (recognizing the necessity of

28   expert assistance when defendant's sanity is in issue).)  He suggests that trial counsel's noted

1    shortcomings cannot be a basis for finding a reasonable trial strategy or tactic because counsel's

2    underlying investigation was unreasonable.  (Doc. No. 38 at 109.)

3           Respondent argues that on deferential review, this court should find the state supreme

4    court reasonably denied the Claim because petitioner failed to overcome the presumption that

5    trial counsel acted in an objectively reasonable fashion.  (Doc. No. 43 at 61-62.)  He argues that

6    petitioner does not describe the mitigation investigation conducted by trial counsel, or state how

7    and the extent to which that investigation was deficient.  (*Id.*)   He argues that without such

8    evidence, "there is no way of knowing what investigative steps counsel took or what tactical

9    decisions counsel made regarding the use of [petitioner's] alleged mental impairments; thus,

10   [petitioner] does not show incompetent performance."  (*Id.*)

11          For example, respondent argues that trial counsel reasonably could have decided that

12   presentation of mitigating mental state evidence would have run contrary to the defense

13   presented at the penalty phase, that petitioner was a "normal and good person who made serious

14   mistakes after his son was shot, not as someone who was seeking the jury's 'sympathy' or

15   'pity.' "  (Doc. No. 43 at 62; *see also* Doc. No. 27-9 at AGO12612-13); *Cone*, 535 U.S. at 698.

16          Finally, as to Dr. Khazanov, respondent argues her opinions are minimally relevant

17   because there is no causal connection between petitioner's alleged organic brain impairments

18   and the capital crime.  (Doc. No. 43 at 61-62.)

19          Here, the court finds that the state supreme reasonably could not have found trial

20   counsel's investigation, development, and presentation of mitigating mental state evidence to be

21   constitutionally adequate.   Petitioner correctly observes the broad responsibility borne by

22   penalty phase counsel to investigate evidence of mental impairment.  (Doc. No. 45 at 27 citing

23   *Benmore v. Chappell*, 788 F.3d 1151, 1171 (9th Cir. 2015) (recognizing counsel's broad

24   responsibility to investigate mitigating mental state evidence).)

25          The record reflects that trial counsel possessed petitioner's educational, work, and

26   military records and knew that he grew up in a migrant farm worker family and later worked for

27   a crop dusting company.  (Doc. No. 29-1 at AGO14624.)  Trial counsel knew or should have

28   known of "red flag" evidence therein raising risk factors for organic brain damage and mental

114

1   impairment including petitioner's low intellectual capacity; congenital syphilis; malnutrition

2   and poverty; lack of access to healthcare; exposure to agricultural chemicals; sporadic schooling

3   coupled with academic performance well below grade level and abandonment of school

4   altogether upon dropping out of the eighth grade at age sixteen; military aptitude testing at the

5   lowest level – below that typically acceptable for service; chronic abuse of alcohol; and historic

6   IQ test scores in the 77 to 83 range.  (Doc. No. 29-1 at AGO14488-622; Doc. No. 31-1 at

7   AGO021-96; Doc. No. 31-2 at AGO16265-98.)

8        Even so, trial counsel did not consult with any mental health expert and present expert

9   mental health testimony.  Objectively reasonable counsel would have adequately investigated

10  petitioner's social history including the relative health and mental health risks and potential

11  impairments raised thereby, and thereupon presented expert testimony like that provided by Dr.

12  Khazarov.  Especially so here, given the penalty defense presented at trial that petitioner's

13  participation in the capital crime was entirely out of character.  Such a defense inherently

14  suggests the possibility of a mental health explanation for the aberrant conduct.  *See e.g.,*

15  *Summerlin*, 427 F.3d at 635 (referring to "an abundance of available classic mitigation evidence

16  concerning family history, abuse, physical impairments, and mental disorders"); *Caro v.*

17  *Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1989) (counsel have an obligation to conduct an

18  investigation which will allow a determination of what sort of experts to consult. Once that

19  determination has been made, counsel must present those experts with information relevant to

20  the conclusion of the expert.").

21       Given the foregoing, trial counsel's deficient investigation precludes any possibility that

22  counsel chose to cut short the mitigation investigation as a matter of reasonable trial tactics.

23  *Wiggins*, 539 U.S. at 523-33.

24                    *(ii)    Prejudice*

25       Petitioner argues that absent counsel's allegedly deficient conduct, there is a reasonable

26  probability of a different result, such that confidence in the death verdict is undermined.  (Doc.

27  No. 38 at 111.)  He argues that:

28       The failure to present evidence [of a] petitioner's mental illness as

a mitigating circumstance is a deficiency that has been repeatedly found prejudicial. James, 659 F.3d at 889; Detrich, 677 F.3d at 981-91; Rompilla v. Beard, 545 U.S. 374, 392 (2005); Daniels v. Woodford, 428 F.3d 1181, 1209 (9th Cir. 2005); Summerlin, 427 F.3d at 641 ("lack of impulse and emotional control and organic brain dysfunction"). Similarly, the Ninth Circuit has found prejudicially deficient the failure to employ a mental health expert to explain the effect of traumatic experiences on a defendant's conduct. James, 659 F.3d at 889; Douglas v. Woodford, 316 F.3d at 1090); Caro v. Calderon, 165 F.3d 1223, 1227 (9th Cir. 1989) (remand for evidentiary hearing on ineffective assistance of counsel for failure to investigate defendant's exposure to neurotoxicants and other neurological impairments).

The prejudice analysis in Detrich is particularly apt here. As in Detrich, the jury here would have learned from Dr. Khazanov how "the crime may have been driven by an instinctive, learned behavior that stemmed from "Petitioner's upbringing and "neuropsychological deficits." Detrich, 677 F.3d at 983-84. This additional evidence would have "added significant mitigating weight." And, as the Ninth Circuit held in Detrich, expert testimony is particularly necessary where the jury "[n]eed[s] expert testimony to understand how a traumatic childhood could shape brain development in a way that would lead to impulsive behavior." Id. at 986-87.

(Doc. No. 38 at 110.)

Petitioner argue that the unpresented proffered evidence was relevant to the following mitigating factors before the jury:

(a) the circumstances of the crime of which [he] was convicted and the existence of any special circumstances found to be true;

(d) whether or not the offense was committed while [he] was under the influence of extreme mental or emotional disturbance;

(g) whether or not [he] acted under extreme duress or under the substantial domination of another person;

(h) whether or not at the time of the offense [his] capacity . . . to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication; and

(k) any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.

(Id. at 110-11 citing Penal Code § 190.3.)

Respondent argues the state supreme court reasonably could have found the alleged

1   error to be nonprejudicial under the *Strickland* standard.  (Doc. No. 43 at 62.)  He argues the

2   state supreme court reasonably could have found the effect of Dr. Khazonov's omitted

3   testimony to be minimal at best because "[the evidence introduced at trial] demonstrates that

4   [petitioner] acted with a level of awareness of his surroundings and an ability to think rationally

5   under pressure that is inconsistent with Dr. Khazanov's evaluation."  (*Id.*)  For example, he

6   points to the noted evidence that petitioner was a responsible and respected member of the

7   community who planned and perpetrated the capital crime as a response to the shooting of his

8   son; while fleeing the crime scene, petitioner told Little Pete, Avila, and Diaz that he had shot

9   Chuck Durbin, not reflexively or accidentally, but because he believed that Durbin was going to

10   get a gun.  (*See e.g.*, Doc. No. 43 at 652 citing Doc. No. 27-4 at AGO11253-57 (5 RT 1276-

11   1280); *see also* Doc. No. 21 at 198.)  He argues that such evidence belies Dr. Khazanov's

12   findings and opinions.  (Doc. No. 43 at 62.)

13        Here, the state supreme court reasonably could find counsel's deficient conduct was not

14   prejudicial.  Even absent trial counsel's deficient failure to develop and present mitigating

15   evidence relating to mental state and impairment, that court reasonably could find no reasonable

16   probability of a sentence other than death.

17        The noted risk factors for mental illness raised by petitioner are rebutted by the evidence

18   before the jury of his decades as a well-functioning and responsible husband, parent, and

19   employee.  Particularly, the evidence considered by the jury readily suggested that the capital

20   crime was not the result of some impulsive, pre-preprogramed act or aberrant mental condition,

21   but rather a deliberate response to the shooting of Little Pete and petitioner's  belief that Uribe,

22   the supposed shooter, was a continuing threat and the shooting should be avenged.  (*See e.g.,*

23   Doc. No. 27-4 at AGO11239; Doc. No. 31-1 at AGO16023-96.)

24        To the extent petitioner suggests that his history of alcohol abuse and alcohol

25   intoxication at the time of the capital crime, conceded by the prosecutor, may have impaired his

26   mental processes along the lines suggested by Dr. Khazanov, that state supreme court

27   reasonably could find no prejudice.  (*See* Doc. No. 45 at 27-28.)  As discussed above, the jury

28   heard and considered firsthand the evidence regarding the effect of alcohol upon petitioner in

1   the hours prior to and at the time of the capital crime.  The jury knew that petitioner had been

2   drink at a family BBQ in the hours before the capital crime and that petitioner was described as

3   being drunk, too drunk to drive, and that he stumbled just before entering the Durbin home.

4          The jury also heard the noted evidence of petitioner's ability to think and act during that

5   timeframe, that petitioner was motivated to and did arm himself and enlisted Little Pete, Avila,

6   and Diaz in his plan to find and confront Uribe; that petitioner shot Durbin to eliminate him as a

7   threat to his plan; that petitioner and the others fled the crime scene; that petitioner and Little

8   Pete attempted to construct a false alibi after the crime; and that petitioner planned to leave

9   California after the crime.  Dr. Khazanov's findings and conclusions rendered upon her case

10  review fifteen years after the crime, that petitioner acted on impulse and/or was driven by an

11  instinctive, learned behavior that stemmed from petitioner's upbringing and neuropsychological

12  deficits (*see* Doc. No. 38 at 110; Doc. No. 31-2 at AGO16295-98), to the extent inconsistent

13  with the facts and circumstances surrounding the crime, reasonably could be seen as

14  unpersuasive.

15         Such expert opinion that petitioner might have had a tendency to act impulsively

16  appears minimally relevant and of minimal mitigating weight, contrary to petitioner's argument

17  otherwise.  (*See* Doc. No. 38 at 110-11.)

18         Additionally, Dr. Khazanov's involvement in the case occurred more than a decade after

19  petitioner's trial.  Dr. Khazanov's findings and opinions are so far removed from the capital

20  crime and trial as to be subject to discount on that basis alone.  *See Odle v. Calderon*, 919 F.

21  Supp. 1367, 1378 (N. D. Cal. 1996), *reversed and remanded on other grounds, Odle v.

22  Woodford*, 238 F.3d 1084 (9th Cir. 2001) (discounting opinions of chronologically remote

23  expert testimony); *Advincula v. Price*, No. 217CV06455ABGJS, 2023 WL 3802194 at *13

24  (C.D. Cal. Mar. 27, 2023), *report and recommendation adopted*, No. 217CV06455ABGJS,

25  2023 WL 3792631 (C.D. Cal. June 2, 2023) (little weight accorded to expert opinion based

26  upon psychological tests conducted more than ten years after the crime); *Agosta v. Paramo,* No.

27  CV1502066CASRAO, 2016 WL 4370056, at *7 (C.D. Cal. June 10, 2016), *report and

28  recommendation adopted,* No. CV1502066CASRAO, 2016 WL 4370027 (C.D. Cal. Aug. 15,

2016) (remote expert opinion of "little probative value.").

This does not appear to be a case where the jury rendered a death verdict based upon a flawed profile of petitioner's personality and character at the time of the crime. For the reasons stated, the state supreme court reasonably could find the unpresented mitigation mental state evidence considered together with the evidence before the jury would not have raised a lingering doubt as to petitioner's culpability in the minds of the penalty phase jurors.

### d. Conclusions

A fair-minded jurist could find the state supreme court's denial of the Claim was not contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claim XIV shall be denied.

## G. Claims Alleging Insufficient Evidence that the Murder of Chuck Durbin was Premeditated

### 1. Claim II

Petitioner alleges that the jury had before it insufficient evidence to convict him of the first degree (premeditated and deliberate) murder of Chuck Durbin. (Doc. No. 38 at 57-60 citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).)

### a. State Court Direct and Collateral Review

Claim II allegations were raised on direct appeal (Doc No. 28-11 at AGO13518- 29), and denied on the merits, as follows:

> Sufficiency of the evidence
>
> Defendant contends that there is no substantial evidence he premeditated Chuck Durbin's murder and, therefore, his conviction must be reduced from first degree to second degree murder. He further contends no substantial evidence supports the jury's finding that he personally used a gun in Juan Uribe's murder.
>
> " 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable,

credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (People v. Edwards (2013) 57 Cal.4th 658, 715, 161 Cal.Rptr.3d 191, 306 P.3d 1049 (Edwards ).)

a. Durbin murder

Substantial evidence supports the jury's finding that defendant premeditated Durbin's murder. The evidence demonstrated defendant and his son armed themselves and went in search of Uribe to kill him. They located Uribe at Durbin's house. Defendant could see from outside Durbin's house that several people were inside, yet defendant continued with his plan to kill Uribe. The jury could reasonably conclude from this evidence that defendant not only premeditated Uribe's death but also the death of anyone inside the house who interfered with that plan. (See People v. San Nicolas (2004) 34 Cal.4th 614, 657–659, 21 Cal.Rptr.3d 612, 101 P.3d 509 (San Nicolas ) [substantial evidence of premeditation when the defendant saw the second victim's reflection in a mirror and turned around and stabbed her, perhaps to eliminate her as a witness to the first murder]; People v. Bolin (1998) 18 Cal.4th 297, 331–333, 75 Cal.Rptr.2d 412, 956 P.2d 374 (Bolin ) [although one of the murder victims was a stranger to the defendant, the defendant may have been motivated to eliminate witnesses to the first victim's murder and to protect his marijuana crop from theft or exposure to law enforcement].) Moreover, Durbin's head and neck wounds were consistent with bullets fired from defendant's gun, and this manner of killing further supports a finding of deliberation.[6] (San Nicolas, at pp. 658–659, 21 Cal.Rptr.3d 612, 101 P.3d 509; Bolin, at p. 332, 75 Cal.Rptr.2d 412, 956 P.2d 374.)


------------------------------FOOTNOTE----------------------------------

n.6 Defendant asserts the jury found not true the personal use of a firearm allegation for Durbin's murder, and contends this demonstrates the jury found the evidence of murder lacking. The jury in fact found the personal use allegation true.

----------------------------END FOOTNOTE----------------------------

*Rangel*, 62 Cal. 4th at 1212–13.  Relatedly, that court, in discussing the trial court's alleged

error in failure to instruct *sua sponte* on involuntary manslaughter as a lesser included offense

based on petitioner's voluntary intoxication, stated that:

"Voluntary intoxication can prevent formation of any specific

intent requisite to the offense at issue, but it can never excuse homicide." (*People v. Boyer* (2006) 38 Cal.4th 412, 469, 42 Cal.Rptr.3d 677, 133 P.3d 581 (*Boyer* ).) Hence, in general at the time the defendant committed his crimes, voluntary intoxication could reduce a criminal homicide to involuntary manslaughter only if the defendant was rendered unconscious: "When a person renders himself or herself unconscious through voluntary intoxication and kills in that state, the killing is attributed to his or her negligence in self-intoxicating to that point, and is treated as involuntary manslaughter." (*People v. Ochoa* (1998) 19 Cal.4th 353, 423, 79 Cal.Rptr.2d 408, 966 P.2d 442.)[12]

------------------------------FOOTNOTE----------------------------------

n.12 In 1995, the year these crimes occurred, Penal Code former section 22 (now Penal Code section 29.4) "was amended to provide prospectively that when the charge is murder, 'voluntary intoxication is admissible solely on the issue ... [of] whether the defendant premeditated, deliberated, or harbored express malice aforethought.' (Stats.1995, ch. 793, § 1, p. 6149.)" (*Boyer, supra,* 38 Cal.4th at p. 469, fn. 40, 42 Cal.Rptr.3d 677, 133 P.3d 581.) Because the amendment took effect after these crimes were committed, it does not apply here. (See generally *People v. King* (1993) 5 Cal.4th 59, 79, 19 Cal.Rptr.2d 233, 851 P.2d 27 ["any statute ' "which makes more burdensome the punishment for a crime, after its commission" ' violates the ex post facto prohibition of the United States Constitution"].)

----------------------------END FOOTNOTE-----------------------------

Here, although there was evidence defendant had been drinking, there is no evidence he was unconscious or otherwise unaware of his actions. Immediately after the murders, defendant told his coperpetrators that he had shot Durbin because he thought Durbin was getting a gun. Later that night, defendant told his nephew Jesse Rangel that he "put those motherfuckers on ice." Shortly after the murders, defendant told Frank Sr. that defendant and Little Pete "had went and done a shooting," and told Frank Jr. that "[t]hey went to the house and shot the house up." Defendant also attempted to fabricate an alibi. He gave police a detailed description of his activities on the night of the murders, falsely claiming to have worked at a convenience store. He manufactured a videotape to support his false alibi. He also asked others to hide weapons used in the crimes. Defendant gave Juan Ramirez a rifle that had fired casings found at the crime scene and a gun that ballistics evidence established was "probably" one of the murder weapons, asked Ramirez to dispose of the weapons, and added they "had resolved their problem." Defendant also gave Frank Jr. a .38–caliber revolver that "match[ed]" the .38–caliber bullets found at the crime scene and asked him to "hold this for me." Defendant's efforts to fabricate an alibi and to hide the murder weapons provide some additional indication that defendant had been aware of his actions during the course of his offenses and therefore was not unconscious during them. (Cf. *People v.*

*Halvorsen* (2007) 42 Cal.4th 379, 416–419, 64 Cal.Rptr.3d 721, 165 P.3d 512 [no substantial evidence of unconsciousness when the defendant's own detailed testimony regarding the shootings and the "complicated and purposive nature of his conduct" during the offenses demonstrated he did not lack awareness during them]; *People v. Abilez* (2007) 41 Cal.4th 472, 481, 516, 61 Cal.Rptr.3d 526, 161 P.3d 58 (*Abilez* ) [evidence did not "even hint[ ] that defendant was so grossly intoxicated as to have been considered unconscious" when he went to his mother's home, spoke to his brother, killed his mother and then ransacked two bedrooms, loaded his mother's car with stolen items before driving away, and then tried to sell the stolen goods].) Accordingly, the trial court did not err in failing to instruct sua sponte on involuntary manslaughter due to voluntary intoxication.

Moreover, any assumed error in failing to instruct on involuntary manslaughter was harmless under any standard. (*Abilez, supra,* 41 Cal.4th at p. 516, 61 Cal.Rptr.3d 526, 161 P.3d 58.) The prosecution proceeded on a theory of premeditated murder, and the court instructed the jury on the effect of voluntary intoxication on defendant's ability to premeditate and deliberate.[13] The jury found the first degree murders of Uribe and Durbin, and therefore necessarily found he had premeditated and deliberated despite his use of alcohol. These mental states are incompatible with unconsciousness.

------------------------------FOOTNOTE----------------------------------

n.13 The trial court instructed the jury: "In the crime[ ] of murder in the first degree ..., a necessary element is the existence in the mind of the defendant of the mental state of premeditation and deliberation. If the evidence shows that the defendant was intoxicated at the time of the alleged crime, you should consider that fact in deciding whether defendant had the required mental state. If from all the evidence you have a reasonable doubt whether the defendant formed that mental state, you must find that he did not have such mental state."

----------------------------END FOOTNOTE----------------------------

*Rangel,* 62 Cal. 4th at 1227-28.

      b.    Legal Standard

        *(i)*    *Sufficiency of Evidence*

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any

1   rational trier of fact could have found the essential elements of the crime beyond a reasonable

2   doubt." *Jackson*, 443 U.S. at 319. "[T]he dispositive question under *Jackson* is 'whether the

3   record evidence could reasonably support a finding of guilt beyond a reasonable doubt.' "

4   *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 318).

5        In conducting federal habeas review of a claim of insufficient evidence, "all evidence

6   must be considered in the light most favorable to the prosecution." *Ngo v. Giurbino*, 651 F.3d

7   1112, 1115 (9th Cir. 2011). "A petitioner for a federal writ of habeas corpus faces a heavy

8   burden when challenging the sufficiency of the evidence used to obtain a state conviction on

9   federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). The

10  federal habeas court determines sufficiency of the evidence in reference to the substantive

11  elements of the criminal offense as defined by state law. *Jackson*, 443 U.S. at 324 n.16; *Chein*,

12  373 F.3d at 983. However, the court looks to Federal law to determine "the minimum amount

13  of evidence that the Due Process Clause requires." *Coleman v. Johnson*, 566 U.S. 650, 655

14  (2012).

15            c.      Analysis

16       Petitioner argues no rational juror could have found him guilty beyond a reasonable

17  doubt of the first degree premeditated and deliberate murder of Chuck Durbin. He posits three

18  reasons why this is so, (1) he was intoxicated, (2) he was surprised by Durbin, and (3) it was not

19  he who shot Durbin.

20       The record reflects that the jury was instructed on deliberate and premeditated murder,

21  that:

22            All murder which is perpetrated by any kind of willfull, deliberate
             and premeditated killing with express malice aforethought is
23            murder of the first degree.

24            The word "willfull," as used in this instruction, means intentional.

25            The word "deliberate" means formed or arrived at or determined
             upon as a result of careful thought and weighing of considerations
26            for and against the proposed course of action.

27            The word "premeditated" means considered beforehand.

28            If you find that the killing was preceded and accompanied by a

clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree.

The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated.

The time will vary with different individuals and under varying circumstances.

The true test is not the duration of time, but rather the extent of the reflection.

A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation as will fix an unlawful killing as murder of the first degree.

To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, he decides to and does kill.

(Doc. No. 22-4 at AGO02643-44 (12 CT 2662-63) [CALJIC 8.20].)  Petitioner has not claimed instructional error in this regard.  (*See* Doc. No. 38; *cf. id.* at 57-58 citing Doc. No. 27-8 at AGO12145 (9 RT 2124) (stating the prosecutor argued, incorrectly, that "premeditation was shown by a 'clear and deliberate intent to kill.' ").)

Here, the court finds that the state supreme court reasonably could reject the Claim for the reasons stated by that court and those that follow.

First, petitioner revisits evidence discussed above, that he was intoxicated to the extent that he could not form the requisite *mens rea* for first degree murder.  (Doc. No. 38 at 57-58 citing *Jackson*, 443 U.S. at 319; Penal Code §189; CALJIC 8.30, 5th ed. 1988) (murder in the second degree is the "unlawful killing of a human being with malice aforethought . . . but the evidence is insufficient to establish deliberation and premeditation."); *People v. Perez*, 2 Cal. 4th 1117, 1134 (1992) ("Traditionally, 'premeditated' has been defined as 'on preexisting reflection' and 'deliberate' as 'resulting from careful thought and weighing of considerations.' ").)  He points to the noted record evidence that he had been drinking in the hours before the

1    capital crime during which he stated his intention to get back at Juan Uribe for shooting Little

2    Pete; and that he was too drunk to drive and tripped and fell on his way into Durbin's home

3    where the crime occurred.  (Doc. No. 38 at 57-60 citing Doc. No. 27-8 at AGO12145-46 (9 RT

4    2124-25), AGO12223-24 (9 RT 2200-2201); *see also* Doc. No. 27-4 at AGO11239-49; Doc.

5    No. 21 at 157.)  He points out the prosecutor conceded that he (petitioner) was intoxicated at the

6    time of the shooting.  (Doc. No. 27-9 at AGO12582 (10 RT 2542).)

7          However, the state supreme court reasonably could find reject the Claim.  The jury had

8    before it uncontroverted evidence that on the night of the capital crime petitioner, seeking

9    revenge based upon his belief that Uribe had shot Little Pete, enlisted his Little Pete, Diaz, and

10   Rafael Avila in his plan to take up arms and go after Uribe; that Little Pete and petitioner

11   entered the Durbin home knowing it was occupied persons additional to Uribe; that petitioner,

12   in pursuit of his plan, intentionally shot Durbin in the head and upper body because he believed

13   Durbin was running to get a gun; and that petitioner's participation in his plan left Uribe and

14   Durbin dead and Cindy Durbin wounded.    (*See e.g.,* Doc. No. 27-4 at AGO11240-56 (5 RT

15   1263-79); *cf.* Doc. No. 21 at 198.)  The jury also had before it the noted evidence that petitioner,

16   having boasted and joked about the shooting to family members, initially denied responsibility

17   for the crime, created a false alibi which he presented to law enforcement, and asked relatives to

18   dispose of weapons used in the capital crime.  (*See e.g.,* Doc. No. 27-10 at AGO12697-701);

19   *Rangel*, 62 Cal. 4th at 1199–1207.

20         Contrary to petitioner's suggestion, this is not a case where the state court ignored

21   highly probative evidence of  petitioner's intoxication as it affected premeditation such that its

22   rejection of the Claim was unreasonable under § 2254(d)(1)(2).  (Doc. No. 45 at 12; *see also*

23   Doc. No. 27-8 at AGO12223-24 (9 RT 2200-2201)); *Rangel,* 62 Cal. 4th at 1227–28; *cf. Taylor*,

24   366 F.3d at 1000 (deference not warranted when state ignores highly probative evidence that is

25   central to petitioner's claims).

26         Petitioner next argues that Durbin unexpectedly ran into the room and petitioner shot

27   him out of surprise, such that petitioner did not premeditate and deliberate before the shooting.

28   (Doc. No. 38 at 57 citing Doc. No. 27-4 at AGO 11239-49.)  He argues that mere multiple acts

1   of violence on the victim alone are not sufficient to support a premeditated and deliberate

2   killing.  (Doc. No. 38 at 60 citing *People v. Anderson,* 70 Cal.2d 15, 26-27 (Cal. 1968)

3   (sustaining first degree murder where there is evidence of planning, motive, and manner of

4   killing reflecting a preconceived design).)  Especially so here, he argues, given that it was not

5   possible to tell where Durbin was positioned at the time he was shot.  (*Id.*; *see also* Doc. No. 27-

6   3, AGO10963-64 (4 RT 996-97).)

7          However, as discussed above, petitioner told his associates in the getaway car

8   immediately after the shooting that he had shot Durbin not out of surprise, but because he

9   believed Durbin was going for a gun.  (Doc. No. 27-4 at AGO11253-55 (5 RT 1276-1278); *see*

10  *also* Doc. No. 21 at 198.)

11         Finally, petitioner revists his trial defense that it was Diaz or Jesse Rangel who shot

12  Durbin.  (Doc. No. 38 at 57-58 citing Doc. No. 27-8, AGO12179-229 (9 RT 2158-2206).)

13         However, in addition to the evidence discussed above, the jury heard Diaz testify that he

14  saw a person who he assumed was Durbin, run through the living room, after which petitioner

15  shot him.  (Doc. No. 27-4 at AGO11249-51.)   The jury also considered the prosecutor's

16  argument that Durbin "got in the way, and they killed him."  (Doc. No. 27-8 at AGO12149 (9

17  RT 2128).)

18         Moreover, the jury heard evidence that Durbin was shot seven times, four times by a

19  small caliber weapon and three times by a large caliber weapon.  (Doc. No. 27-3 at AGO10933-

20  36 (4 RT 966-969).)  Particularly, the jury heard that:

21                     Durbin was shot seven times. Four of the wounds were to the
                      trunk of his body, inflicted by a small caliber weapon like a .22.
22                    Doc. No. 27- 3; AGO10934-36 (4 RT 967-969). Three of the
                      large caliber wounds, likely a .38 or .380,were to the neck, lower
23                    back, and right side of his head. Doc. No. 27-3; AGO10937-41 (4
                      RT 970-974).
24

25  (Doc. No. 38 at 57.)   The jury heard evidence that petitioner was armed with a large caliber

26  pistol at the time Durbin was shot.  (Doc. No. 27-4 at AGO11248); *see also Rangel*, 62 Cal. 4th

27  at 1212–13.

28                    d.       Conclusions

                                           126

A fair-minded jurist could find the state supreme court's denial of the Claim was not contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

Claim II shall be denied.

### 2.    Claim X

Petitioner alleges that the trial court erred by denying his post-conviction application for modification of the death verdict because the jury had before it insufficient aggravating evidence of premeditation for the murder of Chuck Dubin, denying his due process rights under the Fourteenth Amendment.  (Doc. No. 38 at 83-84; *see also* Doc. No. 20-13 at AGO02876-80 (13 CT 2855-2859).)

At the time of petitioner's trial, state law provided that:

> When a verdict has been rendered or a finding made against the defendant, the court may, upon his application, grant a new trial, in the following cases only:
>
> […]
>
> 7. When the verdict or finding is contrary to law or evidence, but in any case wherein authority is vested by statute in the trial court or jury to recommend or determine as a part of its verdict or finding the punishment to be imposed, the court may modify such verdict or finding by imposing the lesser punishment without granting or ordering a new trial, and this power shall extend to any court to which the case may be appealed[.]
>
> […]

Penal Code § 1181(7).

> In every case in which the trier of fact has returned a verdict or finding imposing the death penalty, the defendant shall be deemed to have made an application for modification of such verdict or finding pursuant to Subdivision 7 of Section 11.[2] In ruling on the application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings.

-----------------------------FOOTNOTE----------------------------------

n.2 Probably should read "Section 1181."

---------------------------END FOOTNOTE----------------------------

Penal Code § 190.4(e ); *see also People v. Lang*, 49 Cal. 3d 991, 1045 (1989), *abrogated on other grounds by People v. Diaz*, 60 Cal. 4th 1176, 1190 (2015) (in ruling on the automatic motion to modify a death verdict, the trial judge's function is to independently reweigh the evidence of aggravating and mitigating circumstances and then to determine whether, in the judge's independent judgment, the weight of the evidence supports the jury verdict; the weighing of aggravating and mitigating circumstances is the method by which the jury determines which penalty is appropriate).

a.    State Court Direct and Collateral Review

Claim X allegations were raised on direct appeal (Doc. No. 28-11 at AGO13733-38) and denied on the merits, as follows:

> Defendant contends that the trial court erroneously relied on premeditation as a circumstance of the crime in denying the automatic motion to modify because there was insufficient evidence that Chuck Durbin's murder was premeditated. We have concluded substantial evidence supported the jury's finding of premeditation and therefore reject this claim. (See [Rangel, 62 Cal. 4th at 1210-13, discussing the sufficiency of guilt phase evidence of premeditation of the Durbin murder].)

*Rangel*, 62 Cal. 4th at 1234.

b.    Legal Standard

(i)    *Trial Court Error*

The standard for trial court error is set out in section VIII A 1 b (i), herein.

(ii)    *Sufficiency of Evidence*

The standard for sufficiency of evidence is set out in section VIII G 1 b (i), herein.

c.    Analysis

Petitioner argues as he did in Claim II above, that the jury had insufficient evidence the murder of Chuck Durbin was premeditated.  He argues in this Claim X that the jury erroneously

gave aggravating weight to Chuck Durbin's premeditated murder, the trial court erred by denying his Penal Code § 1181(7) application for modification of the death verdict. (*See* Doc. No. 22-5 at AGO02876-80 (13 CT 2855-2859).) He argues that Penal Code § 190.4(e) provides a mandatory state entitlement the violation of which denied him federal due process rights. (Doc. No. 38 at 83-84, citing *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) (state created liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the state); *Evitts v. Lucey*, 469 U.S. 387, 401 (1985) (same); *Bonin v. Calderon*, 59 F.3d 815, 842 (9th Cir. 1995) (same); *see also* Doc. No. 45 at 21-22.)

Respondent argues that to the extent petitioner claims only state law error, federal habeas relief is unavailable. (Doc. No. 43 at 48-49 citing *McGuire*, 502 U.S. at 72-73.) He argues that petitioner has failed to pass through the §2254(d)(1)(2) gateway. (Doc. No. 43 at 49.)

The record reflects the trial court, in denying petitioner's application, stated that:

> The court has re-weighed independently the evidence of aggravating and mitigating circumstances. The court has also made an independent determination of the propriety of the penalty. The court finds, in the exercise of its independent judgment, the weight of the evidence supports the jury's verdict. Accordingly, the motion for modification of the penalty from death to life imprisonment without the possibility of parole is denied for the following reasons:
>
> The court has reviewed the evidence presented at the trial and has carefully and independently weighed, considered, taken into account, and ]been] guided by the aggravating and mitigating factors set forth in Section 190.3 of the Penal Code. It is not the court's intention to list every item of evidence and all arguments presented. For the purpose of clarifying the court's reasoning, this will be a recital of the principal factors which most powerfully inform and influence the decision at hand.
>
> The Court finds that the first degree murder of Chuck Durbin was an intentional killing personally committed by the defendant and the court further finds that the murder of Chuck Durbin was premeditated, deliberate, willful, and committed with malice aforethought.
>
> The Court finds that the first degree murder of Juan Uribe was an intentional killing personally committed by Pedro Rangel the III, and that Pedro Rangel Jr., with a shared intent to kill Juan Uribe, conspired with and aided and abetted Pedro Rangel the III in the commission of that first degree murder.

The Court further finds that the murder of Juan Uribe was premeditated, deliberate, willful, and committed with malice aforethought. Relative to the above, the Court notes the following as to the circumstances of the crimes of which the defendant was convicted in the present proceedings.

One, the defendant planned, and orchestrated the murder of Juan Uribe, recruited the participants, including his son, and son-in-law and personally lead to the stalking of Juan Uribe. But for the actions and encouragement of the defendant, these murders would not have been committed. Two, in the pursuit of Juan Uribe, defendant lead the invasion into the· Durbin's home, knowing that other people were present. The victims were unsuspecting and extremely vulnerable. Cindy Durbin was shot and seriously wounded by Pedro Rangel the III.

The attack at the Durbin's residence shows the defendant's callous and disturbing disregard for the lives and safety of other people, including the Durbin's three children who were present and witnessed their father's murder. The defendant did not even know the Durbin family. Cindy Durbin and her children are emotionally scarred for life.

Three, the defendant brutally and in cold blood murdered Chuck Durbin. Mr. Durbin had been seriously wounded and posed no threat to the defendant when the defendant killed him by shooting him in the head at close range. Four, the defendant showed no remorse by boasting and laughing about his nefarious deeds shortly after the murders.

[...]

Five. Finally, the reasons or motive for defendant's outrageous and despicable conduct is utterly senseless. The Court has considered every possible mitigating factor, and all possible mitigating evidence, including but not necessarily limited to:

A, the absence of any criminal record for the defendant. B, the defendant had been at the time of the crimes an otherwise responsible citizen who provided for his family. c, the defendant was productively employed and was well thought of by his supervisor and co-workers. D, the defendant has been compliant while in custody pending trial. E, although the evidence shows that the defendant had been somewhat intoxicated at the time the crimes were committed, the evidence clearly establishes that the defendant knew what he was doing.

F, the defendant's mitigating evidence is greatly tempered by involving his family in a coverup and in the planning, pursuing, and presenting to police a false alibi. The court has carefully weighed and considered the aggravating and mitigating factors as set forth in Section 190.3 of the Penal Code and the Court finds

that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that death is warranted instead of life in prison without the possibility of parole.

These reasons for denial of the application for modification are ordered to be entered into the clerk's minutes.

(Doc. No. 27-10 at AGO12697-701.)

Here, the state supreme court reasonably could find that the trial court did not err in denying his application for modification of the death verdict or deny him due process by virtue thereof.  Petitioner has not shown insufficient evidence of premeditation and aggravating weight erroneously assigned thereto.

Particularly, the state supreme court reasonably could find that the trial court independently weighed the evidence of aggravating and mitigating circumstances in the course of denying the post-conviction motion.  That court reviewed the aggravating and mitigating evidence presented to the jury, independently reweighed such evidence under the factors listed in Penal Code 190.3, and summarized its reasoning in finding the weight of the evidence supported the jury's verdict.  *See Lang*, 49 Cal. 3d at 1045, *abrogated on other grounds by Diaz*, 60 Cal. 4th at 1190, ("[I]n ruling on the automatic motion to modify a death verdict, the trial judge's function . . . is to independently reweigh the evidence of aggravating and mitigating circumstances and then to determine whether, in the judge's independent judgment, *the weight of the evidence supports the jury verdict*.") (emphasis in original).

Significantly, the trial court found as aggravating evidence that petitioner's murder of Durbin was premeditated, deliberate, willful, and with malice;  petitioner aided and abetted his son's first degree murder of Uribe; petitioner - though somewhat intoxicated - knew what he was doing and planned and orchestrated both murders which were committed while others were present including Durbin's children; petitioner shot Durbin in the head after Durbin had been seriously wounded and posed no threat; petitioner showed no remorse for the shooting, boasting and joking about the killing; and petitioner initially denied responsibility and enlisted his family in a cover-up.  The trial court found as mitigating evidence that petitioner had no criminal record; was a responsible parent, employee, and community member; and was compliant in

1  custody.  The trial denied the motion by concluding that the aggravating circumstances were so

2  substantial in comparison to the mitigating circumstances as to support the death verdict.  (Doc.

3  No. 27-10 at AGO12697-701.)

4         The state supreme court reasonably could defer to the trial court's independent

5  determination, supported in the record, that the jury's findings and verdict that the aggravating

6  circumstances outweighed the mitigating circumstances were not contrary to law or the

7  evidence presented, for the reasons stated by that court (*Rangel*, 62 Cal. 4th at 1234), and as

8  discussed above.  Petitioner does not point to facts in the record that the trial court failed to

9  independently reweigh the evidence of aggravating and mitigating circumstances and determine,

10 in its independent judgment, that the weight of the evidence supported the jury's verdict.  *See*

11 *Lockett,* 438 U.S. at 604 (the Eighth Amendment requires full consideration of "any aspect of

12 the defendant's character or record and any of the circumstances of the offense that the

13 defendant proffers as a basis for a sentence less than death"); *see also Eddings*, 455 U.S. at 113-

14 114  (sentencer must consider any relevant mitigating evidence).

15        The trial court need not refer to every piece of mitigating evidence that it considered and

16 found insubstantial and unpersuasive.  *People v. Arias*, 13 Cal. 4th 92, 191-92 (1996).  The state

17 supreme court reasonably could find the trial court's failure specifically to mention each piece

18 of allegedly mitigating evidence not indicative of a failure to consider such evidence for

19 purposes of the motion to modify the verdict.

20        Petitioner fails to identify clearly established Federal law requiring the trial court

21 exercise independent review and judgment upon a motion to modify the verdict.  *See Webster v.*

22 *Chappell,* No. CIV S-93-306 LKK DAD, 2014 WL 2526857 at *74 (E.D. Cal. June 4, 2014),

23 *report and recommendation adopted sub nom. Webster v. Warden, San Quentin State Prison*,

24 No. CIV. S-93-0306 LKK D, 2014 WL 4211115 (E.D. Cal. Aug. 26, 2014) (citing *Turner v.*

25 *Calderon*, 281 F.3d 851, 871 (2002)); *Pulley,* 465 U.S. at 41) ("[The] Ninth Circuit has stated

26 that "at most the [trial court's] error [in ruling on the section 190.4(e) motion] would be one of

27 state law" and thus not one cognizable as a habeas claim."); *see also Wainwright v. Goode*, 464

28 U.S. 78, 83 (1983) (citing *Engle v. Isaac,* 457 U.S. 1141 (1982) ("It is axiomatic that federal

1    courts may intervene in the state judicial process only to correct wrongs of a constitutional

2    dimension.").

3        Notably, the Court in *Pully* does not hold that a challenge to the section 190.4(e)

4    sentence modification hearing can provide a basis for federal constitutional error.  This court

5    has recognized as much.  *See Vieira v. Chappell*, No. 1:05-cv-1492 AWI, 2015 WL 641433

6    (E.D. Cal. Feb. 5, 2015) at **170-71; *Webster*, 2014 WL 2526857 at **73-75; *cf. Ross v. Davis*,

7    2017 WL 2374101 (C.D. 2017) at **45-46 (acknowledging that a state law error by the trial

8    court in its section 190.4(e) review, given the particular facts and circumstances, also may

9    violate federal rights).

10       Finally, even if California's statutory process for modifying a death verdict could rise to

11   the level of a due process entitlement under *Hicks* as petitioner argues (*see* Doc. No. 45 at 21-

12   22), he has failed to demonstrate he was denied due process, for the reasons stated.

13           d.      Conclusions

14       A fair-minded jurist could find the state supreme court's denial of the Claim was not

15   contrary to, or an unreasonable application of, clearly established Federal law, as determined by

16   the Supreme Court, or based on an unreasonable determination of the facts in light of the

17   evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

18       Claim X shall be denied.

19   H.   Claims Challenging the Constitutionality of the Death Penalty and California's

20        Death Penalty Statute

21        *1.    Claim XV*

22       Petitioner alleges that his prolonged confinement under sentence of death violates his

23   rights under the Eighth Amendment.  (Doc. No. 38 at 112-13.)

24           a.      State Court Direct and Collateral Review

25       Claim XV allegations were raised in the state habeas corpus petition (Doc. No. 29-1 at

26   AGO14659-67), and summarily denied on the merits (Doc. No. 31-7 at  AGO16725).

27           b.      Legal Standard

28               *(i)    Cruel and Unusual Punishment*

1    The Eighth Amendment prohibits punishments that are "incompatible with the evolving

2 standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S.

3 97, 102 (1976).   Executions that "involve the unnecessary and wanton infliction of pain,"

4 *Gregg,* 428 U.S. at 173, or that "involve torture or a lingering death," *In re Kemmler,* 136 U.S.

5 436, 447 (1890), are not permitted.

6    "[T]he Cruel and Unusual Punishments Clause prohibits the infliction of uncivilized and

7 inhuman punishments.   The State, even as it punishes, must treat its members with respect for

8 their intrinsic worth as human beings.   A punishment is 'cruel and unusual,' therefore, if it does

9 not comport with human dignity." *Furman*, 408 U.S. at 270.

10    The mental suffering, demoralization, uncertainty and consequent psychological hurt

11 inherent in the punishment must be considered in interpreting Eighth Amendment.  *Id.* at 271,

12 272.

13    An execution "cannot be so totally without penological justification that it results in the

14 gratuitous infliction of suffering." *Gregg,* 428 U.S. at 183.

15    The assessment should be whether punishment is cruel and unusual in consideration of

16 the standards of decency that mark the progress of a maturing society, or standards of decency

17 that are more or less universally accepted.  *Id.*

18         c.    Analysis

19    Petitioner argues that his lengthy confinement on death row violates the Eighth

20 Amendment, and that he should be resentenced to life without parole.   (Doc. No. 38 at 112-13

21 citing *Lackey v. Texas*, 514 U.S. 1045 (1995) (citing *Furman v. Georgia*, 408 U.S. 238, 312,

22 (1972) ("when the death penalty ceases realistically to further these purposes [of retribution and

23 deterrence] . . .  with only marginal contributions to any discernible social or public purposes . .

24 .  [it] would be patently excessive and cruel and unusual punishment violative of the Eighth

25 Amendment.' ").)   He observes that (1) the trial court imposed the death penalty on February 8,

26 1999 (Doc. No. 22-5 at AGO02886-90 (13 CT 2865-2869)), (2) the state delayed appointing

27 counsel for his automatic appeal until July 21, 2004 (*see* Cal. Case No. S076785), and (3) he

28 has now been confined on death row awaiting execution for over twenty years (*see* Doc. No. 38

1    at 112).

2         Respondent argues that on deferential review, the state supreme court reasonably found

3    the *Lackey* claim lacks merit.  (Doc. No. 43 at 63-64 citing *Lackey*, 514 U.S. at 1045; *Jones v.*

4    *Davis*, 806 F.3d 538, 541 (9th Cir. 2015) (*Lackey* claim found to be barred by *Teague*)); *see*

5    *also Smith v. Mahoney*, 611 F.3d 978, 998 (9th Cir. 2010) (same); *Allen v. Ornoski*, 435 F.3d

6    946, 958-59 (9th Cir. 2006) ("[t]he Supreme Court has never held that execution after a long

7    tenure on death row is cruel and unusual punishment); *McKenzie v. Day*, 57 F.3d 1461, 1466-67

8    (9th Cir. 1995) (explaining that delay stems from enhanced protective procedures available to

9    condemned persons and not from intent to torture).

10        Here, the state supreme court reasonably could reject the Claim.  Petitioner does not cite

11   any clearly established Supreme Court authority that a prolonged detention is cruel and unusual

12   punishment.  As this court has observed:

> The Ninth Circuit has rejected the claim that extraordinary delay
> and lengthy confinement under sentence of death renders the
> death sentence invalid.  *See Allen v. Ornoski*, 435 F.3d 946, 956-
> 59 (9th Cir. 2006) ("The Supreme Court has never held that
> execution after a long tenure on death row is cruel and unusual
> punishment ... Allen cannot credibly claim that there is any
> clearly established law, as determined by the Supreme Court,
> which would support this ... claim.")); *see also McKenzie v. Day*,
> 57 F.3d 1461, 1466-67 (9th Cir. 1995) (casting doubt that delays
> caused by satisfying the Eighth Amendment can violate it); *Smith*
> *v. Mahoney*, 611 F.3d 978, 997-98 (9th Cir. 2010) (citing
> *McKenzie* and finding *Lackey* claim barred by *Teague v. Lane*,
> 489 U.S. 299, 316 (1989); *Andrews v. Davis*, 866 F.3d 994, 1039
> (9th Cir. 2017) (same), (rehearing *en banc*) 944 F.3d 1092 (9th
> Cir. 2019); *People v. Taylor*, 26 Cal. 4th 1155, 1176-77 (2001)
> (rejecting claim that relatively lengthy period of incarceration
> constitutes cruel and unusual punishment on grounds such delay
> is necessary to permit careful appellate review).
>
> Justice Stevens, in his memorandum respecting denial of
> certiorari in *Lackey*, suggested this issue needed further study.
> 514 U.S. 1045.  *Lackey* indicates that the issue has never been
> squarely addressed by the Supreme Court, nor have lower courts
> in the United States given the issue ample consideration. Id.  Four
> years later, Justice Thomas stated in concurring on a denial of
> certiorari, that:
>
>> I am unaware of any support in the American
>> constitutional tradition or in this Court's precedent
>> for the proposition that a defendant can avail
>> himself of the panoply of appellate and collateral

135

1

> procedures and then complain when his execution
> is delayed.

2

3

> *Knight v. Florida*, 528 U.S. 990 (1999).  At least one other circuit
> has held that the time consumed by a petitioner's direct and
> collateral review proceedings "is a function of the desire of our
> courts, state and federal, to get it right, to explore exhaustively, or
> at least sufficiently, any argument that might save someone's life."
> *Johns v. Bowersox*, 203 F.3d 538, 547 (8th Cir. 2000) (quoting
> *Chambers v. Bowersox*, 157 F.3d 560, 570 (8th Cir. 1998)).

4

5

6

> In any event, since the Supreme Court has not decided the issue,
> the state court's decision could not be contrary to or an
> unreasonable application of Supreme Court precedent. *Musladin,*
> 549 U.S. at 77; *Sims v. Rowland*, 414 F.3d 1148, 1153 (9th Cir.
> 2005) (same).

7

8

9

10

*Weaver v. Chappell*, No. 102CV05583AWISAB, 2021 WL 4264070 at *216–17 (E.D. Cal.

11

Sept. 20, 2021).  Petitioner concedes the Supreme Court has yet to address the issue raised in

12

this Claim.  (Doc. No. 38 at 113).  His observation of a number of dissents from denial of

13

certiorari in cases raising a *Lackey* claim (*id.*, cases cited therein), falls short of clearly

14

established Federal law, and is unpersuasive.  Moreover, sister courts within the Circuit have

15

rejected such claims:

16

> "The Supreme Court has never held that execution after a long
> tenure on death row is cruel and unusual punishment." *Allen v.
> Ornoski*, 435 F.3d 946, 958 (9th Cir.2006). Indeed, the Supreme
> Court has repeatedly declined to address this question. *See e.g.
> Lackey v. Texas*, 514 U.S. 1045, 115 S.Ct. 1421, 131 L.Ed.2d 304
> (1995) (mem.) (Stevens, J., discussing denial of certiorari and
> observing that the claim has not been addressed, noting "the
> Court's denial of certiorari does not constitute a ruling on the
> merits"); *see also Valle v. Florida*, 564 U.S. 1067, 132 S.Ct. 1,
> 180 L.Ed.2d 940 (2011) (mem.); *Thompson v. McNeil*, 556 U.S.
> 1114, 129 S.Ct. 1299, —— L.Ed.2d —— (2009) (mem.); *Smith v.
> Arizona*, 552 U.S. 985, 128 S.Ct. 2997, 169 L.Ed.2d 326 (2007)
> (mem.); *Foster v. Florida*, 537 U.S. 990, 123 S.Ct. 470, 154
> L.Ed.2d 359 (2002) (mem.). The Ninth Circuit has also held that
> *Lackey* claims are barred by Teague. *See Smith v. Mahoney*, 611
> F.3d 978, 998–99 (9th Cir.2010) ("[A] state court considering
> [Petitioner's] Eighth Amendment claim at the time his conviction
> became final would not have felt compelled by existing precedent
> to conclude that the rule sought was required by the
> Constitution.")

17

18

19

20

21

22

23

24

25

26

27

*Roybal v. Davis*, 148 F. Supp. 3d 958, 1110 (S.D. Cal. 2015); *see also Jones*, 806 F.3d at 541.

28

> Petitioner's further argument, analogizing to *Penry*, 492 U.S. at 329-30, that *Teague*

does not bar a *Lackey* claim in all instances (Doc. No. 45 at 28), is unsupported by legal authority and is unpersuasive otherwise on the facts and circumstances of this case, for the reasons stated.

### d. Conclusions

A fair-minded jurist could find the state supreme court's denial of the Claim was not contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claim XV shall be denied.

### 2.  *Claim XVII*

Petitioner alleges that many features of California's death penalty scheme violate the Eighth and Fourteenth Amendments. (Doc. No. 38 at 118-19.)

### a. State Court Direct and Collateral Review

The following Claim XVII allegations were raised on direct appeal (Doc. No. 28-11 at AGO13739-46), and denied on the merits, as follows:

Challenges to the capital sentencing scheme

Defendant contends that California's death penalty statute is constitutionally invalid in numerous respects. We have repeatedly rejected similar claims and do so again here as follows:

"[T]he California death penalty statute is not impermissibly broad, whether considered on its face or as interpreted by this court." (People v. Dykes (2009) 46 Cal.4th 731, 813, 95 Cal.Rptr.3d 78, 209 P.3d 1.) The death penalty statute does not lack safeguards to avoid arbitrary and capricious sentencing, deprive defendant of the right to a jury trial, or constitute cruel and unusual punishment on the ground that it does not require either unanimity as to the truth of aggravating circumstances or findings beyond a reasonable doubt that an aggravating circumstance (other than Penal Code section 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence. (People v. Whalen (2013) 56 Cal.4th 1, 90, 152 Cal.Rptr.3d 673, 294 P.3d 915; Dykes, at p. 814, 95 Cal.Rptr.3d 78, 209 P.3d 1; Avila, supra, 46 Cal.4th at p. 724, 94 Cal.Rptr.3d 699, 208 P.3d 634.) Nothing in Hurst v. Florida (2016) —— U.S. – ——, 136 S.Ct. 616, 193 L.Ed.2d 504,[16] Cunningham v. California (2007) 549 U.S. 270, 127 S.Ct. 856, 166 L.Ed.2d 856, Blakely v. Washington (2004) 542 U.S. 296, 124 S.Ct. 2531,

159 L.Ed.2d 403, Ring v. Arizona, supra, 536 U.S. 584, 122 S.Ct. 2428, or Apprendi v. New Jersey (2000) 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435, affects our conclusions in this regard. (Dement, supra, 53 Cal.4th at p. 55, 133 Cal.Rptr.3d 496, 264 P.3d 292.) "Written findings by the jury during the penalty phase are not constitutionally required, and their absence does not deprive defendant of meaningful appellate review." (People v. Mendoza (2011) 52 Cal.4th 1056, 1097, 132 Cal.Rptr.3d 808, 263 P.3d 1.) "Use of the adjectives 'extreme' and 'substantial' in [Penal Code] section 190.3, factors (d) and (g) is constitutional." (Dement, at p. 57, 133 Cal.Rptr.3d 496, 264 P.3d 292.) A "prosecutor's discretion to select those eligible cases in which the death penalty is sought does not offend the federal or state Constitution." (People v. Wallace (2008) 44 Cal.4th 1032, 1098, 81 Cal.Rptr.3d 651, 189 P.3d 911.) "The federal constitutional guarantees of due process and equal protection, and against cruel and unusual punishment [citations], do not require intercase proportionality review on appeal." (People v. Mai (2013) 57 Cal.4th 986, 1057, 161 Cal.Rptr.3d 1, 305 P.3d 1175.)

------------------------------FOOTNOTE--------------------------------

n.16 In *Hurst v. Florida,* the United States Supreme Court recently held that Florida's sentencing scheme violates the Sixth Amendment in light of *Ring v. Arizona* (2002) 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556. (*Hurst v. Florida, supra,* ––– U.S. at p. –––, 136 S.Ct. 616, 621.) The California sentencing scheme is materially different from that in Florida. Here, a jury weighs the aggravating and mitigating circumstances and reaches a unanimous penalty verdict that "impose[s] a sentence of death" or life imprisonment without the possibility of parole. (Pen.Code §§ 190.3, 190.4.) Unlike Florida, this verdict is not merely "advisory." (*Hurst,* at p. 622.) If the jury reaches a verdict of death, our system provides for an automatic motion to modify or reduce this verdict to that of life imprisonment without the possibility of parole. (Pen.Code § 190.4.) At the point the court rules on this motion, the jury "has returned a *verdict or finding* imposing the death penalty." (Pen.Code § 190.4, italics added.) The trial court simply determines "whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented." (Pen.Code § 190.4.)

---------------------------END FOOTNOTE-----------------------------

*Rangel*, 62 Cal. 4th at 1234-35.

The Claim XVII allegation that the failure to apply a presumption of life at the penalty phase denied petitioner due process was raised in the state habeas corpus petition (Doc. No. 29-1 at AGO14689-91), and summarily denied on the merits (Doc. No. 31-7 at AGO16725).

138

b.      Legal Standards

(i)      *Narrowing the Application of the Death Penalty*

A state capital sentencing system must: "(1) rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." *Marsh*, 548 U.S. at 173-74.  If the "state system satisfies these requirements," then the "state enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed."  *Id.* (citing *Franklin v. Lynaugh,* 487 U.S. 164, 179 (1988)) (plurality opinion); *see also Zant v. Stephens,* 462 U.S. 862, 875-76, n.13 (1983) (specific standards for balancing aggravating and mitigating circumstances are not required).

(ii)      *Prosecutorial Discretion*

Prosecutorial discretion "is essential to the criminal justice process," *McCleskey v. Kemp,* 481 U.S. 279, 297 (1987), and does not violate the federal Constitution.   The Constitution forbids only "purposeful discrimination" in the exercise of that prosecutorial discretion, *id.* at 292-93, and in order to prevail in that regard, the Supreme Court emphasized that "we would demand exceptionally clear proof before we would infer that the discretion has been abused[,]" *id.* at 297.   The mere fact that California's statutory scheme gives the prosecutor discretion does not violate the United States Constitution.  28 U.S.C. § 2254(a); *Gregg*, 428 U.S. at 225.

"A defendant who alleges an equal protection violation has the burden of proving 'the existence of purposeful discrimination'[,]" and must demonstrate that the purposeful discrimination "had a discriminatory effect" on him.  *McCleskey*, 481 U.S. at 292 (quoting *Whitus v. Georgia*, 385 U.S. 545, 550 (1967)).  Therefore, to prevail on this Claim, petitioner "must prove that the decisionmakers in his case acted with discriminatory purpose."  *Id.*  It is not enough that other defendants who may be similarly situated did not receive the death penalty.  *Id.* at 306–07.

Prosecutorial charging decisions are "particularly ill-suited to judicial review."  *Wayte v.*

1  *United States*, 470 U.S. 598, 607 (1985).

2                              *(iii)*     *Cruel and Unusual Punishment*

3        The Eighth Amendment prohibits punishments that are "incompatible with the evolving

4  standards of decency that mark the progress of a maturing society." *Gamble,* 429 U.S. at 102.

5  Executions that "involve the unnecessary and wanton infliction of pain," *Gregg,* 428 U.S. at

6  173, or that "involve torture or a lingering death," *Kemmler,* 136 U.S. at 447, are not permitted.

7        "[T]he Cruel and Unusual Punishments Clause prohibits the infliction of uncivilized and

8  inhuman punishments.  The State, even as it punishes, must treat its members with respect for

9  their intrinsic worth as human beings.  A punishment is 'cruel and unusual,' therefore, if it does

10  not comport with human dignity." *Furman*, 408 U.S. at 270.

11        The mental suffering, demoralization, uncertainty and consequent psychological hurt

12  inherent in the punishment must be considered in interpreting Eighth Amendment.  *Id.* at 271,

13  272.

14        An execution "cannot be so totally without penological justification that it results in the

15  gratuitous infliction of suffering." *Gregg,* 428 U.S. at 183.

16        The assessment should be whether punishment is cruel and unusual in consideration of

17  the standards of decency that mark the progress of a maturing society, or standards of decency

18  that are more or less universally accepted. *Id.*

19                    c.        Analysis

20        Petitioner argues that various feature of California's death penalty process violate his

21  federal rights.  The California Supreme Court reasonably denied these allegations, as discussed

22  below.

23                              *(i)*     *Failure to Narrow*

24        Petitioner argues that California's capital sentencing scheme denies due process because

25  it fails to narrow the special circumstances that give rise to death eligibility.  (Doc. No. 38 at

26  119 citing *McKleskey*, 481 U.S. at 305; *Stephens*, 462 U.S. at 878.)  He argues that:

27              At the time of the homicides in this case, there were 28 special
              circumstances.  Penal Code § 190.2.  Eighty-seven percent of first
28              degree murders were thus eligible for the death penalty. Failing to

                                              140

1   narrow the class of murders eligible for the death penalty violates
    due process. *McKleskey v. Kemp*, 481 U.S. 279, 305 (1987); *Zant*
2   *v. Stephens*, 462 U.S. 862, 878 (1983).

3   (Doc. No. 38 at 119.)

4      Respondent argues that California's narrowing scheme is sufficient under *Furman*

5   because "the only murders eligible for death are (1) those belonging to the subclass of murder in

6   the first degree, but only if (2) a jury finds at least one statutory special circumstance to be true.

7   *Tuilaepa*, 512 U.S. at 975."   (Doc. No. 43 at 71-72 citing *Boyer v. Chappell*, 793 F.3d 1092,

8   1105 (9th Cir. 2015) (California's death statutes adequately perform the narrowing function).)

9      Here, the state supreme court was not unreasonable in rejecting the Claim, for the

10  reasons stated by that court and those that follow.

11     As noted, a state capital sentencing system must rationally narrow the class of death-

12  eligible defendants and permit a jury to render a reasoned, individualized sentencing

13  determination based on a death-eligible defendant's record, personal characteristics, and the

14  circumstances of his crime.   *Marsh*, 548 U.S. at 173-74.   A state may narrow the class of

15  murderers eligible for the death penalty in part by defining degrees of murder and limiting the

16  penalty to first degree murder.   *Sawyer*, 505 U.S. at 342.   A state may further narrow the class

17  of murderers eligible for the death penalty by "specifying [a number of] statutory aggravating

18  circumstances, one of which must be found by the jury to exist beyond a reasonable doubt

19  before a death sentence can ever be imposed."   *Gregg*, 428 U.S. at 196-97.

20     So long as a state's death penalty statute "rationally narrow[s] the class of death-eligible

21  defendants" and "permit[s] a jury to render a reasoned, individualized sentencing

22  determination," states "enjoy[] a range of discretion in imposing the death penalty . . . ."

23  *Marsh*, 548 U.S. at 173-74; *see also Gregg*, 428 U.S. at 195.   The Supreme Court in *California*

24  *v. Ramos* stated that "once the jury finds that the defendant falls within the legislatively defined

25  category of persons eligible for the death penalty[,]" the jury's consideration of a myriad of

26  factors and exercise of "unbridled discretion" in determining whether death is the appropriate

27  punishment is not arbitrary and capricious.   463 U.S. 992, 1008-09 (1983).

28     California's death penalty scheme, which narrows the class of death eligible offenders to

1   less than the definition of first-degree murder and permits consideration of all mitigating

2   evidence, has been approved by the Supreme Court.  *Tuilaepa*, 512 U.S. at 972-79; *Pulley*, 465

3   U.S. at 38.   In *Brown v. Sanders*, 546 U.S. 212 (2006), a case which like petitioner's arose

4   under California's 1978 death penalty statute, the Court again observed that special-

5   circumstance findings "are sufficient to satisfy *Furman's* narrowing requirement."  *Id.* at 224;

6   *see also Marsh*, 548 U.S. at 173 (a state has a range of discretion in imposing the death penalty

7   where its capital sentencing system (1) rationally narrows the class of death-eligible defendants;

8   and (2) permits a jury to render a reasoned, individualized sentencing determination based on a

9   death-eligible defendant's record, personal characteristics, and the circumstances of his

10   crime.").)

11          California adequately narrows application of the death penalty to only first degree

12   murder with a special circumstance found true.  *Tuilaepa*, 512 U.S. at 975; *Sanders*, 546 U.S. at

13   216.; *Boyer*, 793 F.3d at 1105.   As respondent observes, this court has repeatedly so found.

14   (Doc. No. 43 at 72; *Dickey v. Davis*, No. 1:06-cv-00357-AWI-SAB, 2019 WL 4393156 at *119-

15   20 (E.D. Cal. Sept. 13, 2019), *reversed and remanded on other grounds by Dickey v. Davis*, 69

16   F. 4th 624 (2023); *Webster*, 2014 WL 2526857 at *55-66; *Cornwell v. Warden*, No. 2:06-cv-

17   00705 TLN-KJN, 2018 WL 934542 at *118-22 (E.D. Cal. Feb. 15, 2018).)   Petitioner concedes

18   the state supreme court has rejected constitutional challenges to its death penalty.  (*See* Doc. No.

19   28-11 at AGO13739.)

20          Relatedly, in *Mayfield*, the Ninth Circuit stated that:

21              A defendant is eligible for the death penalty under the 1978
               statute only if, at the guilt phase, the jury finds him guilty of first
22              degree murder and finds to be true a statutorily defined special
               circumstance. *See Jurek v. Texas,* 428 U.S. 262, 270–71, 96 S.Ct.
23              2950, 49 L.Ed.2d 929 (1976) (upholding capital punishment
               statute that required the jury to find at the guilt phase that the
24              defendant's crime fell within one of five statutory categories of
               death-eligible murder). At the penalty phase, the class of
25              defendants eligible for death is again narrowed by the jury's
               application of a series of statutorily enumerated aggravating or
26              mitigating factors. *See Blystone v. Pennsylvania,* 494 U.S. 299,
               307, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990) (holding statute
27              sufficiently narrows the class of death-eligible defendants to
               survive constitutional scrutiny if it "allow[s] the jury to consider
28              all relevant mitigating evidence"); *Lowenfield v. Phelps,* 484 U.S.

142

1    231, 246, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) (holding that a
     capital punishment statute is constitutional if it "broadly define[s]
2    capital offenses and provide[s] for narrowing by jury findings of
     aggravating circumstances at the penalty phase"). A reasonable
3    jurist could not debate, therefore, that the 1978 California statute,
     which narrowed the class of death-eligible defendants at both the
4    guilt and penalty phases, was constitutional. We decline to grant a
     COA on this claim.

5

6    270 F.3d at 924.  In *Karis v. Calderon*, the Ninth Circuit rejected a failure to narrow claim,

7    stating that:

8         [W]e reject Karis' argument that the scheme does not adequately
          narrow the class of persons eligible for the death penalty. The
9         California statute satisfies the narrowing requirement set forth in
          Zant v. Stephens, 462 U.S. 862 [] (1983). The special
10        circumstances in California apply to a subclass of defendants
          convicted of murder and are not unconstitutionally vague. See id.
11        at 972 []. The selection requirement is also satisfied by an
          individualized determination on the basis of the character of the
12        individual and the circumstances of the crime. See id. California
          has identified a subclass of defendants deserving of death and by
13        doing so, it has "narrowed in a meaningful way the category of
          defendants upon whom capital punishment may be imposed."
14        Arave v. Creech, 507 U.S. 463, 476 [] (1993).

15   283 F.3d 1117, 1141 n.11 (2002).

16        Accordingly, the state supreme court reasonably could find that California's death

17   penalty process is not impermissibly broad and does not unconstitutionally fail to narrow

18   special circumstances.

19                    *(ii)     Standard of Proof*

20        Petitioner argues that California's capital sentencing scheme violates the Sixth and

21   Fourteenth Amendments because it fails to require aggravating factors be proven beyond a

22   reasonable doubt.  (Doc. No. 38 at 118 citing *Apprendi; Ring; In re Winship; Ford v.*

23   *Wainwright*, 477 U.S. 399 (1986); and *Beck v. Alabama*, 447 U.S. 625 (1980).)

24        Respondent argues the United States Supreme Court has never held that a burden of

25   proof or persuasion must be assigned to the jury's penalty phase determinations.  (Doc. No.

26   at 67 citing *Tuilaepa*, 512 U.S. at 975-80, *Harris*, 465 U.S. at 53.)  He observes the Supreme

27   Court's finding that California's list of statutory factors guarantees the necessary guidance for

28   the jury's exercise of its discretion in selecting a penalty and that California's system, "[o]n its

                                        143

1   face . . . cannot be successfully challenged under *Furman* [*v. Georgia*, 408 U.S. 238 (1972)] and

2   our subsequent cases." *Harris*, 465 U.S. at 53." (Doc. No. 43 at 67.)

3       Here again, the court finds the state supreme court was not unreasonable in rejecting the

4   Claim, for the reasons stated by that court and those that follow.

5       The capital sentencing determination by California jurors is moral and normative and

6   does not require unanimous written findings pursuant to a standard of proof or presumption in

7   favor of life. *See e.g., Weaver*, 26 Cal. 4th at 984-87. The Supreme Court has held that no

8   specific method of balancing aggravating and mitigating factors in a capital sentencing

9   proceeding is constitutionally required. *Marsh*, 548 U.S. at 175.

10      As noted, California's death penalty sentencing scheme has been consistently upheld as

11  constitutional by the Supreme Court. *Tuilaepa*, 512 U.S. at 975-80; *Pulley*, 465 U.S. at 53; *see

12  also Williams*, 52 F.3d at 1485 (failure to require a specific finding that death is the appropriate

13  penalty beyond a reasonable doubt does not render California's death penalty statute

14  unconstitutional).

15      Petitioner has not pointed to clearly established Supreme Court authority that under

16  California's death penalty statute, penalty phase determinations implicate any burden of proof

17  much less a reasonable doubt standard of proof. *See Floyd*, 949 F.3d at 1144 (observing that the

18  federal courts of appeals have uniformly rejected the argument that *Apprendi* and *Ring* require a

19  reasonable doubt instruction at the penalty phase because a jury's balancing inquiry in a capital

20  case is a subjective and moral one, not a factual one). Thus, petitioner's reliance upon *Ring* and

21  *Apprendi* is misplaced.

22      While *Apprendi* requires that facts supporting an increase in sentence greater than jury's

23  guilty verdict must be proved beyond a reasonable doubt, 530 U.S. at 490, and *Ring* extended

24  *Apprendi* to capital defendants, 536 U.S. at 589, it remains that once a jury finds the defendant

25  to be death eligible, the jury may be given "unbridled discretion in determining whether the

26  death penalty should be imposed" upon a death eligible defendant. *Tuilaepa*, 512 U.S. at 979-

27  80. *Apprendi* does not require a jury to find beyond a reasonable doubt the applicability of a

28  specific section 190.3 sentencing factor. *Tuilaepa*, 512 U.S. at 975. Nothing in these cases

1    requires findings beyond a reasonable doubt in California's penalty phase.  *See e.g., People v.*

2    *Prieto*, 30 Cal. 4th 226, 275 (2003) ("[T]he penalty phase determination in California is

3    normative, not factual. It is therefore analogous to a sentencing court's traditionally

4    discretionary decision to impose one prison sentence rather than another. [Citation]

5    Accordingly, *Ring* does not undermine our previous rulings upholding the constitutionality of

6    California's death penalty law[.]").  Notably, the Constitution allows a defendant to carry his

7    burden by preponderance of the evidence to show existence of mitigating circumstances.

8    *Walton v. Arizona*, 497 U.S. 639, 651 (1990), *overruled on other grounds by Ring,* 536 U.S. at

9    589.

10       Thus, the failure to require a specific finding that death is the appropriate penalty

11   beyond a reasonable doubt does not render California's death penalty statute otherwise

12   unconstitutional.  "[T]here is no . . . constitutional requirement of unfettered sentencing

13   discretion in the jury, and States are free to structure and shape consideration of mitigating

14   evidence in an effort to achieve a more rational and equitable administration of the death

15   penalty."  *Boyde,* 494 U.S. at 377 (quoting *Franklin,* 487 U.S. at 181) (plurality opinion); *see*

16   *also Marsh,* 548 U.S. at 175 (no specific method for balancing aggravating and mitigating

17   factors in a capital case sentencing proceeding is constitutionally required).

18       Accordingly, the state supreme court reasonably could find that California's death

19   penalty process is not unconstitutional by its failure to require that aggravating factors be

20   proven beyond a reasonable doubt.

21                    *(iii)    Unanimous Written Findings at the Penalty Phase*

22       Petitioner argues that California's capital sentencing scheme violates that Sixth and

23   Fourteenth Amendments, and denies the right to meaningful appellate review, because it fails to

24   require unanimous written findings on which aggravating factors it finds in returning a death

25   verdict.  (Doc. No. 38 at 118 citing *Richardson v. United States*, 526 U.S. 813, 815-816 (1999)

26   (jury must unanimously agree on which three drug violations constitute a continuing criminal

27   enterprise).)

28       Respondent argues that the Constitution does not require unanimous written findings by

145

the jury regarding imposition of the death penalty.  (Doc. No. 43 at 66, 68-69 citing *Smith v. Spisak*, 558 U.S. 139, 148 (2010) (finding no constitutional violation where the instructions did not say "anything about how - or even whether - the jury should make individual determinations that each particular mitigating circumstance existed"); *Williams*, 52 F.3d at 1484-85 (California's death penalty statute not unconstitutional by its failure to require written jury findings).)

Here, the court finds the state supreme court was not unreasonable in rejecting the Claim, for the reasons stated by that court and those that follow.

The court observes that petitioner was not being tried for any unadjudicated conduct offered at the penalty phase.  Thus, the unanimity safeguard was unnecessary.  Aggravating circumstances are not separate penalties, but are standards to guide the making of the choice between death and life imprisonment.  *People v. Raley*, 2 Cal. 4th 870, 910 (1992), *superseded by statute as stated in People v. Brooks*, 3 Cal. 5th 1 (2017).  A factor set forth in Penal Code section 190.3 does not require a "yes" or "no" answer to a specific question, but points the sentencer to the subject matter which guides the choice between the two punishments.  *Tuilaepa*, 512 U.S. at 975.

Petitioner does not identify any clearly established Supreme Court precedent that a jury must unanimously find an aggravating factor to be true in order to consider it during the penalty phase of a capital case.  Rather, the Supreme Court has made clear that "the constitutional prohibition on arbitrary and capricious capital sentencing determinations is not violated by a capital sentencing scheme that permits the jury to exercise unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty by statute." *Ramos,* 463 U.S. at 1008 n.22 (quoting *Zant*, 462 U.S. at 875).

Petitioner's argument for unanimous written findings fares no better.  *Williams*, 52 F. 3d at 1484-85 (California's death penalty statute "ensures meaningful appellate review, and need not require written jury findings in order to be constitutional"); *Harris v. Pulley*, 692 F.2d 1189, 1195-96 (1982*), judgment reversed by Pulley v. Harris*, 465 U.S. 37, 53-54 (1984) (upholding

California's death penalty process); *see also Hedlund v. Ryan*, 854 F.3d 557, 583-87 (9th Cir. 2017) (sentencer in a death penalty proceeding to fully consider all the mitigating evidence presented in the weighing process).

Thus, the state supreme court reasonably could find California's death penalty process is constitutional without requiring unanimous written findings pursuant to a standard of proof or presumption in favor of life. *Tuilaepa*, 512 U.S. at 979-80 (jurors need not be instructed at the penalty phase on the weighing process.)

Accordingly, the state supreme court reasonably could find that California's death penalty process is not unconstitutional by its failure to require the penalty jury's unanimous written findings on the truth of aggravating factors in returning a death verdict.

### (iv)   *Inter-case proportionality*

Petitioner's argues that California's capital sentencing scheme is arbitrary and capricious because it fails to require statewide inter-case proportionality review of death sentences. (Doc. No. 38 at 118 citing *Gregg v. Georgia*, 428 U.S. 153, 206 (1976) (upholding Georgia's use of proportionality review upon imposition of death penalty); *Parker,* 498 U.S. at 321-22 (disparity in sentencing characterized as mitigating evidence under Florida law).

Respondent argues that there is no clearly established federal authority requiring comparative proportionality review of death sentences. (Doc. No. 43 at 69 citing *Harris*, 465 U.S. at 50-51 ("There is thus no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed and the defendant requests it.").) He argues that proportionality of death is inherent in California's bifurcated capital trial process because petitioner intended to kill and was present for the murders. (Doc. No. 43 at 69-70.)

Here, the state supreme court reasonably rejected the Claim for the reasons stated by that court and those that follow.

Petitioner argues that California's failure to require proportionality review renders its death penalty statute arbitrary and capricious because twenty-nine of the thirty-four states that have capital punishment require comparative, or "inter-case" appellate sentence review. (Doc.

1  No. 38 at 118. )

2  However, there is no requirement that death sentences statewide be proportional.

3  Federal constitutional guarantees of due process and equal protection, and against cruel and

4  unusual punishment do not require inter-case proportionality review on appeal.  *Harris*, 465

5  U.S. at 50-51 ("There is thus no basis in our cases for holding that comparative proportionality

6  review by an appellate court is required in every case in which the death penalty is imposed and

7  the defendant requests it."); *see also Mai*, 57 Cal.4th at 1057 (2013) ("The federal constitutional

8  guarantees of due process and equal protection, and against cruel and unusual punishment (U.S.

9  Const., 6th, 8th, and 14th Amends.), do not require inter-case proportionality review on

10 appeal.").

11 Also as discussed above, the California's death penalty process, which narrows the class

12 of death eligible offenders to less than the definition of first-degree murder and permits

13 consideration of all mitigating evidence, has been approved by the Supreme Court.  *Tuilaepa*,

14 512 U.S. at 972-79; *Pulley*, 465 U.S. at 38.

15 Accordingly, the state supreme court reasonably could find that California's death

16 penalty process is not unconstitutional by its failure to require statewide inter-case

17 proportionality review of death sentences.

18                    *(v)    Vague, Arbitrary, Capricious Sentencing Factors*

19 Petitioner argues that California's capital sentencing scheme is unconstitutional because

20 "a number of the mitigating factors are vague, arbitrary, capricious and incapable of principled

21 application."  (Doc. No. 38 at 119 citing CALJIC 8.85.)  These vague terms, he argues, are

22 barriers to the proper consideration of mitigating evidence.  (*Id.*); *see also Mills v. Maryland*,

23 486 U.S. 367, 384 (1988) (verdict forms and instructions created substantial probability that

24 reasonable jurors may have thought they were precluded from considering mitigating evidence);

25 *Lockett*, 438 U.S. at 604 ("[T]he sentencer, in all but the rarest kind of capital case, [may] not be

26 precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or

27 record and any of the circumstances of the offense that the defendant proffers as a basis for a

28 sentence less than death."); *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (death penalty statute

148

must channel the sentencer's discretion by "clear and objective standards" that provide "specific and detailed guidance," and that "make rationally reviewable the process for imposing a sentence of death.").

Respondent argues that there is no clearly established Federal law that a jury must be instructed in a particular manner. (Doc. No. 43 at 70 citing *Buchanan v. Angelone*, 522 U.S. 269, 275-77 (1998) (the Eighth Amendment does not require that a jury be instructed on particular statutory mitigating factors).)

Here, the court finds the state supreme court was not unreasonable in rejecting the Claim, for the reasons stated by that court and those that follow.

As respondent observes, the Eighth Amendment does not require that a jury be instructed on particular statutory mitigating factors. *Buchanan*, 522 U.S. at 276 ("[T]he state may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence."). The Supreme Court repeatedly has upheld the constitutionality of California's death penalty pattern instructions. *See e.g.*, *Ayers v. Belmontes*, 549 U.S. 7, 24 (2006); *Brown v. Payton*, 544 U.S. 133, 142 (2005); *Boyde*, 494 U.S. at 386; *Tuilaepa*, 512 U.S. at 979.

Accordingly, the state supreme court reasonably could find that California's death penalty process is not unconstitutional on grounds "a number of the mitigating factors are vague, arbitrary, capricious and incapable of principled application."

(vi)   Prosecutorial Discretion

Petitioner argues that California's capital sentencing scheme is unconstitutional because prosecutors have "unbridled discretion in determining whether to seek the death penalty which is largely a political decision that varies by county, notoriety, race, and the proximity of the next election." (Doc. No. 38 at 119.)

Respondent argues that petitioner fails to point to clearly established federal authority guaranteeing capital defendants a right against unfettered prosecutorial discretion. (Doc. No. 43 at 73 citing *McCleskey*, 481 U.S. at 297 ("[Prosecutorial] discretion is essential to the criminal justice process," and does not in itself violate the federal Constitution.).)

149

1    Here, the court finds the state supreme court was not unreasonable in rejecting the

2   Claim, for the reasons stated by that court and those that follow.

3    The mere existence of prosecutorial discretion over charging decisions does not render a

4   capital punishment scheme unconstitutional.  *McCleskey*, 481 U.S. at 297.  This court has

5   rejected constitutional challenge to California's death penalty statute on grounds of unfettered

6   prosecutorial discretion.  *See e.g.*, *Catlin v. Davis*, No. 1:07-cv-01466-LJO-SAB, 2019 WL

7   6885017 at ** 228-29 (E.D. Cal. Dec. 17, 2019) ("The charging discretion of California

8   prosecutors is not unconstitutional and does not violate due process or separation of powers.").

9    Accordingly, the state supreme court reasonably could find that California's death

10   penalty process is not unconstitutional on grounds prosecutors have unbridled discretion in

11   determining whether to seek the death penalty.

12            *(vi)    Presumption of Life*

13    Petitioner argues that California's capital sentencing scheme is arbitrary and

14   capricious in violation of the Eighth and Fourteenth Amendments because it fails to

15   apply a presumption of life.  (Doc. No. 38 at 119 citing *Estelle v. Williams*, 425 U.S.

16   501, 503 (1976) ("[T]he presumption of innocence is a core constitutional value.").)

17    Respondent argues that petitioner fails to point to any clearly established federal

18   authority or juris prudence requiring death penalty statutes apply a "presumption of

19   life." (Doc. No. 43 at 73.)

20    Here, the court finds the state supreme court reasonably could deny the subclaim,

21   for the reasons that follow.

22    Petitioner fails to identify clearly established federal authority requiring application of a

23   "presumption of life."  His reliance upon *Williams* is misplace because that case relates to a

24   presumption of innocence, not a presumption of life.  425 U.S. at 503.  As respondent argues,

25   the absence of clearly established federal authority on this particular issue dooms the claim.

26   (Doc. No. 43 at 73-74 citing *Musladin*, 549 U.S. at 77.)

27    Furthermore, under California law "neither death nor life is presumptively

28   appropriate or inappropriate under any set of circumstances, but in all cases the

150

1    determination of the appropriate penalty remains a question for each individual juror."

2    *People v. Samayoa*, 15 Cal. 4th 795, 853 (1997); *Arias*, 13 Cal. 4th at 190 (finding no

3    merit to the claim that California's death penalty statute is unconstitutional on grounds it

4    "fails to require a presumption that life without parole is the appropriate sentence[.]").

5        Accordingly, the state supreme court reasonably could find that California's

6    death penalty process is not unconstitutional on grounds it fails to provide a presumption

7    of life.

8            d.        Conclusions

9        A fair-minded jurist could find the state supreme court's denial of the Claim was not

10   contrary to, or an unreasonable application of, clearly established Federal law, as determined by

11   the Supreme Court, or based on an unreasonable determination of the facts in light of the

12   evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

13       Claim XVII shall be denied.

14       *3.      Claim XVIII*

15       Petitioner alleges that the  death penalty violates international law and treaties.  (Doc.

16   No. 38 at 120-25.)

17            a.        State Court Direct and Collateral Review

18       Claim XVIII allegations were raised on direct appeal (Doc. No. 28-11 at AGO13745-

19   46), and denied on the merits, as follows:

20               Defendant contends that his death sentence violates international
                 law. He points to no authority that "prohibit[s] a sentence of death
21               rendered in accordance with state and federal constitutional and
                 statutory requirements." (*People v. Hillhouse* (2002) 27 Cal. 4th
22               469, 511, 117 Cal.Rptr.2d 45, 40 P.3d 754.)

23   *Rangel*, 62 Cal. 4th at 1235-36.

24            b.        Legal Standard

25            *(i)      Federal Habeas Jurisdiction*

26       Federal courts have habeas jurisdiction only to the extent that the petition asserts a

27   violation of "the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

28       Federal courts may grant habeas relief to persons who are in state custody as a result of

1  judgment rendered in violation of the Constitution or laws or treaties of the United States.   28

2  U.S.C. § 2241(c)(3).

3                               *(ii)     Cruel and Unusual Punishment*

4          The standard for cruel and unusual punishment is set out in section VIII H 2 b iii, herein.

5                    c.      Analysis

6          Petitioner argues the death penalty and the United States' use of it as a regular method of

7  punishment violates evolving international norms of human decency including as embodied by

8  treaty in the International Covenant of Civil and Political Rights ("ICCPR"), and by extension

9  violates the Eighth Amendment prohibition on cruel and unusual punishment, which itself

10 draws meaning from the evolving standards of decency that mark the progress of a maturing

11 society.  (Doc. No. 38 at 120-22; Doc. No. 45 at 30.)

12         Petitioner argues the Eighth Amendment prohibits the use of forms of punishment not

13 recognized by the civilized nations of Europe.  (Doc. No. 38 at 121-22 citing *Atkins,* 536 U.S. at

14 316 n.21 (basing determination that executing mentally retarded persons violated Eighth

15 Amendment in part on disapproval in "the world community"); *Thompson v. Oklahoma*, 487

16 U.S. 815, 830, n.31 (1988) ("We have previously recognized the relevance of the views of the

17 international community in determining whether a punishment is cruel and unusual.").)   He

18 argues that California's very broad death scheme violates the Eighth and Fourteenth

19 Amendments, and that petitioner's death sentence should be set aside.  (*Id.*)  Especially so, he

20 argues, given evolving international norms against imposition of the death penalty against

21 mentally disordered persons like him.  (Doc. No. 38 at 124-25.)

22         Petitioner further argues that California unconstitutional death penalty scheme with its

23 "excessive delays" between sentencing and appointment of appellate counsel and between

24 sentencing and execution of sentence violates the provisions of international treaties and the

25 fundamental precepts of international human rights.   He argues California's death penalty

26 scheme violates the ICCPR including its Article VI (prohibiting the arbitrary deprivation of

27 life), and Article VII (prohibiting "cruel, inhuman or degrading treatment or punishment.").

28 (Doc. No. 38 at 123; *see also* Doc. No. 38 at 125.)  He argues that federal courts are bound by

1    the ICCPR, ratified by the United States in 1990, pursuant to Article VI of the federal

2    Constitution (treaties stand as supreme law of the land).  (*Id.* at 123-24.)

3            Respondent responds by arguing that on deferential review, the state supreme court

4    reasonably rejected the Claim.  (Doc. No. 43 at 74-75.)  He argues that court correctly observed

5    petitioner's failure to identify clearly established federal authority requiring the states to

6    consider international law where a death sentence has been issued consistent with state and

7    federal constitutional and statutory requirements.  (*Id.*)  He argues that clearly established

8    federal authority has not held that death is constitutionally impermissible as punishment.  (*Id.*)

9            Here, the state supreme court reasonably denied the Claim.

10           The United States Supreme Court and the Ninth Circuit both have held that the ICCPR

11   is not enforceable in the federal courts.  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 734-35 (2004)

12   (UN Charter, Universal Declaration of Human Rights, and International Convention on Civil

13   and Political Rights do not create obligations enforceable in federal court); *Medellin v. Dretke,*

14   544 U.S. 660, 664 (2005) (Vienna Convention did not create individual judicially enforceable

15   rights); *Serra v. Lappin*, 600 F.3d 1191, 1197 (9th Cir. 2010) (ICCPR is not self-executing and

16   does not confer judicially enforceable rights).  The Supreme Court has refused to give domestic

17   effect to a treaty that, like the ICCPR, was ratified with a reservation that it was not self-

18   executing.  *Alvarez-Machain*, 542 U.S. at 735.  Moreover, the United States ratified the ICCPR

19   subject to reservation of the right to impose capital punishment subject only constitutional

20   constraints.  138 Cong. Rec. S-4781-01, S4783 (1992).

21           Petitioner does not point to clearly established Supreme Court precedent that at the time

22   his conviction became final, capital punishment was illegal in this country based on

23   international law or treaty.  (*See* Doc. No. 38 at 123-24 citing *United States v. Duarte-Acero,*

24   208 F.3d 1282, 1284 (11th Cir. 2000) (when the United States Senate ratified the ICCPR "the

25   treaty became, coexistent with the United States Constitution and federal statutes, the supreme

26   law of the land" and must be applied as written); *McKenzie,* 57 F.3d at 1487 (Norris, J.,

27   dissenting) (noting support in foreign courts for a *Lackey* claim); *cf. Beazley v. Johnson*, 242

28   F.3d 248, 266–67 (5th Cir. 2001) (American courts not bound by the ICCPR limitations on

1    capital punishment).

2         Challenges to imposition of the death penalty based upon international law and the law

3    of nations repeatedly have been rejected in federal court.  "[C]ourts that have considered the

4    question of whether international law bars capital punishment in the United States have

5    uniformly concluded that it does not."  *Buell v. Mitchell*, 274 F.3d 337, 376 (6th Cir. 2001); *see*

6    *also id.* at 373 (the abolition of capital punishment has not "risen to the level that the

7    international community as a whole recognizes it as jus cogens, or a norm from which no

8    derogation is permitted.").  In *Coleman v. Mitchell*, the Sixth Circuit explained that "the claim

9    that international law completely bars this nation's use of the death penalty is unsupportable

10   since the United States is not party to any treaty that prohibits capital punishment per se, and

11   since total abolishment of capital punishment has not yet risen to the level of customary

12   international law."  268 F.3d 417, 443 n.12 (6th Cir. 2001).  In *Carter v. Chappell*, the district

13   court noted that "[c]learly established [F]ederal law does not hold the death penalty to violate

14   international law or the federal Constitution."  2013 WL 781910 at *80, (C.D. Cal. Mar. 1,

15   2013).  Similarly, in *Rowland v. Chappell*, the district court rejected an essentially identical

16   claim, stating that "[p]etitioner cannot demonstrate that any claim of a violation of international

17   law is even cognizable on federal habeas review, given that such review is designed to address

18   claims that a petitioner is in custody in violation of the Constitution or laws or treaties of the

19   United States."  902 F. Supp. 2d 1296, 1339 (N.D. Cal. 2012).  Petitioner appears to concede as

20   much.  (Doc. No. 45 at 30, wherein petitioner states that "[he] maintains this [C]laim to preserve

21   his rights.".)

22        The California Supreme Court has found its death penalty process, when applied in

23   accord with state and federal statutory and constitutional requirements, does not violate

24   international law.  *People v. Lewis,* 43 Cal.4th 415, 539 (2008), *rejected on other grounds by*

25   *People v. Black*, 58 Cal. 4th 912 (2014).  That court has found International norms of human

26   decency do not render the death penalty, applied as a regular form of punishment, violative of

27   the Eighth Amendment.  *People v. Curl,* 46 Cal.4th 339, 362-63 (2009); *accord see People v.*

28   *Cowan*, 50 Cal. 4th 401, 510 (2010) (rejecting international law as a basis for finding

154

1  unconstitutional capital punishment and the lengthy delays it can entail); *People v. Bolden*, 29

2  Cal. 4th 515, 567 (2002) ("[W]e are not persuaded that international law prohibits a sentence of

3  death rendered in accordance with state and federal constitutional and statutory requirements.").

4       Petitioner's claim that international human rights norms preclude execution of mentally

5  disordered individuals like him is not a basis to find otherwise, for the reasons stated.  Although

6  the Constitution prohibits the execution of children and persons whose mental illness renders

7  them insane or incompetent, it does not prohibit the execution of the merely mentally ill.

8  *Roper*, 543 U.S. at 568-69; *Atkins*, 536 U.S. at 320-21; *Ford*, 477 U.S. at 410 (establishing that

9  the Eighth Amendment prohibits the execution of the insane).  Neither the Supreme Court nor

10  the Ninth Circuit has extended the *Atkins/Roper* protections to the mentally ill whose illness

11  does not reach that of incompetency or insanity.  *See e.g., Cornwell*, 2018 WL 934542 at *129.

12  To extend *Atkins* and *Roper* to prohibit the execution of the merely mentally ill would constitute

13  a new rule of constitutional law.  *Woodall*, 572 U.S. at 426 ("AEDPA's carefully constructed

14  framework would be undermined if habeas courts introduced rules not clearly established under

15  the guise of extensions to existing law).

16       Furthermore, incompetency-to-be-executed claims do not become justiciable until an

17  execution becomes imminent, and no execution date has yet been set for petitioner.  *Panetti*,

18  551 U.S. at 947; *Martinez–Villareal*, 523 U.S. at 644-45; *see also Pizzuto v. Tewalt*, No. 20-

19  36044, 2021 WL 1904595 at *5 (9th Cir. May 12, 2021) (in a 42 U.S.C. § 1983 proceeding,

20  considering ripeness in context of Idaho's alleged failure to provide information relevant to

21  execution protocol, the Circuit observed the method of execution claim becomes ripe when the

22  method is chosen).

23       Petitioner otherwise fails to show that international law creates a private right of action

24  prohibiting application of the death penalty in his case.  The principles of international law

25  apply to disputes between sovereign governments and not between individuals.  *Hanoch Tel-*

26  *Oren v. Libyan Arab Republic*, 517 F. Supp. 542, 545-47 (D.D.C. 1981).  The Ninth Circuit is in

27  accord that "customary international law is not a source of judicially enforceable private rights

28  in the absence of a statute conferring jurisdiction over such claims."  *Serra*, 600 F.3d at 1197.

The determination of whether customary international law prevents a state from carrying out the death penalty, when the state otherwise is acting in full compliance with the Constitution, is a question that is reserved to the executive and legislative branches of the United States government, as it their constitutional role to determine the extent of this country's international obligations and how best to carry them out.  *Buell*, 274 F.3d at 376; *accord Vieira*, 2015 WL 641433 at *178.

### d.      Conclusions

A fair-minded jurist could find the state supreme court's denial of the Claim was not contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

Claim XVIII shall be denied.

## I.     Claims Alleging Cumulative Error

### *1.      Claim XVI*

Petitioner alleges that he is entitled to habeas relief due to cumulative constitutional error.  (Doc. No. 38 at 114-17.)

### a.      State Court Direct and Collateral Review

Claim XVI allegations were raised in the state habeas corpus petition (Doc. No. 29-1 at AGO14682-85), and summarily denied on the merits (Doc. No. 31-7 at AGO16725).

### b.      Legal Standard

#### *(i)      Cumulative Error*

"The Supreme Court has clearly established that the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal."  *Parle v. Runnels,* 505 F.3d 922, 928 (9th Cir. 2007) (citing *Chambers,* 410 U.S. at 302–03); *see also Ybarra v. McDaniel,* 656 F.3d 984, 1001 (9th Cir. 2011) (quoting *Parle,* 505 F.3d at 933) (a federal court may grant a writ of habeas corpus on the basis of cumulative error "when there is a 'unique symmetry' of otherwise harmless errors, such that they amplify each other in relation to a key

1    contested issue in the case); *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996)

2    (citing *United States v. Wallace,* 848 F.2d 1464, 1476 (9th Cir. 1988)) ("Where, as here, there

3    are a number of errors at trial, a balkanized, issue-by-issue harmless error review is far less

4    effective than analyzing the overall effect of all the errors in the context of the evidence

5    introduced at trial against the defendant."); *Lucas v. Muniz*, No. 5:16-CV-02145-DDP-JC, 2020

6    WL 11039030 at *16 (C.D. Cal. July 30, 2020) (citing *Parle*, 387 F3d. 1045) (same).

7           Furthermore, this court has acknowledged a claim of cumulative error to grant relief

8    pursuant to a habeas corpus petition in the context of claimed ineffective assistance of counsel.

9    *Reinhardt v. Feller*, No. 1:08-cv-00329 LJO DLB HC, 2008 WL 5386802 at *12, n.4 (E.D. Cal.

10   Dec. 24, 2008), *report and recommendation adopted*, No. 1:08-cv-00329 LJO DLB HC, 2009

11   WL 256378 (E.D. Cal. Feb. 3, 2009).

12           In reviewing for cumulative error, the court must review all errors preserved for appeal

13   and all plain errors.  *United States v. Necoechea*, 986 F.2d 1273, 1282 (9th Cir. 1993), *as*

14   *amended on denial of reh'g* (Apr. 15, 1993).

15           The cumulative effect of trial errors can be a basis for habeas relief where there is a

16   "substantial and injurious effect or influence in determining the jury's verdict[.]"  *Brecht,* 507

17   U.S. at 637.

18                   c.    Analysis

19           Petitioner argues the cumulative effect of the constitutional errors raised in the federal

20   petition, discussed herein and summarized below, entitles him to a new guilt and penalty trial:

21

22   •      Two jurors acquainted with penalty phase witnesses were allowed to remain on
            the jury.

23   •      Evidence that the murder of Chuck Durbin was premeditated was insufficient.

24   •      Hearsay statements attributed to his son and co-defendant, that implicated him
25          were erroneously admitted despite the fact that the court had originally decided
            to use two separate juries for this very reason, before granting a severance.

26   •      Evidence of drug usage and drug dealing by victims Chuck Durbin and Juan
27          Uribe was erroneously excluded at the penalty phase, unfairly skewing victim
            impact evidence.

28   •      Irrelevant and highly emotional and inflammatory evidence that Cindy Durbin's

daughter had died of the flu and her son was autistic was erroneously admitted at the penalty phase.

- Hearsay statements by Natasha Durbin, who was never cross-examined, were erroneously admitted at the penalty phase.

- Petitioner's pinpoint instruction on motive was erroneously refused.

- The trial court erroneously refused to instruct that mitigation evidence need not be proven beyond a reasonable doubt.

- The trial court erroneously refused to instruct that favorable treatment to accomplices is mitigation evidence.

- The trial court erroneously upheld the jury's death verdict by finding, inter alia, that the murder of Chuck Durbin was premeditated.

- Petitioner was denied the effective assistance of trial counsel because:

  o Counsel failed to present an expert on alcohol impairment,

  o Counsel failed to present a cultural expert who would have explained how Petitioner's upbringing influenced his reaction when his son was shot and almost killed,

  o Counsel failed to present substantial then available mitigation evidence of the onerous conditions under which petitioner was raised, e.g. he was born with congenital syphilis; grew up in extreme poverty with lack of access to medical care and education; was plagued by severe untreated asthma; was exposed to toxic substances while working in the fields as a child; and experienced trauma from his father's alcoholism and physical abuse,

  o Counsel failed to present expert evidence of Petitioner's mental impairments, such as organic brain damage.

(Doc. No. 38 at 114-16 citing *Chambers*, 410 U.S. at 298 (combined effect of individual errors denied due process and a fair trial.)); *see also Taylor v. Kentucky*, 436 U.S. 478, 487 n.15 (1978) ("The cumulative effect of the potentially damaging circumstances of this case violated the due process guarantee of fundamental fairness."); *Thomas v. Hubbard*, 273 F.3d 1164, 1179-80 (9th Cir. 2000), *overruled on other grounds by Payton v. Woodford*, 299 F.3d 815 (9th Cir. 2002), *certiorari granted judgment vacated by Woodford v. Payton*, 538 U.S. 202 (2003) (analyzing cumulative error in an AEDPA habeas petition); *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001) (prejudice results from cumulative error). He argues that "if there were multiple errors at [his] trial, the cumulative effect of these errors would indeed be prejudicial."

1    (Doc. No. 45 at 29.)

2        Respondent responds that on deferential review, the state supreme court reasonably

3    denied the Claim.  He argues that petitioner fails to identify clearly established Federal law that,

4    on the facts and circumstance of this case, the cumulative effect of constitutional errors entitles

5    him to a new guilt and penalty trial.  (Doc. No. 43 at 64-65 citing *Moses*, 555 F.3d at 759-60

6    (citing *Musladin*, 549 U.S. at 76) (discussing the absence of a Supreme Court decision that

7    "squarely addresses the issue" before the court or establishes a general principle that "clearly

8    extends" thereto)); *see also Montana v. Egelhoff*, 518 U.S. 37, 53 (1996), citing *Chambers*, 410

9    U.S. at 298 (erroneous evidentiary rulings can, in combination, rise to the level of a due process

10   violation); *cf. Parle*, 505 F.3d at 927 (9th Cir. 2007) (citing *Chambers*, 410 U.S. at 298) ("[T]he

11   Supreme Court has clearly established that the combined effect of multiple trial court errors

12   violates due process where it renders the resulting criminal trial fundamentally unfair.").

13       Respondent argues that in any event, petitioner has not demonstrated the constitutional

14   errors he alleges were prejudicial when considered individually or cumulatively, or that his trial

15   was fundamentally unfair.  (Doc. No. 43 at 65 citing *McDonough Power Equipment, Inc*, 464

16   U.S. at 553 (litigants are entitled to fair trials but not perfect trials because there are no perfect

17   trials).)

18       The court finds that the state supreme court reasonably denied the Claim.  While there

19   appears to be some disagreement among the Circuits whether cumulative error doctrine is

20   clearly established under *Chambers* (*see e.g., Sanchez v. McDowell*, No. 22-CV-0192-GPC-

21   KSC, 2023 WL 27360 at *12 n.8 (S.D. Cal. Jan. 3, 2023) (cases collected therein)), there can be

22   no cumulative error where there is no individual error.  *United States v. Solorio*, 669 F.3d 943,

23   956 (9th Cir. 2012); *see also Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) (if "no error of

24   constitutional magnitude occurred, no cumulative prejudice is possible").

25       As the court has explained above, the state court had a reasonable basis for finding no

26   error occurred with regard to each of petitioner's Claims.  Petitioner's cumulative error claim

27   necessarily fails.

28           d.    Conclusions

159

1      A fair-minded jurist could find the state supreme court's denial of the Claim was not

2  contrary to, or an unreasonable application of, clearly established Federal law, as determined by

3  the Supreme Court, or based on an unreasonable determination of the facts in light of the

4  evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

5      Claim XVI shall be denied.

6                  IX. EXHIBITS TO THE § 2254 PETITION

7      Petitioner appends to the federal petition six (6) Exhibits from state court proceedings

8  for Little Pete, who was tried separately after petitioner.  (Doc. No. 38-1 through 38-6.)  The

9  Exhibits were not presented to the California Supreme Court and are not part of the state record

10  now before the court.

11      The parties stipulate that "[t]hese Exhibits were submitted in support of the procedural

12  history and the statement of facts . . . [and] do not affect any of the claims."  (Doc. No. 40 at 2.)

13      In any event, the court is precluded from considering the Exhibits, newly submitted in

14  federal court, because petitioner has not passed through the § 2254(d) gateway, for the reasons

15  stated.  *Pinholster*, 563 U.S. at 181, 185 n.7; *see also Schriro v. Landrigan,* 550 U.S. 465, 473-

16  74 (2007) (for claims that were adjudicated on the merits in state court, a petitioner can only

17  rely on the record that was before the state court to satisfy the requirements of § 2254(d));

18  *Holland v. Jackson,* 542 U.S. 649, 652-53 (2004) (finding that the restrictions of § 2254(e)(2)

19  "apply *a fortiori* when a prisoner seeks relief based on new evidence *without* an evidentiary

20  hearing") (emphasis in original); *accord Colegrove v. Hoshino*, No. 13-CV-00096-BLF, 2014

21  WL 4421393 at *2 (N.D. Cal. Sept. 5, 2014).  It follows that where a state court denies the

22  claim on the merits, an expanded record cannot be considered in determining whether the state

23  court's decision was objectively unreasonable.  *Rogovich v. Ryan*, 694 F.3d 1094, 1096-97  (9th

24  Cir. 2012) (citing *Pinholster,* 563 U.S. at 180); *cf.* SECT 2254 Rule 7.

25                  X. CERTIFICATE OF APPEALABILITY

26      Because this is a final order adverse to the petitioner, Rule 11 of the Rules Governing

27  Section 2254 Cases requires this court to issue or deny a Certificate of Appealability ("COA").

28  Accordingly, the court *sua sponte* has evaluated the Claims within the petition for suitability for

1    the issuance of a COA.  28 U.S.C. § 2253(c); *Turner*, 281 F.3d at 864-65.

2         A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a

3    district court's denial of his petition, and an appeal is only allowed in certain circumstances.

4    *Miller-El*, 537 U.S. at 335-36.  The controlling statute in determining whether to issue a COA is

5    28 U.S.C. § 2253, which provides that:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c) (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from -
>
> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>
> (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

21        The court may issue a COA only "if jurists of reason could disagree with the district

22   court's resolution of [petitioner's] constitutional claims or that jurists could conclude the issues

23   presented are adequate to deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at

24   327; *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (same); *Lambright v. Stewart*, 220

25   F.3d 1022, 1025 (9th Cir. 2000) (same).  While a petitioner is not required to prove the merits of

26   his case, he must demonstrate "something more than the absence of frivolity or the existence of

27   mere good faith on his . . . part."  *Miller-El*, 537 U.S. at 338.

28        In the present case, the court finds that, with respect to the following Claims, reasonable

1   jurists could disagree with the court's resolution or conclude that the issues presented are

2   adequate to deserve encouragement to proceed further: Claims XIII and XIV.

3        Therefore, a COA shall be granted as to these two Claims.  As to the remaining Claims,

4   the court concludes that reasonable jurists would not find the court's determination that

5   Petitioner is not entitled to relief debatable, wrong, or deserving of encouragement to proceed

6   further. The court shall decline to issue a COA as to the remaining Claims.

7                                    XI. ORDER

8        Accordingly, IT IS HEREBY ORDERED that:

9        1.  The Petition (Doc. No. 38) is DENIED, Claims I-XVIII are denied on the merits.

10       2.  A Certificate of Appealability is ISSUED as to the court's resolution of Claims XIII

11  and XIV, and DECLINED as to the remaining Claims.

12       4.  Any and all scheduled dates are VACATED, and

13       5.  The Clerk of the court is directed to SUBSTITUTE Ron Bloomfield, Warden of San

14  Quentin State Prison, as the respondent warden in this action, and to ENTER JUDGMENT

15  accordingly.

16

17

18  IT IS SO ORDERED.

19     Dated:   August 21, 2023     _____

20                                  UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

27

28